UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BAYERISCHE LANDESBANK, NEW YORK BRANCH, | **12 CV 3294** |
| Plaintiff, | Civil Action No. |
| v. | **COMPLAINT** |
| BARCLAYS CAPITAL INC., BARCLAYS BANK PLC, STATE STREET GLOBAL ADVISORS, STATE STREET BANK AND TRUST COMPANY, and STATE STREET CORPORATION, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants. | <u>**ECF CASE**</u> |

U.S. DISTRICT COURT
FILED
APR 25 2012
S. D. OF N.Y.

RECEIVED
2012 APR 25 P II: 30
U S DISTRICT COURT SDNY

Plaintiff Bayerische Landesbank, New York Branch ("BayernLB" or "Plaintiff"), by its attorneys Bernstein Litowitz Berger & Grossmann LLP, for its Complaint herein against Barclays Capital Inc., Barclays Bank plc, State Street Global Advisors, State Street Bank and Trust Company, and State Street Corporation (collectively, "Defendants"), alleges as follows:

## I.   <u>SUMMARY OF THE ACTION</u>

1.      This action arises from a fraud perpetrated by Defendants who misrepresented the single most important fact concerning the purportedly "AAA"-rated notes issued by the Markov collateralized debt obligation ("CDO") structured, designed and marketed by Barclays Capital Inc. ("Barclays"). Specifically, Barclays led BayernLB to believe that the more than $57 million of Markov notes it purchased were backed by assets that had been independently evaluated and selected for their credit quality, and which justified the "AAA" credit ratings assigned to the CDO notes. Defendants represented that the selection and management of the CDO collateral assets was delegated to State Street Global Advisors ("State Street")—an experienced CDO manager whose sole duty was to maximize return to benefit Markov and its noteholders, independent of Barclays. Defendants' representations about State Street's role as the independent Collateral Manager were critical to BayernLB because Barclays's other roles in the transaction precluded it from serving as Collateral Manager for the Markov CDO.

2.      In truth, the Collateral Manager for the Markov CDO—State Street—did not independently "select" the assets included in the CDO using an investment strategy that was "disciplined and seeks to control risk," "designed to produce consistent returns," and "designed to ensure that appropriate due diligence is conducted prior to any security purchase," As the Defendants represented. Indeed, the referenced assets were not "selected" by State Street at all. Instead, unbeknownst to BayernLB and contrary to the statements in Markov's offering

materials, **Barclays itself** selected and even created certain of the assets referenced by Markov because it **knew** those assets would fail, and that Barclays would profit as a result.

3.     Specifically, Barclays designed and exploited Markov as a proprietary trading platform through which Barclays was able to reap illicit profits at the expense of Markov's noteholders, including BayernLB.  As such, Barclay's manipulation of Markov, a $2 billion "Hybrid Synthetic/Cash High-Grade CDO," was similar to the misconduct of other Wall Street banks criticized by the congressional Financial Crisis Inquiry Commission ("FCIC") for using the "CDO Machine" to profit while foisting losses on their clients – conduct the FCIC cited as a cause of the financial crisis.  Like many CDOs, Markov was backed by mortgage-related collateral.  Specifically, 10% of the assets backing Markov were "cash assets," consisting of actual residential mortgage-backed securities ("RMBS") and other asset-backed securities purchased and held by Markov with proceeds derived from the sale of CDO notes to investors. The remaining 90% of Markov's collateral consisted of "synthetic assets."  The synthetic assets were not actually purchased and held by the CDO but, instead, consisted of Credit Default Swaps ("CDS") and Total Return Swaps ("TRS") which, in turn, referenced RMBS.

4.     The CDS and TRS were structured such that the value of the Markov notes would track the performance of the underlying RMBS referenced by the synthetic assets.  Through these swaps, the CDO effectively "insured" the value of a portfolio of referenced collateral assets, and in return received regular payments from the swap counterparty—akin to insurance premiums—in exchange for that guarantee.  If the value of the referenced assets declined, the CDO was required to "swap" with its counterparty and make payments to cover any shortfall. Thus, any decline in the value of the referenced assets caused a loss to the CDO and its noteholders.  In this sense, the CDO (and, by extension, the CDO's noteholders, such as BayernLB), were "long" the referenced CDS assets – standing to profit if the underlying

mortgages performed – while the CDS counterparty was "short" those same assets, and stood to profit if the underlying assets failed.

5.      Critically, Barclays served as the Synthetic Asset Counterparty for the CDS and TRS Assets in the Markov CDO, meaning that it was effectively "short" 90% of the $2 billion notional value of the CDO at its inception.  That is, *Barclays was "short" the assets backing the Markov and stood to profit if those assets failed*.

6.      In order to address the obvious conflict posed by Barclays' "short" position as the CDO's swap counterparty, the Defendants represented that the selection of Markov CDO assets would be determined by a purportedly independent collateral manager, State Street.  Because Barclays stood to profit if the collateral underperformed, it clearly could have no role in the selection of that collateral.  By installing State Street as an independent arbiter whose "*sole*" duty was to ensure that the credit quality of the referenced assets was appropriate and sufficient to generate the returns and stability promised to the Markov CDO noteholders, BayernLB was assured that Markov would perform as represented and that the selection of collateral would not be influenced by Barclays' interest as the CDO's swap counterparty.

7.      Those assurances were false.  State Street has now *admitted* that the importance of an independent collateral manager to investors "*cannot be overstated*."  State Street made that admission in connection with its agreement to pay $5 million in penalties and fines to resolve an action by the Massachusetts Securities Division alleging that it misrepresented its role as a collateral manager in another collateralized debt obligation.

8.      While BayernLB accepted the disclosed risks of investing in Markov, and conducted its own analysis to assess and verify the risks described in the Markov offering materials, it did not accept, and could not discover, the concealed risk that Barclays would secretly and fraudulently exploit Markov for its own benefit by manipulating the selection of

Markov's collateral.  As Barclays ensured, through its control over the selection of the CDO assets, Markov defaulted just over six months after it was issued, and BayernLB lost its entire investment while Barclays reaped profits from its short position.

9.     Through this action, BayernLB seeks to recover the losses caused by Defendants' misconduct, including compensatory and/or rescissory damages against Defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, fraud, fraud in the inducement, aiding and abetting fraud, breach of fiduciary duty, negligent misrepresentation, and breach of contract.

## II.     **JURISDICTION AND VENUE**

10.     This Court has subject matter over this matter pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

11.     Venue is proper pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §§1391(b) and (c), as a substantial part of the events and/or omissions and/or their effects giving rise to the claims asserted herein occurred in this District.  Specifically, Barclays' creation and structuring of Markov, and the authorship and dissemination of marketing materials and communications to investors, including its communications to BayernLB, occurred in New York.

12.     Venue is also appropriate under Markov's governing documents, which provide that the notes purchased by BayernLB "will be governed by, and construed in accordance with, the laws of the State of New York," and that the relevant parties have or will "submit irrevocably" to the jurisdiction of the courts of the State of New York and the courts of the United States of America in the State of New York (in each case sitting in the County of New York) for the purposes of hearing and determining any suit, action or proceedings or settling any disputes arising out of or in connection with the Markov notes.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, and the facilities of national securities markets.

## III.   THE PARTIES

### A.     Plaintiff

14.     Plaintiff Bayerische Landesbank, New York Branch ("BayernLB" or "Plaintiff") is licensed by the Office of the Comptroller of the Currency with an office located in New York, New York.  BayernLB operates as a branch of Bayerische Landesbank.

### B.     Defendants

15.     Defendant Barclays Capital Inc. ("Barclays") is a corporation organized under the laws of Delaware, with principal offices located at 200 Park Avenue, New York, New York 10166.  Barclays created, arranged, structured and underwrote Markov, acted as the initial purchaser of Markov's notes, and marketed and sold Markov's notes in New York, including to BayernLB, and was the holder of Markov's "Super Senior" tranche, as discussed below. Markov's Offering Circular, which was prepared by Barclays and State Street (defined below), advised investors seeking further information concerning Markov notes to contact Barclays' CDO/Structured Funds Group at Barclays' New York address on Park Avenue.

16.     In marketing Markov to investors, Barclays, together with State Street, prepared and disseminated to BayernLB and other Markov investors information concerning the Markov CDO, including (a) a "pitchbook" dated March 2007 (the "Pitchbook"), (b) an "offering circular" dated May 1, 2007 (the "Offering Circular"), (c) the Collateral Management Agreement between Markov and State Street Bank and Trust Company, acting through State Street Global Advisors, dated May 1, 2007 (the "Collateral Management Agreement"), and (d) the Markov CDO I Indenture, dated May 1, 2007.   The Pitchbook, Offering Circular, Collateral Management

Agreement, and Indenture are referred to herein as the "Offering Materials." The Pitchbook states that it was prepared by Barclays, that Barclays "accepts responsibility for the distribution of this document in the United States," and that "any transactions by U.S. persons in any security discussed herein must only be carried out through" Barclays. As set forth below, the Offering Materials prepared and disseminated by Barclays and State Street contained materially misleading misrepresentations and omissions of fact. In addition, Barclays made further misrepresentations to BayernLB concerning Markov in direct, private communications, as set forth below.

17. Barclays Bank plc ("BBPLC") is a public limited company organized under the laws of England and Wales under number 1026167, with principal offices located at 1 Churchill Place, London, E145HP, and with United States offices at 200 Park Avenue, New York, New York 10166.

18. BBPLC controls Barclays and, through it, conducts investment banking operations in the United States. BBPLC and Barclays have the same United States address (200 Park Avenue, New York, New York 10016). Barclays' financial results are consolidated into and reported as part of BBPLC's financial results.

19. BBPLC, acting in concert with Barclays, served several roles in connection with the Defendants' scheme to profit off of Markov, including: (a) BBPLC arranged and underwrote the Markov notes and marketed and sold them to investors outside of the United States; (b) BBPLC served as Markov's CDS counterparty (the Synthetic Asset counterparty with respect to all of the Synthetic Assets acquired by Markov prior to the closing date of the Markov offering); and (c) BBPLC provided "warehouse" financing and services through which Barclays assembled and held Markov's collateral assets prior to Markov's closing (at which time, the warehoused assets were transferred to Markov).

20.     Defendant State Street Global Advisors, Inc. ("State Street") is a global leader in asset management and is incorporated in Delaware, with its principal place of business at One Lincoln Street, Boston, Massachusetts 02111.  State Street is the asset management division of Defendant State Street Bank and Trust Company, which is in turned owned by Defendant State Street Corporation.

21.     As set forth in the Offering Materials, Barclays and State Street represented that State Street would serve as "Collateral Manager" for the Markov CDO.  As represented by Barclays and State Street, State Street's role as Collateral Manager was to purportedly act "*solely*" on behalf of Markov, the "Issuer," and in furtherance of the interests of its noteholders by, among other things, (i) "determining the specific" assets to be contained in Markov, "taking into consideration, among other factors, the payment obligations of the Issuer" to investors like BayerLB, (ii) "acting on behalf of the Issuer with respect to the Issuer's rights and obligations under" any CDS and TRS transactions entered into by Markov, and (iii) "supervising and directing the investment and reinvestment" of Markov's collateral assets.

22.     In addition, in supervising and directing the investment of Markov collateral, State Street, as Collateral Manager, was required to "buy, sell, enter into or terminate Collateral Assets solely with the objective of maximizing the Issuer's return (applying criteria like those used by fixed income portfolio managers) and not with a view to actuarial pooling of independent risks or entering into offsetting transactions to profit from a bid-ask or similar spread."  State Street was also prohibited from acquiring any asset "in expectation that it or any obligation or security to which it refers will default or for the purpose of restructuring an obligation, security or arrangement or an obligor, issuer or counterparty."  Further, under the governing documents, State Street, as Collateral Manager, represented that it would "perform its obligations hereunder in good faith, using a degree of skill and attention no less than customarily

used by institutional managers of national standing in the management of assets of the nature and character" of the assets backing Markov.

23.     Defendant State Street Bank and Trust Company ("SSB&TC") is a bank organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located at One Lincoln Street, Boston, Massachusetts 02111.  SSB&TC is a wholly owned subsidiary of Defendant State Street Corporation, a publicly-registered financial holding company. SSB&TC, acting through its division State Street, is a signatory and party to the Collateral Management Agreement.

24.     Defendant State Street Corporation ("State Street Corp.") is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at One Lincoln Street, Boston, Massachusetts 02111.  State Street Corp. is a public-registered financial holding company for SSB&TC.  State Street represented that State Street Corp. was a "leading provider of financial services to institutional investors."

25.     At all relevant times herein, SSB&TC and State Street Corp. were controlling persons of State Street within the meaning of Section 20(a) of the Securities Exchange Act of 1934.  During the relevant time period, State Street's President and Chief Executive Officer William Hunt was also the Vice Chairman of State Street Corp., and Sean Flannery, State Street Chief Investment Officer, Americas, served as an Executive Vice President of State Street Corp. Any acts by State Street were caused and/or influenced by SSB&TC and State Street Corp. by virtue of their domination and control thereof.

26.     Relevant Non-Party Markov CDO I, Ltd. (the "Markov SPV") was an exempted company with limited liability incorporated on March 2, 2007 under the Companies Law (2004 Revision) of the Cayman Islands, with a registered office formerly located at the offices of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George

Town, Grand Cayman, Cayman Islands.  The Markov SPV was ordered into liquidation on or about January 22, 2008 by Barclays, in its capacity as the holder of Markov's super senior tranche.

27.     The Markov SPV, like every other CDO, was a special purpose vehicle ("SPV")—basically, a corporate "robot" that had as its sole purpose to serve as an intermediary through which all functions of the CDO were conducted.  Indeed, the Offering Circular stated that the Markov SPV was "established as special purpose vehicle for the purpose of the issuance of the Notes," that its activities were limited to acquiring the collateral portfolio and issuing the notes backed by that collateral, and that the Markov SPV had "no employees, prior operating history or prior business."

28.     The Markov SPV's few permissible activities were actually performed by other parties.  For example, Bank of New York Mellon, which served as Markov's CDO trustee, distributed the cashflows generated by the CDO assets to noteholders; State Street, as Collateral Manager, purportedly selected and managed the CDO collateral assets; Barclays, as warehouse provider, assembled, housed and financed the collateral assets prior to the issuance of the CDO. The rules governing the CDO's operations—how "money-in" cashflows generated by the CDO collateral assets were dispensed as "money-out" cashflows to various third parties (e.g., fees to the Collateral Manager, the trustee, and other obligors) and to CDO noteholders—were set forth in the Markov CDO I Indenture.  That document, among other things, dictated how principal and interest and other cash flows from the CDO assets would be distributed to Markov noteholders, the conditions under which the CDO or any of its notes would be considered to be in default, and the steps that would be followed in such a circumstance.  Those rules were written by Barclays.

## IV.    BACKGROUND ON CDOs AND MARKOV

29.    A CDO is an investment vehicle that is generally constructed by forming an SPV, which raises money through the sale of securities to investors.  The securities sold to investors are generally backed by a portfolio of investment assets whose expected cash flows serve as the source of income to pay the CDO noteholders.  Generally, CDOs issue notes in several distinct classes, or tranches, each of which is entitled to the proceeds generated by the CDO's assets in a specified order according to a defined priority known as the "waterfall."  The most senior tranches have the first priority to receive proceeds from the CDO, and therefore bear the lowest risk of loss and carry the highest credit rating; such senior tranches typically receive payments of principal and interest before the junior tranches. Conversely, lower or more junior tranches only receive payment after more senior tranches have been paid, and thus have higher risk of loss and, consequently, lower credit ratings.

30.    The differing levels of risk of loss on the CDO collateral are reflected in the varying yields paid by different tranches of CDO notes.  The more senior, "safer," higher-rated tranches received lower coupon payments while more junior, "riskier," lower-rated tranches received higher coupon payments.

31.    BayernLB purchased the most senior, highest-rated Markov notes, which bore a triple-A rating and were purportedly the safest securities offered by Markov—the last to suffer any losses through Markov's waterfall structure.

32.    While CDOs can be supported by many different kinds of collateral, the primary source of collateral backing Markov—as with the majority of the CDOs issued from 2005 through 2007—consisted of RMBS.  RMBS are securities backed by pools of mortgage loans, which entitle investors to a stream of income derived from the payments of principal and interest

by the borrowers on those mortgages.  RMBS, like CDOs, are divided up into tranches with varying levels of credit ratings, subordination and yields.

33.     As noted by the FCIC, CDOs often included as collateral lower-rated RMBS tranches—the "mezzanine" or "BBB"-rated tranche.  Even though these CDOs consisted of some of the riskier tranches of RMBS, the Defendants represented (and the rating agencies accepted) that, when the cash flows from such securities properly structured (such as through tranches in a "waterfall" described above), a large pool containing many different BBB-rated RMBS assets can provide diversification benefits that can produce secure, AAA-rated securities. Increasingly, based on the same theory that the amalgamation, structuring and tranching of cash flows from subprime mortgages can produce AAA-rated securities, CDOs began to include as collateral *other CDOs* that were, in turn, backed by lower-rated "BBB"-rated RMBS.  Wall Street banks termed CDOs backed by primarily BBB collateral as "Mezzanine CDOs." CDOs backed by "safer," higher quality assets—such as higher-rated A, AA and AAA-rated RMBS tranches—were termed "High Grade CDOs."  Markov was marketed by Defendants as a "High Grade CDO."  As the Offering Materials represented, this meant that the complex structure of the Markov CDO designed by Defendants, coupled with the careful selection of collateral by State Street as an independent Collateral Manager, ensured that the senior notes issued by Markov (and purchased by BayernLB) were secure investments deserving of the "AAA" ratings they carried.

34.     In Markov, Barclays took the financial alchemy behind the CDO structure one step further by including *synthetic* assets as collateral. Unlike traditional "cash" CDOs backed by actual RMBS notes purchased and held by the CDO, "synthetic" CDOs replace "cash" assets with "synthetic" assets that merely reference actual RMBS assets.  Barclays represented that the use of synthetic assets would enable State Street "to design a portfolio selected from a broader

pool of collateral than available in cash" and that the structure would be more efficient because of reduced funding costs, as the "absence of a liquidity provider or term facility improves overall transaction structure and efficiency."   Unlike a cash CDO, a synthetic CDO does not have to raise $1 billion in investments to gain exposure to its $1 billion collateral portfolio.  Instead, a synthetic CDO typically issues two sets of notes: (1) a set of "funded" tranches, from unrated equity notes to AAA notes (such as those purchased by BayernLB in Markov), to raise a set amount of up-front funds that the CDO can hold in a reserve account and call on for initial credit protection payment payouts; and (2) an "unfunded" super senior tranche (in essence, a "no money down" promise from another party to provide the CDO with whatever further funds it may need should collateral portfolio losses exhaust the CDO's up-front funding in the reserve account).  In Markov, Barclays was the sole holder of the "unfunded" super senior tranche.

## V.   BARCLAYS' CONFLICTED ROLE IN THE MARKOV CDO

35.   Banks that arrange CDOs typically perform multiple roles, including: (a) structuring and modeling the CDOs; (b) marketing and selling the CDOs' notes to investors; (c) retaining ratings agencies to provide ratings for the CDOs' tranches; (d) financing and facilitating the purchases of the cash collateral and holding—or "warehousing"—that collateral on their own books prior to closing; and (e) facilitating hybrid structures by acting as the initial protection buyer for CDS included in the synthetic collateral pool.  Moreover, because the SPV that serves as the deal's issuer does not have any employees of its own, the arranging banks usually act for the issuer and serve as the underwriter, or "initial purchaser," that buys all of the notes from the issuer at closing and then selling them to investors.  For performing these functions, arranging banks typically receive millions of dollars in fees at closing.  Barclays performed all of these functions with respect to Markov.

36.     As noted above, Barclays structured Markov to be a hybrid CDO containing both cash and synthetic assets.   A simplified description of Markov's structure shows how this worked in practice.   The proceeds from the sale of $400 million in Markov notes was used as follows:  $200 million was used to purchase the "cash" RMBS assets that comprised 10% of Markov's $2 billion in collateral, while the remaining $200 million was deposited into a reserve account that served as the initial source of funding for Markov's contingent obligations under the CDS with Barclays, and which provided Barclays with protection on the remaining $1.8 billion in synthetic "referenced" collateral.   Because Markov's CDS and TRS contracts with Barclays were contingent—i.e., Barclays would only receive payments under the terms of CDS and TRS if the synthetic collateral performed poorly—Barclays was able to build a $2 billion investment with only $400 million in initial "up-front" funding.   Markov would use the $200 million "reserve" account funds first to pay to Barclays any payments owed as swap counterparty, and then could liquidate the $200 million in "cash" RMBS assets to pay Barclays any amounts exceeding $200 million.

37.     In the event the $400 million in "real" assets were insufficient—i.e., the $200 million in funds from the reserve account are exhausted and the $200 million in Markov's funded cash assets are liquidated and used to pay the swap counterparty—Barclays would still be in the hook for the $1.6 billion portfolio.   In such a case, Markov's "unfunded" Super Senior Class S notes were obligated to make any payments owed to the swap counterparty.   The sole holder of the Super Senior notes, however, was Barclays itself.   Accordingly, when the deal closed, Barclays had no actual exposure to loss as the holder of the Super Senior Class S notes.

38.     In such a circumstance, Barclays stood on both sides of the transaction—in its role as swap counterparty, Barclays had the right to payment arising from Markov's $1.8 billion in swap obligations but, as Super Senior noteholder, Barclays itself was the party ultimately on

the hook for those payments.  In other words, in the event Markov's synthetic referenced collateral experienced losses requiring CDS payments in excess of $400 million, Barclays (as swap counterparty) would essentially be demanding payment from itself (as Super Senior noteholder).  Thus, in the event Markov's collateral failed, Barclays stood to receive the $200 million being held in reserve as well as the proceeds of the sale of the $200 million of real assets held as "cash collateral."  Moreover, as the Super Senior noteholder, Barclays was granted significant rights as the sole member of the "controlling class" of Markov noteholders, including the ability to force the trustee to liquidate the CDO's collateral under certain events of default, which Barclays used to its advantage.

39.     Because of the potential conflict created by Barclays multiple roles in the Markov CDO—and particularly the conflicts created by Barclays' role as a synthetic counterparty to the CDO—State Street's role as independent Collateral Manager was of utmost importance to investors.  In theory, the Collateral Manager's independent role of determining which assets would be included in the collateral portfolio ensured that Barclay's – which stood to profit if that synthetic collateral failed – would not be able to influence the selection of collateral in a way that served its own interests but not those of the investors in Markov notes.  In other words, because Barclays' "short" interest was dependent upon collateral selected independently by State Street—and not comprised of collateral that Barclays selected for itself—investors were assured that the risks posed by Barclays' conflicted positions would not impact the CDO's performance.

## VI.    BARCLAYS EXPLOITS ITS CONTROL OVER MARKOV'S COLLATERAL TO BET, AND PROFIT, ON ITS COLLAPSE

40.     Barclays executed its scheme to maximize its bet against Markov's synthetic assets by influencing and controlling State Street's purported "independent" selection of the composition and quality of the CDO collateral.  An analysis of Markov's actual collateral

demonstrates that (i) Markov contained an extraordinarily high percentage of securities from other CDOs as collateral, (ii) of the CDO securities included in or referenced by Markov, an extraordinarily high percentage were among the riskiest of this risky asset class, and (iii) that Markov even included CDO assets that Barclays and State Street custom-built for Markov—the so-called "Markov Chain" CDOs—that, despite their triple-A ratings, were among the riskiest collateral included in Markov.

41.     Markov's $2 billion in collateral can be broken down as follows:  Markov used $200 million in proceeds from "funded" notes (including the $57 million paid by BayernLB) to purchase actual "cash" collateral.  That "cash" collateral consisted of $95 million in RMBS and $105 million in tranches of other CDOs.  Markov's remaining $1.8 billion in *synthetic* collateral was comprised of $1.25 billion in swaps referencing RMBS assets and $550 million in swaps referencing tranches of other CDOs.  Put another way, Markov was comprised of $1.345 billion in RMBS (holding $95 million in "cash" RMBS assets and referencing $1.25 billion in synthetic RMBS exposure), and $655 million in CDOs (holding $105 million in "cash" CDO tranches and referencing $550 million in synthetic CDO exposure).

42.     Significantly, Markov was structured with a 35% "CDO bucket," meaning that up to $700 million of Markov's $2 billion collateral portfolio could consist of CDO assets—a larger "CDO bucket" than any Barclays CDO created during the prior 3 years, and nearly double the average "CDO buckets" contained in other High Grade CDOs.  Markov's CDO bucket was then filled with $655 million of CDO collateral, representing 32.75% of Markov's total $2 billion portfolio.

43.     Barclays further influenced the collateral referenced by Markov (and the odds that its bet would pay off) by designing "bespoke" synthetic CDOs that were custom-built to serve as collateral for Markov.  Specifically, Barclays caused Markov to enter into $300 million in

CDS—an amount representing 15% of Markov's total portfolio—that referenced the tranches of 12 "Markov Chain" CDOs which, in turn, referenced other RMBS assets. While the "Markov Chain" CDOs were each assigned AAA ratings—creating the impression they were among the safest of Markov's collateral assets—they were, in fact, among its riskiest.

44.      In the Markov Chain CDOs, Barclays designed a reference asset with the exact characteristics and parameters it desired through the use of creative swap engineering. Specifically, the "Markov Chain" CDOs referenced single tranches from bespoke mezzanine CDOs—synthetic assets that mimicked the performance of a single tranche of a hypothetical fully-structured CDO—that were created by Barclays and State Street for the sole and express purpose of serving as collateral for Markov. The ultimate collateral backing these creative products, however, were they very assets Barclays wanted to bet against: a portfolio of subprime BBB-rated RMBS tranches hand-picked by Barclays and State Street.

45.      Significantly, while the Markov Chain CDOs were assigned the same AAA-rating as other CDOs included in Markov, the attachment and detachment points in the Markov CDOs—the points at which (1) the tranche experiences its first dollar loss and (2) suffers 100% in losses—were far lower and thus much more exposed to the risk of loss on the underlying collateral. By manipulating the structure of the Markov Chain CDOs to increase the risk borne by the tranches in which Barclays and State Street caused Markov to invest, Barclays and State Street were able to mask the risk that they had placed into Markov.

46.      Having controlled the selection of the synthetic collateral to be included in Markov, Barclays also wanted to insure that its bet against those synthetic assets (as Markov's CDO counterparty) would pay off. It did so by ensuring that the "cash" collateral purchased by Markov would be of higher quality than the synthetic collateral Markov was betting against. That is, while the performance of the "synthetic" reference assets determined whether Barclays

would be entitled to payment on its short position, half of that payment was dependent upon the continued performance of the $200 million in "cash" collateral held by Markov. (The other half of Barclays' payout would be drawn from the $200 million reserve held by Markov.) For this reason, Barclays included in Markov better quality "cash" CDO and RMBS assets than the riskier "synthetic" CDO and RMBS assets that it bet against.

## VII.   DEFENDANTS' FALSE AND MISLEADING MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT IN THE OFFERING MATERIALS

47.    Barclays' bet against Markov and Barclays' ability to guarantee that its wager would pay was concealed by Defendants' misrepresentations. Specifically, the Offering Materials on which Plaintiff relied in purchasing the Markov notes contained numerous misrepresentations of material fact, or omitted to state material facts necessary to make the statements therein not misleading. Those misrepresentations included: (i) the fact that State Street had ceded control over the selection of Markov assets to Barclays, (ii) the due diligence process State Street purportedly used to select the Markov assets, (iii) the true nature of the collateral backing Markov and Barclays' disbelief in the credit ratings assigned to that collateral, (iv) Barclays' improper use of its ability to withhold "consent" to control State Street's selection of Markov's collateral assets, and (v) Barclays' scheme to design Markov to fail so that Barclays could profit off of its "short" position and/or reduce its own exposure to similar or correlated CDO and RMBS positions on its own books.

48.    Barclays and State Street represented in the Offering Materials that State Street would serve as the Collateral Manager that would select Markov's assets. The Pitchbook represented that "State Street Global Advisors, a division of State Street Bank & Trust Company (SSgA) will act as collateral manager for Markov," and touted State Street's expertise and experience in managing other CDOs. A visual depiction of Markov's "Structural Overview"

likewise reflected this purported role, showing State Street *alone* in charge of the "management" of Markov.  According to the Pitchbook, State Street's CDO "philosophy" was to "[m]anage portfolios that do not rely on credit or interest rate structural elements" such as "excessive CDO buckets."

49.     The Pitchbook also provided detail concerning the process by which State Street was to perform this role, including the four steps—(1) Develop Macroeconomic View, (2) Identify Portfolio Opportunities, (3) Security Selection, and (4) Surveillance Process—that State Street purportedly followed to select the assets to be included in Markov.  Among other things, in managing CDO collateral, State Street stated that it performs a qualitative analysis on the underwriting standards and creditworthiness of collateral; uses delinquency, default and recovery projections and considers the level of credit enhancement, and performs a quantitative analysis that employs a regression analysis that is used to predict defaults in each loan pool and predicts cash flows that are tested in multiple stress scenarios.  Indeed, 35 pages of the Markov Pitchbook are devoted to addressing State Street's role and expertise as Collateral Manager in the deal.

50.     The Offering Circular contained similar misrepresentations, describing State Street's fixed income process as "designed to produce consistent returns," by "pursu[ing] an asset management style that is disciplined and seeks to control risk."  According to the Offering Circular, State Street's investment process:

> seeks to provide an efficient process to identify and execute potential structured product investment opportunities. The investment process addresses not only the front-end analysis and purchase decisions, but also the on going surveillance of the portfolio. This process is designed to ensure that appropriate due diligence is conducted prior to any security purchase, and appropriate monitoring of security performance is conducted on a regular basis for as long as the security remains in the portfolio.

51.     The Offering Circular also repeatedly represented that **State Street** would "select" the assets to be included in Markov.  For example, the Offering Circular represented that, at

closing, the "issuer [Markov] will have Acquired, or will have entered into binding agreements to Acquire, a portfolio of Collateral Assets *selected by the Collateral Manager*"; that the " Initial Synthetic Asset Counterparty will enter into CDS Assets with the Issuer at the request of the Collateral Manager"; and that the "performance of the Collateral Assets and Eligible Investments depends heavily on the skills of the Collateral Manager in analyzing, selecting and managing the Collateral Assets and Eligible Investments."

52.     The Collateral Management Agreement between State Street and Markov contained additional representations and promises concerning State Street's role as Collateral Manager.  Specifically, under that Agreement, State Street represented that it would "perform its obligations hereunder in good faith, using a degree of skill and attention no less than customarily used by institutional investors of national standing in the management of assets of the nature and character of the Collateral Assets" and that its "undertakings herein and under any other Transaction Document are subject to this standard of care."

53.     Under the agreement, State Street was to provide management services, including: (a) determining the specific Collateral Assets, Eligible Investments and Synthetic Asset Reserve Investments, to be Acquired or Disposed of by the Issuer, and effect such Acquisitions or Dispositions, taking into consideration, among other factors, the payment obligations of the Issuer on each Payment Date or any Redemption Date under the Indenture in so doing, and (b) acting on behalf of the Issuer with respect to the Issuer's rights and obligations under any Synthetic Asset Agreement and supervising and directing the investment and reinvestment of the CDO collateral "in accordance with the requirements set forth on Annex B hereto, the applicable provisions of the Indenture and any Synthetic Asset Agreement."  In turn, Annex B requires the "Issuer or any person acting on its behalf" to satisfy the following requirements, among others:

The Issuer or any person acting on its behalf decides whether to buy, sell, enter into or terminate Collateral Assets *solely with the objective of maximizing the Issuer's return* (applying criteria like those used by fixed income portfolio managers)…

***

The Issuer or any person acting on its behalf *does not Acquire a Collateral Asset in the expectation that it or any obligation or security to which it refers will default or for the purpose of restructuring an obligation, security or arrangement or an obligor, issuer or counterparty.*

54.    Further, the Collateral Management Agreement represented that State Street was charged with "monitoring the Collateral Assets, the Eligible Investments, the Synthetic Asset Reserve Investments and any Synthetic Asset Agreement, the Deposit Agreement and any Hedge Agreement on an ongoing basis, and [] providing to the Issuer, and to the Collateral Administrator on behalf of the Issuer, reports, schedules and other data to the extent the Issuer, or the Collateral Manager on behalf of the Issuer, is required to prepare and deliver such information under the Indenture, any Synthetic Agreement or the Collateral Administration Agreement, consistent with the requirements thereof."

55.    The above representations concerning State Street's role as an independent collateral manager with sole responsibility for selecting Markov's collateral assets to protect the interests of Markov investors—and whose very function was to protect against the risk that Barclays (in its role as Markov's swap counterparty) would be unable to select CDO collateral in a disinterested manner—were materially false and misleading.  State Street has already admitted that these representations were material to investors.

56.    Specifically, in connection with a Consent Order entered into between State Street and the Massachusetts Securities Division in connection with State Street's alleged misconduct in its role as Collateral Manager for another CDO, Carina CDO, Ltd., State Street

*admitted* that the Collateral Manager's role and importance to CDO investors "*cannot be overstated*":[1]

> The Investment Manager of a CDO is responsible for the selection, acquisition, management and disposition of collateral assets. Its services are governed by an Investment Management Agreement signed by manager and the CDO. The Investment Manager's selection, acquisition and management of collateral assets is required to conform with certain eligibility criteria (addressing asset type, credit ratings, and risk profile) set forth in documents setting the terms of the CDO investment, such as the Trust Indenture.
>
> In terms of the selection process, the Investment Manager must conduct appropriate due diligence on each asset before it is recommended for inclusion into the collateral pool. *The significance of the Investment Manager's front-end analysis cannot be overstated since it is the Investment Manager's duty to ensure that each asset selected for inclusion in the collateral pool comports with the predefined standards of quality and risk established by the eligibility criteria.*
>
> In terms of the acquisition and retention of collateral assets, the Investment Manager often creates or contributes to the sales and marketing materials (e.g., termsheets, flipbooks and offering circular) and participates in meetings with actual or potential investors.

57.     Contrary to Barclays' and State Street's representations in the Markov Offering Materials, State Street ceded control over the selection of Markov assets to Barclays, which Barclays used to structure a rigged bet that would pay off when the collateral assets failed. As in the Massachusetts Securities Division's action involving Carina, the analysis driving the investment decisions for Markov's collateral were not based on State Street's purported expertise and judgment, but were in fact driven by Barclays' desire to profit off of its "short" bet on Markov's collateral.

58.     The representations in the Offering Materials concerning Barclay's purported role to withhold "consent" to an asset selected by the Collateral Manager were also false and

---

[1] Consent Order, *In re the Matter of State Street Global Advisors (Carina CDO, Ltd.)*, Docket No. 2011-0023 (Mass. Sec. Div. Feb. 28, 2012)

misleading.  In particular, the Offering Materials represented that the assets selected by State Street for inclusion in Markov were subject to the "consent" of Barclays, in its role as "Warehouse Provider."  Given the extensive discussion and description of State Street's role in selecting Markov's collateral assets, as well as the expectation and common understanding in industry practice, such consent was understood to have served as a means for Barclays to "reject" bad assets (to which, as Warehouse Provider, Barclays would have direct exposure between the purchase of the assets and the formation of the CDO), not—as in fact occurred—for Barclays to force Markov to purchase risky assets it knew would fail.  Indeed, based on the extensive disclosures in the Offering Materials and in the context in which representation concerning Barclays' "consent" rights were made, investors understood that State Street, as Collateral Manager, would initially select assets based on their credit quality and expected performance (as determined by State Street through the extensive investment process described above), and that Barclays would confirm this initial judgment, given the risk it bore in having to retain (or "warehouse") the assets until the CDO closed.

59.    In truth, however, Barclays wielded its "consent" power in a manner that vitiated State Street's purported role as an independent Collateral Manager and the duties it had promised to perform under the Collateral Management Agreement.  Rather than provide an additional layer of protection to Markov investors, Barclays granted its consent for Markov to include assets it believed would fail, not to good assets, so that Barclays could maximize its profits on its "short" interest in Markov's collateral.

## VIII.  DEFENDANTS ACTED WITH FRUADULENT INTENT

60.    An extensive investigation into the conduct of financial institutions in creating, underwriting and marketing CDOs by congressional investigators and the news media has recently revealed how Barclays exerted its control over the selection of collateral assets, took

control over the role purportedly performed by State Street as Collateral Manager, and concealed this conduct from CDO investors.  For example, a recent investigative report by *Propublica* quotes one CDO manager who explained how Merrill Lynch was able to exercise control over the collateral managers in deals underwritten by the bank, in the very same manner that Barclays exercised its control over State Street here:

> The way CDOs are put together, there is a brief period when the bonds picked by managers sit on the banks' balance sheets. Because the value of such assets can fall, banks reserved the right to overrule managers' selections.  According to numerous bankers, managers and investors, banks rarely wielded that veto until late 2006, after which it became common.

61.     That same report described how banks like Barclays threatened to partner with other competing managers to extort a collateral manager's agreement to "select" assets chosen by the underwriting bank.  If collateral managers insisted upon maintaining independence and control over collateral selection, banks "froze out" such stubborn collateral managers from further CDO collateral management assignments. As a result, collateral managers became reduced, as one CDO banker put it, to "indentured slaves":

> Merrill exercised its leverage over the managers. A strong relationship with Merrill could be the difference between a business that thrived and one that didn't. The more deals the banks gave a manager, the more money the manager got paid. As the head of Merrill's CDO business, [Chris] Ricciardi also wooed managers with golf outings and dinners. One Merrill executive summed up the overall arrangement: "I'm going to make you rich. You just have to be my bitch."

> But not all managers went for it.

> An executive from Trainer Wortham, a CDO manager, recalls a 2005 conversation with Ricciardi. "I wasn't going to buy other CDOs. Chris said: 'You don't get it. You have got to buy other guys' CDOs to get your deal done. That's how it works.'" When the manager refused, Ricciardi told him, "'That's it. You are not going to get another deal done.'"

*****

> Once, Merrill[] pushed a manager to buy a CDO slice for a Merrill-produced CDO called Port Jackson that was completed in the beginning of 2007: "'You

don't have to buy the deal but you are crazy if you don't because of your business,'" an executive at the management firm recalls Margolis telling him. "'We have a big pipeline and only so many more mandates to give you.' You got the message." In other words: Take our stuff and we'll send you more business. If not, forget it.

"All the managers complained about it," recalls O'Driscoll, the former Credit Suisse banker who competed with other investment banks to put deals together and market them. But "they were indentured slaves." . . . ***Other big CDO-producing banks quickly adopted the practice.***

62.     Unbeknownst to investors like BayernLB, Barclays exerted its veto power over State Street's selection of Markov's collateral to ensure Barclays' profits.

63.     Indeed, State Street was recently censured by the Massachusetts Securities Division for alleged violations of the Massachusetts state securities laws for ceding its role as collateral manager for the Carina CDO—a separate CDO deal underwritten by Deutsche Bank—in the exact manner as alleged herein.  In that action, State Street agreed to pay penalties and fines totaling $5 million to resolve allegations that it misrepresented its role as collateral manager in the relevant offering materials for the Carina CDO—representations that were nearly identical to those alleged as false and misleading in this action.

64.     As set forth in the Consent Order and alleged by the Massachusetts Securities Division, State Street misled investors in the Carina CDO by failing to disclose the fact that it had permitted an outside party that sought to "short" the CDO notes from providing input into the collateral selection process.

65.     Specifically, as set forth in the Consent Order dated February 28, 2012, State Street admitted to a "Statement of Facts" which cited to numerous emails between State Street, the collateral manager of Carina; Deutsche Bank, which served as the underwriting bank and arranger of Carina; and a hedge fund, Magnetar, that developed a significant "short" position in the Carino CDO with Deutsche Bank and State Street's help.  For example, the Statement of

Facts cites a June 26, 2006 email from a Deutsche Bank CDO director to State Street's Head of Structured Products stating that "We have credit approval for the 200m – we should probably run the [collateral asset] names by Magnetar – do you have something ready to go?"  In response, State Street's Head of Structured Products stated that "let's chat for a second when you can.  I want to make sure that we understand what our relationship with Magnetar is going to be going forward.  I do not plan on getting approval from Magnetar for every trade...I want to be very clear about that.  We are engaged with DB and as such are required to get warehouse approval from DB only."

66.    Similarly, as noted in the Consent Order, on July 14, 2006, a Magnetar trader sent an email to State Street's Head of Structured Products stating "Seems like you're making good progress.  If it's not too much trouble, I'd like to establish a bit more of a dialogue between us.  Discuss ramping up strategy, talk about each list as it goes out, plan for non-sub/mid-prime sectors, market conditions, that sort of thing.  Just talk briefly a few times a week.  Would be much appreciated."  State Street's Head of Structured Products replied, "Absolutely."

67.    As noted in that in the Statement of Facts, State Street also learned that Magnetar would be taking a "short" position to bet against Carina CDO, and that State Street's Head of Structured Products sent an email on August 3, 2006 noting that State Street was "not comfortable with [Magnetar] shorting into the deal."  Yet, just several months later, in a December 6, 2006 email to State Street's Head of Structured Products, the Magnetar trader stated:  "As we did last time, I would like to strategize and discuss names for the CDO bucket before we execute any trades.  Thought that worked out well for Carina I.  I will be taking the other side of this first trade as approved such that I am effectively pairing of the risk...."  In response, State Street's Head of Structured Products stated, "I'm happy to discuss the CDO

bucket with you.  As we've talked about in the past we do quite a bit of analysis on CDO managers and transactions and it's often hard to find deals we like, so our universe of available deals to go long is somewhat limited."

68.     As demonstrated by the emails cited in the Statement of Facts (as admitted by State Street), State Street ceded its purportedly "independent" role as Collateral Manager in the Carina CDO to Magnetar—a party that State Street *knew* was betting against the performance of the CDO and the interests of its noteholders.  On information and belief, State Street likewise ceded its authority as Collateral Manager in the Markov CDO to Barclays in the same manner it acquiesced to Magnetar's shorting of Carina.  Markov differs from Carina only in that the party influencing and betting against Markov's collateral portfolio is not an external hedge fund such Magnetar, *but rather Barclays itself*.

69.     As reflected in the emails cited in the Statement of Facts, State Street abdicated its duty to act as an independent manager in Carina was that the potential fees it would earn were "ENORMOUS."  As reflected in an email from the Managing Director of the Core Bond Group/Head of Active U.S. Fixed Income for SSgA to senior personnel within State Street's Fixed Income Unit concerning the potential deal with Deutsche Bank:

> [Deutsche Bank has] approached us on [a] reverse inquiry with an ENORMOUS mezzanine CDO opportunity.  It seems a large U.S. hedge fund has asked DB to structure a deal around a $70 million equity order and Deutsche has proposed that SSGA manage it.  An equity order of that size makes the trade $1.5 to $2 billion in size.  This would be the largest mezzanine CDO ever done.  Proposed fees are 20 basis points running, or $3 million per year at $1.5 billion.  Smells like a lay-up to me but we need to respond very quickly.

70.     While State Street was willing to readily jettison its obligations to act as an independent Collateral Manager for the "ENORMOUS" $3 million opportunity—a decision that a senior State Street executive described as a "lay-up"—the fees to be made by State Street in performing this same puppet role in Markov were potentially even greater.  While State Street

was poised to earn "ENORMOUS" fees on the $1.5 billion Carina CDO, the potential take for
State Street on Markov—a $2 billion deal—was potentially more.

71.     Significantly, as set forth in the emails cited in the Statement of Facts, State
Street's conduct in permitting Magnetar to select the assets in the Carina CDO was carried out
by the very individuals in charge of managing Markov.  Indeed, by December 2006, when State
Street executives were discussing the contents of the CDO bucket in a new CDO—a Carina II
CDO—with traders at Magnetar who were scheming to bet against it, State Street was already
engaged in discussions with Barclays concerning its role as Collateral Manager for Markov.

## IX.    BAYERNLB'S REASONABLE RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS

72.     BayernLB reasonably and actually relied on Barclays' and State Street's
misrepresentations concerning Markov in the Offering Materials and in numerous other
communications with marketing and other personnel at Barclays and State Street.

73.     Specifically, in connection with its evaluation of potential investments in CDO
securities, such as the Markov notes, BayernLB conducted its own analysis employed detailed
guidelines and criteria to ensure the investment was appropriate and suitable within the risk
parameters established BayernLB established for such investments.

74.     Among other things, in connection with its investment in the Markov Notes,
BayernLB reviewed the Offering Materials, including the Offering Circular and Pitchbook, the
Indenture and other legal documents, ratings letters from Moody's and Standard & Poor's, and
asset-level information of the Markov collateral portfolio provided by Barclays.  Through that
review, BayernLB conducted an independent analysis that confirmed that the investment—as
represented by Defendants—was appropriate.  Critical to that determination was Barclays' and

State Street's numerous representations concerning the State Street's role as Collateral Manager, which BayernLB understood greatly mitigated the risk of the investment.

75.     BayernLB could not know, and could not have known, that: (i) State Street had ceded and would continue to cede control over the selection and management of Markov's collateral assets to Barclays, (ii) Barclays had and would exploit its control over the selection of Markov collateral to conduct a proprietary trading strategy to bet against assets that in Markov it knew would fail, and (iii) that, as a result, the Markov CDO notes purchased by BayernLB were not the investment Defendants represented them to be, and were in fact a fundamentally flawed, rigged bet that BayernLB was guaranteed to lose.

## X.     BECAUSE OF DEFENDANTS' CONDUCT, BAYERNLB LOST ITS ENTIRE INVESTMENT

76.     As a result of Defendants misconduct as alleged herein, including Barclays' rigged bet against the $550 million in CDO collateral contained in Markov, investors in Markov notes began to suffer massive losses just shortly their having been issued.  On November 16, 2007, just over six months after Markov's May 1, 2007 closing, Markov suffered an "event of default."   On January 22, 2008, Barclays, exercising its rights as holder of the Markov's controlling super senior tranche, directed the trustee to liquidate the collateral capable of being sold.  The proceeds from the liquidation were insufficient, and each class of "funded" tranche noteholders—including BayernLB's Class A-1 Markov notes—suffered 100% losses.

### FIRST CAUSE OF ACTION

**(Violation of Section 10(b) of the Securities Exchange Act of 1934
Against Barclays and State Street)**

77.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

78.    As alleged above, Barclays and State Street carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive BayernLB and other Markov investors; and (ii) cause BayernLB to purchase or otherwise invest in Markov CDO notes.

79.    Barclays and State Street, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interest commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the purpose of the CDO, the CDO's collateral selection process, the role of the State Street as Collateral Manager, the nature and quality of the CDO's collateral portfolio, and the risk profile of the CDO notes, as set forth herein.

80.    Barclays and State Street employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of conduct that represented the nature of the Markov notes and Barclays' disguised bet that those investments would fail, which included the making of, or the participation in the making of, materially misleading statements of fact and omitting to state material facts necessary to make the statements concerning Markov not misleading.

81.    Barclays and State Street had actual knowledge of the misrepresentations and omissions of material facts as alleged herein, or acted with reckless disregard for the truth in that they failed to discover or disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were knowingly or recklessly made with the purpose and effect of concealing the true design and purpose of the Markov CDO, State Street's abdication of its role as an independent Collateral Manager, the actual bases and methods used to select and manage Markov's collateral portfolio, and the true nature and quality of that collateral.

82.    As a result of Defendants' misrepresentations, the price of the Markov CDO notes was artificially inflated. BayernLB invested in the Markov notes in direct reliance on

Defendants' misrepresentations, as set forth above, and ignorant of the true facts concealed by Defendants' misrepresentations, which were in the exclusive control and knowledge of Defendants and were not and could not have been discovered through the exercise of due diligence or by any means available to Plaintiff. Had Plaintiff known the truth concealed by Defendants, BayernLB would not have purchased the Markov notes. As a direct and proximate cause of Defendants' wrongful conduct, BayernLB suffered damages in connection with its investment in the Markov notes.

83.     Less than five years has elapsed since the date of Defendants' violation, and less than two years has elapsed since the time when BayernLB discovered, or using reasonable due diligence could have discovered, the facts constituting the violation.

## SECOND CAUSE OF ACTION

### (Violation of Section 20(a) of the Exchange Act
### Against Barclays Bank PLC, State Street Bank & Trust Company and
### State Street Corporation)

84.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

85.     Defendants Barclays Bank PLC, State Street Bank & Trust Company and State Street Corporation, are liable as control persons of Barclays (in the case of Barclays Bank PLC) and State Street (in the case of State Street Bank & Trust Company and State Street Corporation) given their ownership, control, participation, and knowledge of these Defendants as primary violators of Section 10(b) of the Exchange Act.

86.     Barclays Bank PLC ("BBPLC") owns its subsidiary Barclays, and thus serves as a controlling person of Barclays within the meaning of Section 20(a) of the Exchange Act as alleged herein. Through its subsidiary, BBPLC conducts investment banking operations in the United States. BBPLC and Barclays share a common United States address (200 Park Avenue,

New York, NY 10166) and common officers. Barclay's financial results are consolidated into and reported as part of BBPLC's financial results.

87.    Defendant BBPLC had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and did influence and control, directly or indirectly, the decision-making of Barclays, including the content and dissemination of the various misrepresentations alleged herein as materially false and misleading. In addition, BBPLC served in various capacities in the Markov CDO transaction, including as its role as counterparty to certain swaps Markov entered into and as the Deposit Agreement Counterparty, among other things. Defendant BBPLC participated directly with Barclays in the creation, arranging, marketing and sale of the Markov CDO. BBPLC aided Markov's creation by warehousing Markov's collateral and by entering into a $1.8 billion in credit default swaps with Markov that enabled Barclays to bet against the CDO. BBPLC then sought to "fund" this bet by marketing Markov notes outside the United States to non-U.S. investors, while BarCap marketed Markov notes inside the United States to U.S. investors. Through these roles, acted as a culpable participant in Barclay's fraud.

88.    Defendants State Street Bank & Trust Company ("SSB&TC") and State Street Corporation control SSGA within the meaning of Section 20(a) of the Exchange Act as alleged herein. State Street Bank & Trust Company owns and controls State Street, which is SSB&TC's asset management arm. In turn, SSB&TC is a wholly-owned subsidiary of State Street Corporation, a publicly-registered financial holding company. All three entities share a common Massachusetts address (One Lincoln Street, Boston, Massachusetts 02111) and overlapping officers. Both SSB&TC and State Street Corporation own and control SSGA. Defendants SSB&TC and State Street Corporation had the power to influence and control and did influence and control, directly or indirectly, the decision-making of SSGA, including the

content and dissemination of the various statements which Plaintiff contends are false and misleading. SSBT&C, "acting through its division State Street Global Advisors," is a party to the Collateral Management and the party identified, in such capacity, as the "Collateral Manager." Through their involvement in preparing the Offering Materials and other conduct, Defendants SSB&TC and State Street Corporation were aware or directly participated in a fraud alleged herein, including by concealing adverse material information about the purpose of the CDO, the CDO's collateral selection process, the independence of the collateral manager, the nature of the collateral and the risk of investing in the CDO.

89.     As set forth above, Barclays and State Street each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their ownership and control of Barclays and State Street, Defendants BBPLC, SSB&TC and State Street Corporation are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its acquisition of the Markov CDO.

90.     Less than five years has elapsed since the date of Defendants' violation, and less than two years has elapsed since the time when BayernLB discovered, or using reasonable due diligence could have discovered, the facts constituting the violation.

### THIRD CAUSE OF ACTION

**(Common Law Fraud Against
Barclays and State Street)**

91.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

92.     In connection with issuance, marketing and sale of Markov notes, Defendants Barclays and State Street drafted, created, prepared and disseminated to potential Markov

investors materials that contained numerous misrepresentations of material fact and omitted to state material facts necessary to make the statements therein not misleading, including a "Pitchbook" dated March 2006, the Offering Circular dated May 1, 2007, the Collateral Management Agreement dated May 1, 2007, the Indenture dated May 1, 2007, and numerous other written and oral communications and solicitations.  The misrepresentations contained in such communications included the materially false and misleading representation that State Street would serve as a disinterested, independent third-party Collateral Manager that would select the Markov's collateral; the bases and methods by which State Street would purportedly evaluate and select collateral for inclusion in Markov, and, as result of Barclays' manipulation, the true nature and risk profile of the Markov notes.

93.     Barclays and State Street knew their statements were false and misleading, or were reckless in not knowing that the statements were not true when made.  Defendants made these false and misleading statements with the intent and expectation that BayernLB would rely upon them.

94.     BayernLB believed Defendants' misrepresentations to be true and actually and justifiably acted in reliance thereon.   But for Defendants false and misleading misrepresentations, BayernLB would not have invested in the Markov notes.

95.     As a direct, proximate and foreseeable result of Defendants' conduct, BayernLB was damaged in an amount to be determined at trial.

## **THIRD CAUSE OF ACTION**

### **(Fraudulent Inducement Against Barclays and State Street)**

96.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

97.     In connection with issuance, marketing and sale of Markov notes, Defendants Barclays and State Street drafted, created, prepared and disseminated to potential Markov investors materials that contained numerous misrepresentations of material fact and omitted to state material facts necessary to make the statements therein not misleading, including a "Pitchbook" dated March 2006, the Offering Circular dated May 1, 2007, the Collateral Management Agreement dated May 1, 2007, the Indenture dated May 1, 2007, and numerous other written and oral communications and solicitations.  The misrepresentations contained in such communications included the materially false and misleading representation that State Street would serve as a disinterested, independent third-party Collateral Manager that would select the Markov's collateral; the bases and methods by which State Street would purportedly evaluate and select collateral for inclusion in Markov, and, as result of Barclays' manipulation, the true nature and risk profile of the Markov notes.

98.     Barclays and State Street knew their statements were false and misleading, or were reckless in not knowing that the statements were not true when made.  Defendants made these false and misleading statements with the intent and expectation that BayernLB would rely upon them.

99.     BayernLB believed Defendants' misrepresentations to be true and actually and justifiably acted in reliance thereon.   But for Defendants false and misleading misrepresentations, BayernLB would not have invested in the Markov notes.

100.     As a direct, proximate and foreseeable result of Defendants' conduct, BayernLB was damaged in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

**(Aiding and Abetting Fraud Against
Barclays and State Street)**

101.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

102.    State Street and Barclays provided substantial assistance to advance the fraud described herein.

103.    State Street aided and abetted Barclays in its fraudulent misrepresentations made to BayernLB, as described herein, including by agreeing to participate in Markov as Markov's Collateral manager.  State Street had knowledge of the fraud alleged herein and intentionally assisted in its commission.  As the assigned Collateral Manager for Markov, State Street was fully aware of its duties to independently evaluate the assets to be included in Markov, and knew that Barclays' control over the selection of collateral assets was being used in a manner in a manner in direct conflict with interests of Markov noteholders.

104.    As Collateral Manager for Markov, State Street had superior knowledge of the true quality and value of Markov's collateral portfolio and the actual risk of default for the assets in the portfolio.   State Street possessed knowledge that BayernLB did not have reasonable access to, and BayernLB, therefore, could not verify the representations made by the Defendants.

105.    State Street's participation was critical to the fraud.  Defendants' representations that State Street would serve as a disinterested party responsible for the selection of Markov's collateral concealed Barclay's effective control over Markov's collateral and enabled Barclays to exploit Markov as a vehicle through which to "short" that very collateral.

106.    State Street participated in, or had knowledge of, Barclay's reckless or intentional dissemination of false and misleading information to Markov investors.    It was foreseeable to State Street that BayernLB would be harmed as a result of its assistance.

107.    Barclays also provided substantial assistance to State Street in order to advance the fraud described herein. Specifically, Barclays aided and abetted State Street's false and misleading statements concerning its role as Collateral Manager in Markov and the bases and methods State Street would employ in evaluating and selecting collateral to be included Markov. Barclays had knowledge of the fraud described herein and intentionally assisted in its commission.

108.    BayernLB has suffered damages as a direct and natural result of the fraud committed by Barclays and State Street, and Barclays' and State Street's knowing and active participation therein.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation Against Defendant State Street)

109.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein, except any allegations that Defendants made any untrue statements and omissions intentionally or recklessly.   For the purposes of this Count, Plaintiff expressly disclaims any claim of fraud or intentional misconduct.

110.    This is a claim for negligent misrepresentation against State Street.

111.    As a result of its role as Collateral Manager for Markov, State Street had superior access to information and knowledge as to who had been responsible for selecting such collateral, the true quality and value of the collateral portfolio and knowledge as an expert concerning the actual risk of the assets in the portfolio.

112.   State Street also knew, or should have known, that Plaintiff did not have reasonable access to such information and, therefore, could not verify the representations made by the Defendants.

113.   State Street incorrectly represented that it was an independent third-party Collateral Manager, who would perform its collateral management duties independent of Barclays' interests and in the interests of the Plaintiff and other Markov investors. State Street made materially inaccurate representations concerning how, and on what bases, State Street would evaluate and select Markov's collateral.

114.   State Street acted negligently in not knowing that the above statements were not true when they were made. State Street made these inaccurate statements with the intent and expectation that BayernLB would rely upon them in evaluating a potential investment in Markov notes. Plaintiff believed Defendants' misrepresentations to be true and justifiably acted in reliance upon them. Plaintiff believed Defendant SSGA was performing its duties independent of Barclays' interests and in the interests Plaintiff and other Markov investors. Without these false and misleading representations Plaintiff would not have agreed to make its Markov investment.

115.   Defendants are liable to the Plaintiff for the damages caused by Defendants' unlawful conduct in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Breach of Fiduciary Duty Against State Street)

116.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

117.   State Street's exercise of discretion as Markov's purportedly independent Collateral Manager gave rise to fiduciary duties obligating State Street to act in Markov's

investors' best interests in managing the collateral portfolio. As Collateral Manager, SSGA was charged with selecting collateral assets for the Markov CDO based on the criteria in stated in Markov's indenture and in the Offering Documents, and "good faith, using a degree of skill and attention no less than customarily used by institutional investors of national standing in the management of assets of the nature and character of the Collateral Assets." As State Street admitted in the Massachusetts Securities Division Consent Order, the "significance of the Investment Manager's front-end analysis cannot be overstated since it is the Investment Manager's duty to ensure that each assets selected for inclusion in the collateral pool comports with the predefined standard of quality and risk established by the eligibility criteria."

118.   State Street's superior expertise and knowledge of the collateral assets in Markov, the process used in selecting those assets, and the reasons it selected those assets, gave rise to a fiduciary duty to disclose material information to the Plaintiff. As Collateral Manager, State Street had essential and unique knowledge that the Plaintiff did not have reasonable access to. Plaintiff did not have reasonable access to the same information to verify State Street's representations which, unbeknownst to the Plaintiff at the time, were partial, compromised, ambiguous, false, and incomplete.

119.   As a result of its superior expertise, knowledge, purported role and discretionary authority, State Street occupied a position of trust and influence, and Plaintiff reposed trust and confidence in State Street.

120.   Among other things, State Street breached its fiduciary duties to Plaintiff by acting in the interests of Barclays, as the "short" position in Markov, instead of in the best interests of the CDO and its noteholders. State Street also breached its duties by misrepresenting (i) State Street's role in selecting Markov's collateral, (ii) how, and on what

basis, State Street would evaluate and select Markov's collateral, (iii) and by placing Barclays' interests before those of BayernLB and other Markov investors.

121.   As a direct, proximate and foreseeable result of State Street's breach of its fiduciary duties, BayernLB has been damaged by an amount to be determined at trial.  Plaintiff is also entitled to punitive damages.

## SEVENTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty Against Barclays)

122.   Plaintiff repeats and realleges the foregoing allegations in each of the preceding paragraph, except as to the paragraphs that allege scienter, as though they were fully set forth herein.

123.   Barclays had actual knowledge of the facts, described directly above and throughout the complaint, that are pled in connection with SSGA's breaches of fiduciary duty. As described above, Barclays knowingly and substantially assisted State Street's breaches of fiduciary duty owed to the Plaintiff.  Accordingly, as a direct, proximate and foreseeable result of Barclays' conduct, Plaintiff has been damaged by an amount to be determined at trial. Plaintiff is also entitled to punitive damages.

## EIGHTH CAUSE OF ACTION

### (Breach of Contract Harming a Third Party Against State Street)

124.   Plaintiff repeats and realleges the foregoing allegations in the preceding paragraphs as though they were fully set forth herein.

125.   Markov and State Street entered into a contract, the Collateral Management Agreement, dated May 1, 2007, wherein State Street agreed to select collateral for Barclays'

Markov CDO in a manner set forth in the contract between the parties and for the benefit of investors in Markov.

126.    As described above, the Collateral Management Agreement (contract) between State Street and Markov was intended for the benefit of Markov investors, including BayernLB, as set forth in the Offering Materials, in order to ensure that State Street would use its independent judgment and professional expertise to select collateral assets that would benefit Markov investors.  As alleged herein, State Street did not employ the bases and methods of collateral selection in the manner called for by the Collateral Management Agreement, the contract was breached, and as a result Plaintiff suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)    Awarding compensatory and/or rescissory damages in favor of Plaintiff  against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)    Awarding punitive damages for Plaintiff's common-law fraud claims;

(c)    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demand a trial by jury on all claims so triable.

Dated: April 25, 2012

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Gerald H. Silk
Avi Josefson
Michael D. Blatchley

1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:     (212) 554-1400
Fax:     (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com


*Counsel for Plaintiff*