

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BAYERISCHE LANDESBANK, NEW YORK BRANCH,<br><br>                Plaintiff,<br><br>      v.<br><br>BARCLAYS CAPITAL INC., BARCLAYS BANK PLC, STATE STREET GLOBAL ADVISORS, STATE STREET BANK AND TRUST COMPANY, and STATE STREET CORPORATION,<br><br>                Defendants. | Civil Action No. 12-3294(LLS)(KNF)<br><br>**AMENDED COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u><br><br><u>**ECF CASE**</u> |

Plaintiff Bayerische Landesbank, New York Branch ("BayernLB" or "Plaintiff"), for its Complaint herein against Barclays Capital Inc., Barclays Bank plc, State Street Global Advisors, State Street Bank and Trust Company, and State Street Corporation (collectively, "Defendants"), brings this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), common law fraud, fraud in the inducement, aiding and abetting fraud, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract. The allegations herein are made on personal knowledge as to BayernLB's own acts and on information and belief as to all other matters, such information and belief having been informed through the investigation conducted by and under the supervision of Plaintiff's counsel, the materials referenced in this Complaint, counsel's review of documents filed by the Defendants with the Securities and Exchange Commission ("SEC"), documents, testimony and other evidence made public in related litigation brought by private litigants, the SEC and the Massachusetts Securities Division against Defendants, counsel's interviews of relevant witnesses, and the complaint and the decision denying Defendants' motion to dismiss in the related action *Space Coast Credit Union v. Barclays Capital Inc.*, No. 11-cv-2802(LLS) (S.D.N.Y.). Many of the facts related to Plaintiff's allegations are known only by the Defendants named herein or are exclusively within their custody or control. Formal discovery, including document discovery and depositions of relevant witnesses, is expected to provide additional evidentiary support for the allegations herein. By and through counsel, BayernLB alleges as follows:

## I.    SUMMARY OF THE ACTION

1.    This action arises from a fraud perpetrated by Defendants, who misrepresented the single most important fact concerning the purportedly "AAA"-rated notes issued by the Markov collateralized debt obligation ("CDO") structured, designed and marketed by Barclays

Capital Inc. ("Barclays").  Specifically, Defendants led BayernLB to believe that the more than $57 million of Markov notes it purchased were backed by assets that had been independently evaluated and selected for their credit quality, and which justified the "AAA" credit ratings assigned to the CDO notes.  Defendants represented that the selection and management of the CDO collateral assets was delegated to State Street Global Advisors ("State Street")—an experienced CDO manager whose sole duty was to maximize return to benefit Markov and its noteholders, independent of Barclays.  Defendants' representations about State Street's role as the independent Collateral Manager were critical to BayernLB because Barclays's other roles in the transaction precluded it from serving as Collateral Manager for the Markov CDO.

2.     In truth, the Collateral Manager for the Markov CDO—State Street—did not independently select the assets included in the CDO using an investment strategy that was "disciplined and seeks to control risk," "designed to produce consistent returns," and "designed to ensure that appropriate due diligence is conducted prior to any security purchase," as the Defendants represented.  Indeed, the referenced assets were not "selected" by State Street at all. Instead, contrary to the statements in Markov's offering materials, ***Barclays itself*** selected and even created certain of the assets referenced by Markov because it ***knew*** those assets would fail, and that Barclays would profit as a result.

3.     Barclays designed and exploited Markov as a proprietary trading platform through which Barclays was able to reap illicit profits at the expense of Markov's noteholders, including BayernLB.  As such, Barclays' manipulation of Markov, a $2 billion "Hybrid Synthetic/Cash High-Grade CDO," was similar to the misconduct of other Wall Street banks criticized by the congressional Financial Crisis Inquiry Commission ("FCIC") for using the "CDO Machine" to profit while foisting losses on their clients – conduct the FCIC cited as a cause of the financial crisis.  Like many CDOs, Markov was backed by mortgage-related collateral.  Specifically, 10%

of the assets backing Markov were "cash assets," consisting of actual residential mortgage-backed securities ("RMBS") and other asset-backed securities, including CDO securities, purchased and held by Markov with proceeds derived from the sale of CDO notes to investors. The remaining 90% of Markov's collateral consisted of "synthetic assets." The synthetic assets were not actually purchased and held by the CDO but, instead, consisted of Credit Default Swaps ("CDS"), Total Return Swaps ("TRS") and other swaps which, in turn, referenced RMBS and other asset-backed securities, including other CDOs. A CDO that, like Markov, contains assets that include other CDO securities is sometimes referred to as a "CDO-squared."

4.      The CDS, TRS and other swaps were structured such that the value of the Markov notes would track the performance of the underlying RMBS referenced by the synthetic assets. Through these swaps, the CDO effectively "insured" the value of a portfolio of referenced collateral assets, and in return received regular payments from the swap counterparty—akin to insurance premiums—in exchange for that guarantee. If the value of the referenced assets declined, the CDO was required to "swap" with its counterparty and make payments to cover any shortfall. Thus, any decline in the value of the referenced assets caused a loss to the CDO and its noteholders. In this sense, the CDO (and, by extension, the CDO's noteholders, such as BayernLB), were "long" the referenced CDS assets – and would benefit if the underlying mortgages performed – while the CDS counterparty was "short" those same assets, and stood to profit if the underlying assets failed.

5.      Critically, Barclays served as the Synthetic Asset Counterparty for the CDS and TRS Assets in the Markov CDO, meaning that it was effectively "short" 90% of the $2 billion notional value of the CDO at its inception. That is, ***Barclays was "short" the assets backing Markov and stood to profit if those assets failed***. Moreover, Barclays (through BBPLC) also served as the valuation agent for the Markov's synthetic collateral, meaning that it possessed, in

effect, unilateral authority to determine the amounts of any payments Markov would be required to make under the terms of the synthetic CDS, TRS and other swaps.

6.      In order to address the obvious conflict posed by Barclays' "short" position as the CDO's swap counterparty, the Defendants represented that the selection of Markov CDO assets would be determined by a purportedly independent collateral manager: State Street.  Because Barclays stood to profit if the collateral underperformed, it clearly could have no role in the selection of that collateral.  By installing State Street as an independent arbiter whose "***sole***" duty was to ensure that the credit quality of the referenced assets was appropriate and sufficient to generate the returns and stability promised to the Markov CDO noteholders, Defendants assured BayernLB that Markov would perform as represented and that the selection of collateral would not be influenced by Barclays' interest as the CDO's swap counterparty.

7.      Those assurances were false.  State Street has now ***admitted*** that the importance of an independent collateral manager to investors "***cannot be overstated***."  State Street made that admission in connection with its agreement to pay $5 million in penalties and fines to resolve an action by the Massachusetts Securities Division alleging that it misrepresented its role as a collateral manager in another collateralized debt obligation.

8.      Barclays has likewise admitted to misleading investors in the lead up to the financial crisis.  On June 27, 2012, U.S. and U.K. regulators announced that Barclays would be fined $450 million after admitting to a multi-year effort to secretly and unlawfully manipulate the London Interbank Offered Rate ("LIBOR")—a critical interest rate metric for securities and loan products, including the RMBS and swaps included in Markov.  That misconduct and Barclays' manipulation of Markov were driven by the same purpose: to profit Barclays at investors' expense.  Citing to internal Barclays emails, the U.K. Chancellor of the Exchequer George Osborne concluded that Barclays' "only motive was greed…. They knew what they were

doing [was] wrong."  The emails on which Osborne relied in reaching that conclusion included a February 2007 email from a Barclays trader urging another to "Keep a secret" and another warning that "If you breathe a word of this I'm not telling you anything else"—communications sent to conceal the LIBOR fraud at the same time Barclays was scheming to defraud BayernLB concerning Markov.

9.      While BayernLB accepted the disclosed risks of investing in Markov, and conducted its own analysis to assess and verify the risks described in the Markov offering materials, it did not accept, and could not discover, the concealed risk that Barclays would secretly and fraudulently exploit Markov for its own benefit by manipulating the selection of Markov's collateral.  As Barclays ensured through its control over the selection of the CDO assets, Markov defaulted just over six months after it was issued; BayernLB lost its entire investment while Barclays reaped profits from its short position.

10.      Through this action, BayernLB seeks to recover the losses caused by Defendants' misconduct, including compensatory and/or rescissory damages against Defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, fraud, fraud in the inducement, aiding and abetting fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation, and breach of contract.

## II.      JURISDICTION AND VENUE

11.      This Court has subject matter over this matter pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

12.      Venue is proper pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §§1391(b) and (c), as a substantial part of the events and/or omissions and/or their effects giving rise to the claims asserted herein occurred in this District.  Specifically, Barclays'

creation and structuring of Markov, and the authorship and dissemination of marketing materials and communications to investors, including its communications to BayernLB, occurred in New York.

13.     Venue is also appropriate under Markov's governing documents, which provide that the notes purchased by BayernLB "will be governed by, and construed in accordance with, the laws of the State of New York," and that the relevant parties have or will "submit irrevocably" to the jurisdiction of the courts of the State of New York and the courts of the United States of America in the State of New York (in each case sitting in the County of New York) for the purposes of hearing and determining any suit, action or proceedings or settling any disputes arising out of or in connection with the Markov notes.

14.     In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, and the facilities of national securities markets.

## III.     **THE PARTIES**

### A.     **Plaintiff**

15.     Plaintiff Bayerische Landesbank, New York Branch ("BayernLB" or "Plaintiff") is licensed by the Office of the Comptroller of the Currency with an office located in New York, New York.  BayernLB operates as a branch of Bayerische Landesbank.

### B.     **Defendants**

16.     Defendant Barclays Capital Inc. ("Barclays") is a corporation organized under the laws of Delaware, with principal offices located at 200 Park Avenue, New York, New York 10166.  Barclays created, arranged, structured and underwrote Markov, acted as the initial purchaser of Markov's notes, and marketed and sold Markov's notes in New York, including to

BayernLB, and was the holder of Markov's "Super Senior" tranche, as discussed below. Markov's Offering Circular, which was prepared by Barclays and State Street (defined below), advised investors seeking further information concerning Markov notes to contact Barclays' CDO/Structured Funds Group at Barclays' New York address on Park Avenue.

17.     In marketing Markov to investors, Barclays, together with State Street, prepared and disseminated to BayernLB and other Markov investors information concerning the Markov CDO, including (a) a "pitchbook" dated March 2007 (the "Pitchbook"), (b) a "discussion sheet" dated March 2007 (the "Discussion Sheet"), (c) an "offering circular" dated May 1, 2007 (the "Offering Circular"), (d) the Collateral Management Agreement between Markov and State Street Bank and Trust Company, acting through State Street Global Advisors, dated May 1, 2007 (the "Collateral Management Agreement"), and (e) the Markov CDO I Indenture, dated May 1, 2007.  The Pitchbook, Discussion Sheet, Offering Circular, Collateral Management Agreement, and Indenture are referred to herein as the "Offering Materials."  The Pitchbook states that it was prepared by Barclays, that Barclays "accepts responsibility for the distribution of this document in the United States," and that "any transactions by U.S. persons in any security discussed herein must only be carried out through" Barclays.  As set forth below, the Offering Materials prepared and disseminated by Barclays and State Street contained materially misleading misrepresentations and omissions of fact.  In addition, Barclays made further misrepresentations to BayernLB concerning Markov in direct, private communications, including in-person meetings with representatives from Barclays and State Street in March 2007.

18.     Barclays Bank plc ("BBPLC") is a public limited company organized under the laws of England and Wales under number 1026167, with principal offices located at 1 Churchill Place, London, E145HP, and with United States offices at 200 Park Avenue, New York, New York 10166.  BBPLC controls Barclays and, through it, conducts investment banking operations

in the United States.  BBPLC and Barclays have the same United States address (200 Park Avenue, New York, New York 10166).  Barclays' financial results are consolidated into and reported as part of BBPLC's financial results.  As used herein, "Barclays" refers to both Barclays and BBPLC, except where additional clarification is necessary.

19.     BBPLC, acting in concert with Barclays, served several roles in connection with the Defendants' scheme to profit off of Markov, including:  (a) BBPLC arranged and underwrote the Markov notes and marketed and sold them to investors outside of the United States; (b) BBPLC served as Markov's CDS counterparty (the Synthetic Asset counterparty with respect to all of the Synthetic Assets acquired by Markov prior to the closing date of the Markov offering); and (c) BBPLC provided "warehouse" financing and services through which Barclays assembled and held Markov's collateral assets prior to Markov's closing (at which time, the warehoused assets were transferred to Markov).  BBPLC also acted as the "valuation agent" under the terms of the synthetic swap agreements governing the TRS, CDS and other synthetic assets "purchased" by Markov, and had virtually unchecked authority to determine what amounts Markov was obligated to pay to BBPLC, as Markov's CDS counterparty.  (As discussed below, State Street had an obligation and certain limited ability to dispute BBPLC's conclusions as valuation agent, but abdicated this role.)

20.     BBPLC, through Barclays, became a significant player in the U.S. subprime RMBS market, and reaped enormous profits by securitizing, structuring, and selling RMBS and other mortgage-related investments, such as CDOs.  Although Barclays was a late-comer to the U.S. subprime RMBS market, it successfully "caught up" to its Wall Street peers by pursuing the acquisition of mortgage servicing and origination companies including HomEq and Equifirst, providing warehouse financing to subprime mortgage originators, and purchasing, securitizing and selling RMBS backed by U.S. subprime loans.  As noted by Bob Diamond, then-President

and future-CEO of BBPLC, during a February 20, 2007 conference call, Barclays' activities in the U.S. residential mortgage market had been a significant growth driver.  Diamond said that "We are delighted with our progress.  Not many foreign banks have accomplished what we've accomplished in the U.S. market….We're growing our residential mortgage business.  But that's BarCap catching up in a mature market."  By 2007, Barclays had become the fifth largest issuer of mortgage-related CDOs, underwriting nearly $37 billion in CDOs in 2007 alone.

21.     Barclays' CDO underwriting and other mortgage-related activities reaped enormous profits for BBPLC.  Barclays' 2006 annual profit grew 55% from the year before, and continued to provide steady returns to BBPLC even as the housing crisis intensified throughout 2007.  As Diamond noted on an August 2007 conference call, Barclays had a "terrific first half" of 2007, and "the first half of 2007 in BarCap exceeded the full year 2005."  On a November 15, 2007 earning conference call, Barclays' then-CEO Jon Varley noted that in the face of the surging subprime crisis, "our income performance in BarCap in October was the best monthly income level in any fourth quarter month in BarCap's history."  The next day, Markov defaulted.

22.     Defendant State Street Global Advisors, Inc. ("State Street") is a global leader in asset management and is incorporated in Delaware, with its principal place of business at One Lincoln Street, Boston, Massachusetts 02111.  State Street is the asset management division of Defendant State Street Bank and Trust Company, which is in turn owned by Defendant State Street Corporation.

23.     As set forth in the Offering Materials, Barclays and State Street represented that State Street would serve as the independent "Collateral Manager" for the Markov CDO.  As represented by Barclays and State Street, State Street's role as Collateral Manager was to purportedly act "***solely***" on behalf of Markov, the "Issuer," and in furtherance of the interests of its noteholders by, among other things, (i) "determining the specific" assets to be contained in

Markov, "taking into consideration, among other factors, the payment obligations of the Issuer" to investors like BayernLB, (ii) "acting on behalf of the Issuer with respect to the Issuer's rights and obligations under" any CDS and TRS transactions entered into by Markov, and (iii) "supervising and directing the investment and reinvestment" of Markov's collateral assets.

24.     In addition, in supervising and directing the investment of Markov collateral, State Street, as Collateral Manager, was required to "buy, sell, enter into or terminate Collateral Assets solely with the objective of maximizing the Issuer's return (applying criteria like those used by fixed income portfolio managers) and not with a view to actuarial pooling of independent risks or entering into offsetting transactions to profit from a bid-ask or similar spread."  State Street was also prohibited from acquiring any asset "in expectation that it or any obligation or security to which it refers will default or for the purpose of restructuring an obligation, security or arrangement or an obligor, issuer or counterparty."  Further, under the governing documents, State Street, as Independent Collateral Manager, represented that it would "perform its obligations hereunder in good faith, using a degree of skill and attention no less than customarily used by institutional managers of national standing in the management of assets of the nature and character" of the assets backing Markov.

25.     The Offering Circular and Pitchbook listed a number of individuals as "Key Personnel" at State Street responsible for performing State Street's purported role as Independent Collateral Manager for Markov, including:  Sean Flannery, Chief Investment Officer, Americas; Michael Wands, Senior Managing Director of State Street and Director of Fixed Income in North America; Michael O'Hara, Managing Director in the Core Bond group and the Head of Active Fixed Income; and Frank Gianatasio, Jr., Vice President of State Street and Head of Global Structured Products.

26.    Defendant State Street Bank and Trust Company ("SSB&TC") is a bank organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located at One Lincoln Street, Boston, Massachusetts 02111.  SSB&TC is a wholly owned subsidiary of Defendant State Street Corporation, a publicly registered financial holding company. SSB&TC, acting through its division State Street, is a signatory and party to the Collateral Management Agreement.

27.    Defendant State Street Corporation ("State Street Corp.") is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at One Lincoln Street, Boston, Massachusetts 02111.  State Street Corp. is a publicly registered financial holding company for SSB&TC.  State Street represented in the Offering Materials that State Street Corp. was a "leading provider of financial services to institutional investors," that its "[c]ore business" was "managing and servicing financial assets" and that it had a "[f]iduciary heritage since 1792."  As set forth below, the Offering Materials prepared and disseminated by Barclays and State Street contained materially misleading misrepresentations and omissions of fact.   State Street made further misrepresentations to BayernLB concerning Markov, and held itself out as BayernLB's fiduciary, in direct, private communications, including in-person meetings with representatives from State Street in March 2007 and in other communications, including phone calls and emails from August 2007 through November 2007, and thereafter.

28.    At all relevant times herein, SSB&TC and State Street Corp. were controlling persons of State Street within the meaning of Section 20(a) of the Exchange Act.  Any acts by State Street were caused and/or influenced by SSB&TC and State Street Corp. by virtue of their domination and control thereof, as described below.

29.     Among other things, during the relevant time period, State Street's business strategy was monitored and approved by the senior management and Board of Directors of State Street Corp., and State Street executives frequently communicated with State Street Corp. senior managers concerning State Street's business.  Indeed, in certain cases, the executives at State Street and State Street Corp. were one and the same.  For example, during the relevant time period, State Street's President and Chief Executive Officer William Hunt was also the Vice Chairman of State Street Corp., and Sean Flannery, State Street's Chief Investment Officer, Americas, served as an Executive Vice President of State Street Corp.  These individuals, among others, played an active role in overseeing State Street's business.

30.     For example, in an April 10, 2007, email from Flannery to State Street Corp. Chief Financial Officer Edward J. Resch, Flannery provided detailed information concerning State Street's subprime holdings in its role as an "asset manager," including in its role as collateral manager for CDOs like Markov.  In that memorandum, which was sent a month before Markov closed, Flannery told State Street Corp.'s CFO that State Street would be "wrestling with mortgage-related issues for some time," that "risk levels" were "elevated," and that there would be some "bruises along the way."  Flannery later clarified during his trial testimony in another action that while State Street owned the trading strategies of those portfolios, its clients, like BayernLB, were the ones who would take the bruises, or "losses in value."  (This action and Flannery's testimony are discussed below in ¶¶88-117.)   In another example of State Street Corp.'s close supervision of State Street, a July 2007 presentation by State Street senior executives to the Board of Directors of State Street Corp. highlighted the increased fees State Street was able to generate through more "active" strategies (as opposed to State Street's more traditional role in "passive" management of funds that tracked benchmark indexes), which included State Street's purported management of CDOs like Markov.

31.     The profits generated by State Street's role as collateral manager for CDOs like Markov were critical to State Street Corp., as State Street's financial results were consolidated into and reported as part of State Street Corp.'s financial results.   According to State Street Corp.'s SEC filings, State Street became an increasingly significant contributor to State Street Corp.'s financial results during the relevant period, with State Street's revenues constituting approximately 19% of consolidated total revenue and approximately 24% of consolidated income from continuing operations before income taxes for 2006, compared to 18% and 21%, respectively, for 2005.   State Street contributed even more to State Street Corp.'s financial results in 2007, with total revenue increasing 25% over 2006.

32.     In its 2006 Annual Report filed on SEC Form 10-K in February 2007, State Street Corp. described its and State Street's role as collateral manager for CDOs like Markov as follows:

> We manage a series of collateralized debt obligations, or 'CDOs.'  A CDO is a managed investment vehicle which purchases a portfolio of diversified highly-rated assets.  A CDO funds purchases through the issuance of several tranches of debt and equity, the repayment and return of which are linked to the performance of the assets in the CDO.  Typically, our involvement is as collateral manager. We may also invest in a small percentage of the debt issued….  We are not the primary beneficiary of these CDOs, as defined by FIN 46(R), and do not record these CDOs in our consolidated financial statements.

33.     In 2006, the total assets in CDOs managed by State Street totaled $3.48 billion; in 2007, the total asset size of CDOs managed by State Street nearly doubled to $6.73 billion.  State Street Corp.'s description of its and State Street's activities as CDO collateral manager in its 2007 Annual Report filed on SEC Form 10-K in February 2008, after Markov closed and had defaulted, was substantially similar to that given in the 2006 Annual Report, except that the description omitted the term "highly-rated" in describing the "portfolio of diversified assets" purchased by the CDOs.

13

34.     Relevant Non-Party Markov CDO I, Ltd. (the "Markov SPV") was an exempted company with limited liability incorporated on March 2, 2007 under the Companies Law (2004 Revision) of the Cayman Islands, with a registered office formerly located at the offices of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.  The Markov SPV was ordered into liquidation on or about January 22, 2008 by Barclays, in its capacity as the holder of Markov's super senior tranche.

35.     The Markov SPV, like every other CDO, was a special purpose vehicle ("SPV")—basically, a corporate "robot" that had as its sole purpose to serve as an intermediary through which all functions of the CDO were conducted.  Indeed, the Offering Circular stated that the Markov SPV was "established as a special purpose vehicle for the purpose of the issuance of the Notes," that its activities were limited to acquiring the collateral portfolio and issuing the notes backed by that collateral, and that the Markov SPV had "no employees, prior operating history or prior business."

36.     The Markov SPV's few permissible activities were actually performed by other parties.  For example, Bank of New York Mellon, which served as Markov's CDO trustee, distributed the cash flows generated by the CDO assets to noteholders; State Street, as Collateral Manager, purportedly selected and managed the CDO collateral assets; and Barclays, as warehouse provider, assembled, housed and financed the collateral assets prior to the issuance of the CDO.  The rules governing the CDO's operations—how "money-in" cash flows generated by the CDO collateral assets were dispensed as "money-out" cash flows to various third parties (e.g., fees to the Collateral Manager, the trustee, and other obligors) and to CDO noteholders— were set forth in the Markov CDO I Indenture.  That document, among other things, dictated how principal and interest and other cash flows from the CDO assets would be distributed to

Markov noteholders, the conditions under which the CDO or any of its notes would be considered to be in default, and the steps that would be followed in such a circumstance. Those rules were written by Barclays.

## IV.    BACKGROUND ON CDOs AND MARKOV

37.    A CDO is an investment vehicle that is generally constructed by forming an SPV, which raises money through the sale of securities to investors. The securities sold to investors are generally backed by a portfolio of investment assets, the expected cash flows from which serve as the source of income to pay the CDO noteholders. Generally, CDOs issue notes in several distinct classes, or tranches, each of which is entitled to the proceeds generated by the CDOs' assets in a specified order according to a defined priority known as the "waterfall." The most senior tranches have the first priority to receive proceeds from the CDOs, and therefore bear the lowest risk of loss and carry the highest credit rating; such senior tranches typically receive payments of principal and interest before the junior tranches. Conversely, lower or more junior tranches only receive payment after more senior tranches have been paid, and thus have higher risk of loss and, consequently, lower credit ratings.

38.    The differing levels of risk of loss on the CDO collateral are reflected in the varying yields paid by different tranches of CDO notes. The more senior, "safer," higher-rated tranches received lower coupon payments while more junior, "riskier," lower-rated tranches received higher coupon payments. In CDO parlance, the more senior, "safer," higher-rated tranches have greater levels of "credit enhancement" because, through the waterfall structure, the lower-rated tranches have to suffer 100% losses before the more senior tranches suffer their first dollar loss. As with most CDOs, the coupon on Markov notes was expressed as a premium of several basis points over the common benchmark interest rate LIBOR, or the London Interbank Offered Rate ("L").

39.     BayernLB purchased the most senior, highest-rated Markov notes that were offered to investors, which bore a triple-A rating and were purportedly the safest securities offered by Markov—the last to suffer any losses through Markov's waterfall structure.

40.     While CDOs can be supported by many different kinds of collateral, the primary source of collateral backing Markov—as with the majority of the CDOs issued from 2005 through 2007—consisted of RMBS.  RMBS are securities backed by pools of mortgage loans, which entitle investors to a stream of income derived from the payments of principal and interest by the borrowers on those mortgages.  RMBS, like CDOs, are divided into tranches with varying levels of credit ratings, subordination and yields.

41.     As noted by the FCIC, CDOs often included as collateral lower-rated RMBS tranches—the "mezzanine" or "BBB" rated tranche.  Even though these CDOs consisted of some of the riskier tranches of RMBS, the Defendants represented (and the rating agencies accepted) that, when the cash flows from such securities were properly structured (such as through tranches in a "waterfall" described above), a large pool containing many different BBB rated RMBS assets can provide diversification benefits that can produce secure, AAA rated securities. Increasingly, based on the same theory that the amalgamation, structuring and tranching of cash flows from subprime mortgages can produce AAA rated securities, CDOs began to include as collateral *other CDOs* that were, in turn, backed by lower-rated "BBB" rated RMBS.  Wall Street banks termed CDOs backed by primarily BBB collateral as "Mezzanine CDOs."  CDOs backed by "safer," higher quality assets—such as higher-rated A, AA and AAA rated RMBS tranches—were termed "High Grade CDOs."  Markov was marketed by Defendants as a "High Grade CDO."  As the Offering Materials represented, this meant that the complex structure of the Markov CDO designed by Barclays, coupled with the careful selection of collateral by State Street as an independent Collateral Manager, ensured that the senior notes issued by Markov

16

(and purchased by BayernLB) were secure investments deserving of the "AAA" ratings they carried.

42.     In Markov, Barclays took the financial alchemy behind the CDO structure one step further by including *synthetic* assets as collateral. Unlike traditional "cash" CDOs backed by actual RMBS notes purchased and held by the CDO, "synthetic" CDOs replace "cash" assets with "synthetic" assets that merely reference actual RMBS assets.  Barclays represented that the use of synthetic assets would enable State Street "to design a portfolio selected from a broader pool of collateral than available in cash" and improve the CDO's efficiency because of reduced funding costs.  Specifically, the Defendants represented that the "absence of a liquidity provider or term facility" – which presumably would have been needed to fund the purchase of cash assets – "improves overall transaction structure and efficiency."

43.     Unlike a cash CDO, a synthetic CDO does not have to raise $2 billion in investments to gain exposure to its $2 billion collateral portfolio.  Instead, a synthetic CDO typically issues two sets of notes: (1) a set of "funded" tranches, from unrated equity or "income" notes to AAA notes (such as those purchased by BayernLB in Markov), to raise a set amount of up-front funds that the CDO can hold in a reserve account and call on for initial credit protection payment payouts; and (2) an "unfunded" super senior tranche.  The holder of the "unfunded" super senior tranche is obligated to provide the CDO with whatever further funds it may need should collateral portfolio losses exhaust the CDO's up-front funding in the reserve account (which, again, was made up of proceeds from the "funded" tranche notes) – unless the CDO goes into default.

44.     In this sense, the unfunded super senior tranche represented a "no money down" promise to pay the synthetic asset counterparties, but provided the super senior tranche holder with potential returns if the synthetic assets performed.  In Markov, BayernLB purchased the

highest-rated offered notes, and Barclays was the sole holder of the unissued and "unfunded" super senior tranche, but also controlled the valuation of the CDO and thus determined when and whether Markov defaulted on its notes.

45.    The capital structure of Markov, including the various tranches and offered notes, their par value, their level of credit enhancement, their offering coupon (the rate of return expressed as a percentage above LIBOR), and their assigned initial ratings, is illustrated in the chart below:

| Class | Par ($mm) | Par % | Credit Enhancement % | Rating Moody's/ S&P | Offering Coupon | Interested Party |
|---|---|---|---|---|---|---|
| Super Senior | 1,600 | 80.00% | 20.00% | Aaa/AAA | Not Offered | Barclays |
| A-1 | 100 | 5.00% | 15.00% | Aaa/AAA | L +65bps | BayernLB |
| A-2 | 70 | 3.50% | 11.50% | Aaa/AAA | L +75bps | |
| A-3 | 80 | 4.00% | 7.50% | Aaa/AAA | L +85bps | |
| B | 70 | 3.50% | 4.00% | Aa2/AA | L +100bps | |
| C | 35 | 1.75% | 2.25% | A2/A | L +350bps | |
| D | 27 | 1.35% | 0.90% | Baa2/BBB | L +700bps | |
| E | 5 | 0.25% | 0.65% | Ba1/BB+ | L +900bps | |
| Income Notes | 13 | 0.65% | First Loss | NR | N/A | |

## V.    BARCLAYS' CONFLICTED ROLE IN THE MARKOV CDO

46.    Banks that arrange CDOs typically perform multiple roles, including: (a) structuring and modeling the CDOs; (b) marketing and selling the CDOs' notes to investors; (c) retaining ratings agencies to provide ratings for the CDOs' tranches; (d) financing and facilitating the purchases of the cash collateral and holding—or "warehousing"—that collateral on their own books prior to closing; and (e) facilitating hybrid structures by acting as the initial protection buyer for CDS included in the synthetic collateral pool.  Further, because the SPV that serves as the deal's issuer does not have any employees of its own, the arranging banks usually

act for the issuer and serve as the underwriter, or "initial purchaser," that buys all of the notes from the issuer at closing and then sells them to investors.  For performing these functions, arranging banks typically receive millions of dollars in fees at closing.  Barclays performed all of these functions with respect to Markov.

47.    As noted above, Barclays structured Markov to be a hybrid CDO containing both cash and synthetic assets.  A simplified description of Markov's structure shows how this worked in practice.  After deducting Barclays' and State Street's fees (and certain other administrative expenses), the proceeds from the sale of $400 million in Markov notes, including the AAA notes purchased by BayernLB, were used as follows: approximately $200 million was used to purchase the "cash" RMBS assets that comprised 10% of Markov's $2 billion in collateral, while the remaining amount was deposited into a reserve account that served as the initial source of funding for Markov's contingent obligations under the CDSs with Barclays.  That "reserve" of nearly $200 million provided Barclays with protection on the $1.8 billion in synthetic "referenced" collateral.

48.    Because Markov's CDS and TRS contracts with Barclays were contingent—*i.e.*, Barclays would only receive payments under the terms of the CDS and TRS if the collateral performed poorly—Barclays was able to build a $2 billion CDO with only $400 million in initial "up-front" funding.  If the synthetic assets performed poorly, Markov would use the roughly $200 million "reserve" account funds first to pay to Barclays any amounts owed to it as swap counterparty, and then could liquidate the $200 million in "cash" RMBS assets to pay Barclays any amounts exceeding $200 million.

49.    In the event Markov's $400 million in "real" assets were insufficient to fund its obligations as credit protection seller because the referenced assets performed poorly—*i.e.*, the $200 million in funds from the reserve account were exhausted and the $200 million in Markov's

funded cash assets were liquidated and used to pay the swap counterparty—Barclays, as swap counterparty, would still be obligated to fund swap payments against a notional $1.8 billion portfolio.  In such a case, and assuming no CDO event of default had occurred, Markov's "unfunded" Super Senior Class S notes were obligated to make any payments owed to the swap counterparty.  If, however, an event of default occurred before the Super Senior Class S notes were issued, the swap counterparty—Barclays—would take possession of the notes.  In either case, the sole holder of the Super Senior notes was Barclays itself.  Accordingly, when the deal closed, Barclays had no actual exposure to loss as the holder of the Super Senior notes.

50.     In this sense, Barclays stood on both sides of the transaction—in its role as swap counterparty, Barclays had the right to payment arising from Markov's $1.8 billion in swap obligations but, as Super Senior noteholder, Barclays itself was the party ultimately on the hook for those payments.  In other words, in the event Markov's synthetic referenced collateral experienced losses requiring CDS payments in excess of $400 million, Barclays (as swap counterparty) would essentially be demanding payment from itself (as Super Senior noteholder).  Thus, in the event Markov's collateral failed, Barclays stood to receive the $200 million being held in reserve as well as the proceeds of the sale of the $200 million of real assets held as "cash collateral."  Moreover, as the Super Senior noteholder, Barclays was granted significant control rights as the sole member of the "controlling class" of Markov noteholders, including the ability to force the trustee of the Markov SPV to liquidate the CDO's collateral under certain events of default. Barclays used this control to its advantage.

51.     Significantly, even though Barclays served as the counterparty to Markov's synthetic collateral, it also acted as the "Calculation Agent" charged with valuing those synthetic positions under the governing swap agreements.  Specifically, in simplified terms, the values of the synthetic assets, and the payments required to be made to Markov or Barclays under the

synthetic swaps, were determined by either (a) any ratings downgrades on the underlying referenced asset, or (b) the "value" of the referenced asset as determined by the Calculation Agent. While State Street, as Independent Collateral Manager, ostensibly had the authority to challenge Barclays' valuations, State Street abdicated this role and permitted Barclays to use its control over the valuations of Markov's synthetic collateral to manipulate Markov for Barclays' own benefit. The control over the valuation of Markov's synthetic collateral gave Barclays extraordinary control over Markov's performance, and Barclays used this control for its own benefit. Among other things, controlling the valuations of Markov's synthetic collateral provided Barclays with the ability to cause Markov to fail an overcollateralization, interest coverage or interest diversion test—structural triggers that were intended to **protect** Markov noteholders like BayernLB. In such a case, Barclays' control over the valuations of Markov's synthetic collateral could result in an event of default—an event which could trigger liquidation of Markov's collateral and the distribution of the liquidation proceeds through Markov's waterfall structure to Barclays, in its role as synthetic swap counterparty.

52. Because of the potential conflict created by Barclays' multiple roles in the Markov CDO—and particularly the conflicts created by Barclays' role as a synthetic counterparty to the CDO and the Calculation Agent charged with valuing the synthetic assets—State Street's role as Independent Collateral Manager was of utmost importance to investors. In theory, the Collateral Manager's independent role of determining which assets would be included in the collateral portfolio ensured that Barclays—which stood to profit if that synthetic collateral failed—would not influence the selection of collateral in a way that served its own interests but not those of the investors in Markov notes. In other words, because Barclays' "short" interest was dependent upon collateral selected independently by State Street—and not

upon collateral that Barclays selected for itself—investors were assured that the risks posed by Barclays' conflicted positions would not impact the CDO's performance.

## VI. BARCLAYS EXPLOITS ITS CONTROL OVER MARKOV'S COLLATERAL TO BET, AND PROFIT, ON MARKOV'S COLLAPSE

53.     Barclays executed its scheme to maximize its bet against Markov's synthetic assets by influencing and controlling State Street's purportedly "independent" selection of the composition and quality of the CDO collateral. An analysis of Markov's collateral demonstrates that (i) Markov contained an extraordinarily high percentage of securities from other CDOs as collateral, (ii) an extraordinarily high percentage of the CDO securities included in or referenced by Markov were among the riskiest of this risky asset class, and (iii) Markov even included CDO assets that Barclays and State Street custom-built for Markov—the so-called "Markov Chain" CDOs—that, despite their AAA ratings, were among the riskiest collateral included in Markov.

54.     Markov's $2 billion in notional collateral can be broken down as follows: Markov used $200 million in proceeds from "funded" notes (including the $57 million paid by BayernLB) to purchase actual "cash" collateral. That "cash" collateral consisted of $95 million in RMBS and $105 million in tranches of other CDOs. Markov's remaining $1.8 billion in *synthetic* collateral was comprised of $1.25 billion in swaps referencing RMBS assets and $550 million in swaps referencing tranches of other CDOs. Put another way, Markov was comprised of $1.345 billion in RMBS (holding $95 million in "cash" RMBS assets and referencing $1.25 billion in synthetic RMBS exposure), and $655 million in CDOs (holding $105 million in "cash" CDO tranches and referencing $550 million in synthetic CDO exposure):



55.     Significantly, Defendants represented that State Street's CDO "philosophy" was to "[m]anage portfolios that do not rely on credit or interest rate structural elements" such as "excessive CDO buckets."   Contrary to this purportedly conservative approach, however, Markov was actually structured with a 35% "CDO bucket," meaning that up to $700 million of Markov's $2 billion collateral portfolio could consist of CDO assets—a larger "CDO bucket" than any Barclays CDO created during the prior 3 years, and nearly double the average "CDO buckets" contained in other High Grade CDOs.  Markov's CDO bucket was then filled with $655 million of CDO collateral, representing 32.75% of Markov's total $2 billion portfolio.

56.     Barclays further influenced the collateral referenced by Markov (and the odds that Barclays' bet would pay off) by designing "bespoke" synthetic CDOs that were custom-built to serve as collateral for Markov.  Specifically, Barclays caused Markov to enter into $300 million

in CDS—an amount representing 15% of Markov's total portfolio—that referenced the tranches of 12 "Markov Chain" CDOs which, in turn, referenced other RMBS assets.  While the "Markov Chain" CDOs were each assigned AAA ratings—creating the impression that they were among the safest of Markov's collateral assets—they were, in fact, among its riskiest.  Further, the opaque nature of the Markov Chain CDOs enabled Barclays to disguise its profit from the "sale" of those referenced CDS to Markov at an unverifiable and inflated markup.  Specifically, while the RMBS assets backing the Markov chain CDOs had experienced significant deterioration in value by the time Markov closed, these CDOs were "sold" to Markov at spreads reflecting their perceived credit quality months earlier.

57.    In the Markov Chain CDOs, Barclays designed a reference asset with the exact characteristics and parameters it desired through the use of creative swap engineering.  Specifically, the "Markov Chain" CDOs referenced single tranches from bespoke mezzanine CDOs—synthetic assets that mimicked the performance of a single tranche of a hypothetical fully structured CDO—that were created by Barclays for the sole and express purpose of serving as collateral for Markov. While Barclays represented in materials provided to BayernLB that the RMBS tranches referenced in the Markov Chain CDOs had been "SSGA [State Street] selected," State Street's CDO department had neither the expertise nor capacity to properly model or evaluate the performance of the synthetic Markov Chain CDOs tranches, and was thus dependent on Barclays in developing these bespoke products.  As a result, the ultimate collateral backing these creative products was the very assets Barclays wanted to bet against:  a portfolio of subprime BBB rated RMBS tranches hand-picked by Barclays.

58.    Significantly, while the Markov Chain CDOs were assigned the same AAA rating as other CDOs included in Markov, the attachment and detachment points in the Markov CDOs—the points at which (1) the tranche experiences its first dollar loss and (2) suffers 100%

in losses—were far lower and thus much more exposed to the risk of loss on the underlying collateral.  By manipulating the structure of the Markov Chain CDOs to increase the risk borne by the tranches in which Barclays and State Street caused Markov to invest, Barclays and State Street were able to mask and manipulate the risk that they had placed into Markov.

## VII.   BARCLAYS AND STATE STREET ACTED WITH SCIENTER

59.    Barclays and State Street knew their representations concerning Markov were materially false and misleading.  As set forth below, while each had its own independent motivations for misleading BayernLB, they were both driven by the same goal of pursuing their own financial interests at BayernLB's expense.  Barclays had previously profited through its manipulation of the collateral of another CDO, and knew—through its own involvement in securitizing defective RMBS and its extensive financial relationships with the lenders that produced the mortgages backing that collateral—that Markov presented an opportunity to bet against the impending bursting of the subprime bubble.  State Street likewise knew that Barclays wanted to influence Markov's collateral, as State Street had allowed another investment bank help a hedge fund to rig such a bet against another CDO that State Street managed.

### A.    BARCLAYS' PRIOR IMPROPER MANIPULATION OF THE COLLATERAL IN ANOTHER SYNTHETIC CDO IT CREATED SERVED AS A TEMPLATE FOR MARKOV

60.    Barclays' plan to reap enormous profits through Markov drew upon its prior experience in exploiting a similar synthetic CDO.  Specifically, in 2000, Barclays created a $950 million CDO named Corvus CDO, a synthetic CDO that operated in a similar fashion to Markov.  Like Markov, Corvus consisted of synthetic collateral—specifically, CDS—that referenced various corporate debt obligations.  And, as in Markov, Barclays served as the "short" swap counterparty to the CDS purchased by Corvus.  Unlike in Markov, however,

Barclays also served as the collateral manager that was charged with selecting the reference obligations that the Corvus CDO insured through its CDS.

61.     As explained in subsequent lawsuits brought by Corvus investors Hamburgische Landesbank and Landesbank Schleswig-Holstein (or "LB Kiel," which together with Hamburgische Landesbank later became part of HSH Nordbank), Barclays exploited its role as collateral manager to benefit from its short interest in Corvus's CDS assets, and intentionally selected poor quality assets—including tranches from other bespoke CDOs that Barclays had created—in order to profit from their failure.

62.     As described in one account, Barclays' CDO team, led by Vincent Balducci, decided in October 2001 to "hit the red eject button" and began to remove "good assets" from the Corvus CDO, and replaced them with "bad" assets.  While Barclays was required to include assets that were "of equal or better credit quality," the measure of credit quality was solely determined by the ratings assigned to the collateral, which Barclays knew did not accurately reflect the collateral's true credit risk.  As explained in journalist Nicholas Dunbar's account:

> What happened next was ugly.  Perfectly good assets sitting inside client CDO portfolios were replaced by chunks of unsold CDOs with the same credit rating.  The unsold CDOs would have other unsold CDOs already lurking inside them, which in turn contained more unsold CDOs, so that Barclays deals started to resemble Russian dolls.  Toxic Russian dolls.

63.     By the third quarter of 2001, 90% of the Corvus portfolio had been replaced in this manner with assets that Barclays did not want.  Further, because there was no active market for the assets contained in Corvus, the CDO's investors (similar to Markov's investors) were entirely dependent upon Barclays' pricing of the synthetic collateral assets.  In emails to Corvus investors at year end, Barclays insisted that the CDOs included in Corvus were still worth 100 cents on the dollar.  When Fitch Ratings finally reevaluated Corvus' holdings in late 2002, it repeatedly downgraded Corvus' AAA tranches to BB or worse, causing the CDO investments to

plummet in value.  LB Kiel and Hamburgische Landesbank later settled their action against Barclays for an undisclosed amount shortly before trial, which was scheduled to begin in February 2005.  Until the subprime crisis and defaults of the Carina and Markov CDOs several years later, Corvus was the worst performing CDO on record.  (State Street's role in the Carina CDO is discussed below in ¶¶92-102 and 108-111.)

64.     The key Barclays' "contacts" for Markov all reported to Balducci, Barclays' head of global credit derivatives and the leader of the CDO team that decided to use Corvus as a dumping ground for Barclays' unwanted assets.  Specifically, the following four members of Barclays 14-person CDO team, all of whom were hired in 2005 to help grow Barclays CDO business and ultimately reported to Balducci, were listed as "contacts" for Markov:  Kristopher Kraus, Edward Dale, Stephen King (who reported to Kraus), and Rohit Chaku.

**B.     BARCLAYS GAINED UNIQUE INSIGHT INTO THE POOR QUALITY OF RMBS COLLATERAL INCLUDED IN OR REFERENCED BY MARKOV**

65.     Barclays had unique insight into the poor quality of the RMBS and CDO assets included in Markov.  Barclays' knowledge of the risky nature of these assets and their true quality was gleaned through its vast experience and involvement in reviewing the actual underlying loans backing those securities as a prolific underwriter and securitizer of subprime RMBS.  As explained by Chris Lucas, BBPLC's Group Finance Director, on a February 2007 earnings conference call, Barclays' U.S. RMBS business model was to "originate and sell rather than originate and hold."  In performing its role as an "originate and sell" sponsor and underwriter of RMBS, Barclays performed extensive due diligence on the loans it selected to securitize as RMBS, and knowingly included in the RMBS it securitized scores of loans that failed to meet the originators' underwriting guidelines.

66.     By the time Markov closed, Barclays purchased and securitized over $13 billion in loans from eight of the originators whose loans backed the RMBS included in Markov. Through the due diligence Barclays performed in securitizing these loans, Barclays learned that the loans were not underwritten in accordance with the originators' stated guidelines, that the loans were secured by properties with wildly inflated appraisals, that the RMBS backed by the loans were much riskier than reflected by the credit ratings they were assigned, and that RMBS containing those originators' loans were much riskier than represented or than any investor that did not have Barclays' unique access to information could ever have discovered.

67.     Indeed, as revealed in documents produced to the FCIC by Clayton Holdings, Inc. ("Clayton")—one of the firms Barclays hired to perform due diligence on the loans it securitized—nearly 30% of all loans that Clayton reviewed for Barclays during the height of the mortgage boom (from 2006 to mid-2007) failed to meet the originators' underwriting guidelines.  In evaluating the soundness of a loan, Clayton would assign each loan a number—1, 2 or 3—"1" being the best—i.e., the loan met the originator's underwriting guidelines—and "3" being the worst, i.e., the loan failed to meet the originator's guidelines.  Yet Barclays knowingly "waived in" approximately *28%* of the loans identified as defective and graded "3" by Clayton, and securitized them anyway.  Moreover, because Barclays only sampled a small percentage of the loans it purchased for securitization, it knew that, based on the limited nature of the sample, the rest of the untested loans—i.e., the loans that were not reviewed by Clayton—were similarly defective, yet those loans were securitized without further review. Barclays repeated this process, reviewing reports revealing the poor quality of the loans before purchasing those loans for securitization, for at least eight lenders whose loans backed the RMBS included in Markov.  In total, Barclays sampled, reviewed, and securitized over $13 billion in loans in over 166 separate RMBS securitizations before Markov's closing date from

just these eight lenders.  Moreover, as discussed below in paragraphs ¶¶84-87, Barclays, through Markov, "shorted" at least 25 RMBS that Barclays itself had underwritten.

68.    Barclays also knew that it was not alone in securitizing defective loans as RMBS, and that other major underwriting banks similarly routinely securitized loans that failed to meet the originators' underwriting guidelines.  Indeed, in marketing the RMBS it securitized to RMBS investors, Barclays represented that it "conduct[ed] comprehensive due diligence on each purchased pool which [was] *more complete in scope and significantly more thorough than due diligence conducted by other buyers of HEL* [home equity loans]."  In addition, Barclays represented that Barclays employees performed on-site due diligence and quality control at some of the mortgage originators that issued the loans it securitized, and even represented that every "exception" loan that was included in a Barclays-sponsored RMBS deal had been reviewed by a Barclays employee to ensure the loan's appropriateness for inclusion in the securitization.  In other words, Barclays *knew* that loans originated by the lenders whose loans it had securitized as RMBS were defective and that those defective loans were securitized as RMBS as a matter of course, as Barclays *itself* had securitized over $13 billion of loans originated by these lenders in such a manner by the time Markov closed.

69.    Barclays also gained unique knowledge of the quality of the loans backing the RMBS included in or referenced by Markov through Barclays' warehouse lending relationships with the originators whose loans backed Markov's collateral.  Mortgage originators generated profits primarily through the sale of their loans to investment banks like Barclays, and the originators were therefore driven to originate and sell as many loans as possible.  In order to fund those loans, mortgage originators established warehouse lines of credit with investments bank such as Barclays.  Those lines of credit, in turn, would be secured by the very mortgage loans that investment banks like Barclays would purchase for securitization.  Barclays earned

29

fees and interest income on those warehouse lines of credit.  From 2005 to 2007, Barclays extended warehouse lines of credit totaling billions of dollars to several of the originators whose loans backed the RMBS purchased and referenced by Markov.  Of course, before providing such funding, Barclays became intimately familiar with the lending practices of these originators through extensive due diligence on their business operations.

70.     According to notes of an interview published by the FCIC, former Clayton President Keith Johnson stated that banks like Barclays were particularly culpable in disregarding Clayton's findings and securitizing defective loans:

> For every hundred 3's that we found, forty were still purchased. Some firms would purchase way more (tended to be those that had warehouse lines related to them) and some would purchase way less. ***The ones with the warehouse lines had the highest.*** I think we actually talked to a law firm that was doing the prospectuses, and we said that they should disclose the due diligence, and they said that they spent 20 pages talking about the underwriting guidelines. I thought that the investors and the rating agencies would be interested in the exceptions.

Memorandum for the Record, Phone Interview with Keith Johnson, former President and COO of Clayton Holdings (June 8, 2010).

71.     At the beginning of 2007, Barclays had over $6.6 billion in warehouse lines of credit extended to third-party subprime originators, including those whose loans backed the RMBS purchased or referenced by Markov.

72.     Barclays' financial relationship with New Century—the single-largest originator of loans backing the synthetic RMBS referenced by Markov, and the primary originator of the loans backing the synthetic RMBS referenced in the Markov Chain CDOs—exemplifies how Barclays gained and exploited its unique knowledge of the poor quality of RMBS to bet against Markov.  In total, loans originated by New Century represented a notional value of over $750 million in the synthetic RMBS referenced by Markov.  From 2005 through 2007, Barclays

securitized over $5.8 billion in New Century loans, and had securitized over $3.8 billion in New Century loans by the time Markov closed.

73.     In each of Barclays' securitizations involving New Century loans, Barclays performed due diligence, which, as explained above, confirmed the poor quality of New Century loans.  That due diligence confirmed for Barclays what the bankruptcy examiner that investigated the reasons behind New Century's subsequent collapse concluded: that "the increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007."  Among other things, the bankruptcy examiner found that by as early as 2004, New Century was aware of an increasing number of early payment defaults ("EPDs")— where a borrower fails to make even the first several payments on a loan—suggesting that the loan should have never have been made in the first place.  In every month after March 2006, the EPD rate exceeded 10%, with EPDs accounting for 15% of all loans issued by New Century by the end of the year.

74.     Numerous former New Century employees interviewed by BayernLB's counsel confirm the egregious nature of this subprime lender's underwriting practices.  For example, CW 1, a former New Century production risk manager from April 2002 until April 2007 who performed quality control audits and funded loans, said that it was a running joke at New Century that "If you could fog a mirror, you can get a loan at New Century."  According to CW 2, a former regional vice president employed at New Century from 1999 until May 2007, New Century's operation division did not care whether a loan was good or bad—so long is it could be sold to an investment bank like Barclays (who would then package and sell the loan as RMBS), the loan was good.  CW 2 said that New Century booked "ugly" loans and that it was about "volume, volume, volume…pretty reckless volume."  In July 2010, New Century's top three officers (its CEO, CFO and COO) agreed to pay a substantial fine to settle an SEC action

alleging they had committed fraud.  Barclays, through its financial relationships with New Century—including as a securitizer of over $3.8 billion of loans by the time Markov closed—was keenly aware of these practices and of the poor quality of loans originated by New Century.

75.     CW 3, a New Century assistant vice president, operations manager, from 2000 through 2006, confirmed that Barclays was a main purchaser of New Century loans, that banks like Barclays "saw problems with the products," that New Century was "funding shitty loans," and that all that mattered at New Century was whether a loan was approved, because a "loan was a loan."  CW 4, a transaction manager in the secondary marketing department of New Century Capital Corporation from November 2006 through June 2007, stated that he personally closed a number of New Century deals with investment banks including Barclays.  CW 4 stated that CW 4 believes that New Century was able to sell approximately 90% to 95% if its loans to investment banks like Barclays even though, as noted above, the investment banks' due diligence revealed that the percentage of defective loans was far greater than 10%.

76.     Barclays also had similar knowledge of the poor quality of loans originated by four lenders—Wells Fargo, Option One, WMC, and Countrywide—which originated loans that represented $215 million in notional value of the synthetic RMBS collateral referenced by Markov.  These lenders represented, respectively, the second, fourth, fifth and eighth largest originators in Markov, as measured in terms of notional value of the loans backing the RMBS that had been synthetically referenced by the CDO.  Combined, Barclays reviewed, purchased, and securitized over $7.7 billion in loans originated by these four lenders by the time Markov closed, and therefore knew that a substantial percentage of the loans issued by these lenders failed to meet the lenders' stated underwriting guidelines, and that RMBS backed by these loans were far riskier than represented.

C.       **BARCLAYS EXPLOITS ITS SHORT POSITION IN MARKOV TO PROFIT FROM THE HOUSING COLLAPSE**

77.       Armed with the knowledge acquired through its extensive activities and financial relationships in the mortgage origination and securitization industry, Barclays knew that by 2007, the subprime mortgage market was on the precipice of collapse.  Barclays designed Markov in order to limit its own exposure to the declining housing market and to seize the profit opportunity created by the bursting of the housing bubble.

78.       Barclays' knowledge of the rapid deterioration in the U.S. subprime mortgage market and Barclays' own exposure to RMBS assets backed by such collateral was also informed by Barclays' purchase of a major subprime mortgage originator in January 2007. Eager to capitalize on the booming market for subprime mortgages, which provided the raw materials that could be securitized, sold, referenced and bet against through CDOs such as Markov, in January 2007, Barclays agreed to purchase the subprime mortgage originator Equifirst for $225 million in cash.  At the time, EquiFirst was the 12th-largest subprime mortgage originator in the United States.  EquiFirst originated at least $24.4 billion in subprime loans from 2005 through 2007.

79.       According to Barclays' officials, its purchase of Equifirst was intended to supplement its active wholesale loan mortgage business, which involved the purchase and securitization of mortgages on a principal basis, such as the Barclays-underwritten and sponsored "SABR" RMBS that were included in Markov.  As touted by Grant Kvalheim, co-president of Barclays Capital, the "acquisition offer[ed] Barclays Capital an excellent opportunity to further vertically integrate and expand our existing U.S. mortgage business." Consistent with Barclays' "originate and sell" model, the loans originated by EquiFirst were expected to be securitized or sold on an ongoing basis after an average holding period of

approximately 2 to 3 months.  Over the next few weeks after Barclays' agreement to acquire EquiFirst, as borrower defaults began to skyrocket and warehouse lenders became increasingly anxious over the quality of the collateral securing their financing, Barclays renegotiated a drastically reduced purchase price for EquiFirst.  The final price when the deal closed on April 2, 2007—just a month before the Markov notes were issued—was $76 million, or less than two-thirds of what Barclays had agreed to pay just weeks before.

81.     Over this same time period, which coincided with Barclays' and State Street's efforts to market Markov's notes to BayernLB, Barclays became acutely aware of the deteriorating condition of the housing market and the subprime-related securities tied to that market.  For example, as Barclays admitted in litigation against Bear Stearns arising from Barclays' role as liquidity provider to the two infamous Bear Stearns hedge funds that collapsed in June 2007, February 2007 was a time of "extreme volatility and dropping prices in ABX indices that track the performance of bundles of asset-backed debt securities, particularly those tied to sub-prime mortgage debt."  Barclays alleged that it was misled by the performance of the Bear Stearns hedge funds in February 2007 due to representations concerning Bear Stearns' hedging strategy, and that Bear Stearns' representation that the funds' "hedges are working beautifully" convinced Barclays that the Bear Stearns funds had performed well despite the volatile market.

81.     In other words, Barclays **knew** that the subprime-related RMBS and CDO securities included in the Bear Stearns funds—which were of the same type and quality as those selected for Markov—were at extreme risk, and that only by "hedging" such securities could the funds have generated the returns represented by Bear Stearns.  Barclays' experience as liquidity provider to the Bear Stearns hedge funds informed Barclays' decision to develop its own "hedge" against the collapsing subprime market through its short positions in the Markov CDO.

82.     Barclays also became acutely aware of the need to protect itself against the rapidly deteriorating RMBS market through its financial relationships with mortgage lenders that were coming under increasing stress in the beginning of 2007.   For example, while Barclays had learned of New Century's reckless lending practices in intimate detail through Barclays' due diligence of loans it securitized throughout 2005 and 2006, the poor quality of New Century loans became even clearer to Barclays as borrowers began to default at alarming rates at the beginning of 2007.

83.     Specifically, on March 22, 2007, as Barclays was pitching Markov's AAA rated notes to BayernLB, Barclays agreed to allow New Century to avoid paying $900 million it owed to Barclays under a warehouse lending arrangement in exchange for Barclays' taking possession of New Century loans Barclays had financed.   Under the agreement, Barclays assumed all outstanding mortgage loans funded but not yet sold through Barclays' warehouse credit facility at New Century on an "as-is" basis, "without any representations or warranties by [New Century] or its subsidiaries, and without any holdback by Barclays."   Barclays' willingness to forego the standard representations and warranties reflected its belief that New Century would be financially unable to make good on any such promises, and that Barclays was better off accepting defective New Century loans rather than trying to recover the funds it extended through its warehouse lines of credit in a New Century bankruptcy proceeding.   As explained by an industry insider, in March 2007, "New Century [was] essentially telling its creditors 'you can take your loans as is, or you can see what you get out of receivership in bankruptcy' at this point."

**D.   BARCLAYS KNEW THE BBB RATED SECURITIES INCLUDED IN MARKOV WOULD FAIL, A FACT THAT WAS CONFIRMED BY THE DUE DILIGENCE BARCLAYS PERFORMED ON SPECIFIC SECURITIES INCLUDED IN MARKOV**

84.     Barclays' knowledge of the extraordinarily high number of defective loans backing the RMBS Barclays itself had securitized provided assurance that its bet against the "BBB" rated tranches in the Markov Chain CDOs would pay off.  Because they were lower in the capital structure, the BBB rated tranches would be the first to suffer losses as a result of defaults on the underlying mortgage loans.  Investors like BayernLB were unable to discern just how highly exposed Markov was to BBB rated RMBS because much of that exposure was assumed indirectly through Markov's purchase of tranches of Mezzanine CDOs that themselves received higher-grade ratings (from A to AAA).  But these mezzanine CDO securities—which comprised $635 million of Markov's total $2 billion of collateral—were exposed to the credit risk posed by BBB rated subprime RMBS.

85.     Barclays' bet against Markov's synthetic collateral was not only informed by Barclays' views on BBB rated subprime securities, but its specific knowledge of the true quality of RMBS and CDO securities that Barclays itself had underwritten.  Indeed, four of the RMBS deals Barclays "shorted" as the CDS counterparty to Markov and *21* RMBS that were "referenced" in the Markov Chain CDOs were actually underwritten by Barclays itself.  In total, Barclays was directly "short" $80 million worth of securities Barclays itself had underwritten.  Barclays also included in Markov eight Barclays-underwritten RMBS that were indirectly "referenced" through the Markov Chain CDOs, and these Barclays-underwritten RMBS likewise had a significant impact on the performance of each of the three Markov Chain CDOs.  These securities, including five RMBS issued by the Barclays subsidiary Securitized Asset Backed Receivables LLC, or "SABR," contained loans originated by New Century,

Countrywide, and Option One, among others—originators whose loans Barclays knew were defectively underwritten as a matter of course.  For each of these securities, Barclays performed due diligence on the individual loans backing these securities, and based on that review, Barclays **knew** that the loans failed to meet the originators' purported underwriting guidelines, and were thus much riskier than BayernLB could ever have discovered.

86.     Indeed, the only Barclays-underwritten securities that were actually purchased as "cash" assets (instead of synthetically referenced as assets that Barclays was "short") were those that Barclays wanted to move off its own books.  For example, the only Barclays-underwritten and sponsored RMBS actually "purchased" by Markov was SABR 2007-NC2, an RMBS comprised of New Century loans that was sold to Markov via a private placement, and contained loans that Barclays had acquired from New Century just as the originator was imploding, as described above.

87.     Even worse, Barclays included in Markov two securities issued from a CDO that Barclays **itself** had created—the Pampelonne CDO II.  The securities that Markov purchased from the Pampelonne CDO II, which closed just two months before Markov, represented 20% of all "cash" CDO securities purchased by Markov, and represented the only "High Grade" CDO included in Markov.  The Pampelonne CDO II, which was managed by Vertical Capital, in turn, bought $20 million in notes issued by Markov that Barclays could not otherwise sell. These incestuous purchases enabled Barclays to rid itself of the exposure to the CDOs it had underwritten, collect a profit from their sale, and create an artificial demand for CDO securities that helped Barclays to sell even more CDO securities to investors like BayernLB, which did not share Barclays' unique knowledge of the rapidly deteriorating RMBS market.  As explained by *ProPublica*:

How could something so seemingly short-sighted have happened?

\*\*\*

The CDO managers played a crucial role. CDOs were so complex that even buyers had a hard time seeing exactly what was in them – making a neutral third party that much more essential…

By persuading managers to pick the unsold slices of CDOs, the banks helped keep the market going.

**E.      BARCLAYS ENLISTS STATE STREET, WHICH CEDES ITS ROLE TO INDEPENDENTLY SELECT MARKOV'S ASSETS, TO CARRY OUT THE FRAUD**

88.      As a result of its experience with Corvus, Barclays knew that creating and marketing synthetic CDOs to investors was an effective way for Barclays to bet against the declining U.S. housing market and to make virtually risk-free profits while simultaneously reducing its trading desks' exposure to unwanted assets.  Barclays also knew, however, that it would not be able to market the synthetic CDOs it sponsored without providing investors assurance that Barclays would be unable to exploit its short interest in the CDO's synthetic collateral, as it had by serving as collateral manager for Corvus.  To accomplish this goal, Barclays enlisted State Street as a purportedly independent collateral manager.

89.      Extensive investigations by congressional investigators and the news media into the conduct of financial institutions in creating, underwriting and marketing CDOs have recently revealed how Barclays exerted its control over the selection of collateral assets, took control over the role purportedly performed by State Street as Collateral Manager, and concealed this conduct from CDO investors.  For example, a recent investigative report by *ProPublica* quotes one CDO manager who explained how Merrill Lynch was able to exercise control over the collateral managers in deals underwritten by the bank, in the very same manner that Barclays exercised its control over State Street here:

The way CDOs are put together, there is a brief period when the bonds picked by managers sit on the banks' balance sheets. Because the value of such assets can fall, banks reserved the right to overrule managers' selections.  According to numerous bankers, managers and investors, banks rarely wielded that veto until late 2006, after which it became common.

90.     That same report described how banks like Barclays threatened to partner with other competing managers to extort a collateral manager's agreement to "select" assets chosen by the underwriting bank.  If collateral managers insisted upon maintaining independence and control over collateral selection, banks "froze out" such stubborn collateral managers from further CDO collateral management assignments. As a result, collateral managers became reduced, as one CDO banker put it, to "indentured slaves":

> Merrill exercised its leverage over the managers. A strong relationship with Merrill could be the difference between a business that thrived and one that didn't. The more deals the banks gave a manager, the more money the manager got paid. As the head of Merrill's CDO business, [Chris] Ricciardi also wooed managers with golf outings and dinners. One Merrill executive summed up the overall arrangement: "I'm going to make you rich. You just have to be my bitch."

> But not all managers went for it.

> An executive from Trainer Wortham, a CDO manager, recalls a 2005 conversation with Ricciardi. "I wasn't going to buy other CDOs. Chris said: 'You don't get it. You have got to buy other guys' CDOs to get your deal done. That's how it works.'" When the manager refused, Ricciardi told him, "'That's it. You are not going to get another deal done.'"

> *****

> Once, Merrill[] pushed a manager to buy a CDO slice for a Merrill-produced CDO called Port Jackson that was completed in the beginning of 2007: "'You don't have to buy the deal but you are crazy if you don't because of your business,'" an executive at the management firm recalls [a Merrill executive] telling him. "'We have a big pipeline and only so many more mandates to give you.' You got the message." In other words: Take our stuff and we'll send you more business. If not, forget it.

> "All the managers complained about it," recalls O'Driscoll, the former Credit Suisse banker who competed with other investment banks to put deals together and market them. But "they were indentured slaves." . . . ***Other big CDO-producing banks quickly adopted the practice.***

39

91.     Just as Merrill Lynch exerted its control over the collateral managers of the CDOs it sponsored, Barclays exercised veto power over State Street's selection of Markov's collateral to ensure Barclays' profits.

92.     Indeed, the Massachusetts Securities Division recently censured State Street for alleged violations of the Massachusetts state securities laws for ceding its role as collateral manager for the Carina CDO—a separate CDO underwritten by Deutsche Bank—in the exact same manner as alleged herein.  In that action, State Street agreed to pay penalties and fines totaling $5 million to resolve allegations that it misrepresented its role as collateral manager in the offering materials for the Carina CDO—representations that were nearly identical to those alleged as false and misleading in this action, as set forth above.

93.     As set forth in the Consent Order and alleged by the Massachusetts Securities Division, State Street misled investors in the Carina CDO by failing to disclose the fact that it had permitted an outside party that sought to "short" the CDO notes to provide input into the collateral selection process.

94.     Specifically, in the Consent Order dated February 28, 2012, State Street admitted to a "Statement of Facts" which cited numerous emails between State Street, the collateral manager of Carina; Deutsche Bank, which (like Barclays here) served as the underwriting bank and arranger of Carina; and a hedge fund, Magnetar, that developed a significant "short" position in the Carino CDO with Deutsche Bank's and State Street's help.

95.     For example, the Statement of Facts cites a June 26, 2006 email from a Deutsche Bank CDO director to Frank Gianatasio, Jr., State Street's Head of Structured Products and one of the "Key Personnel" that State Street and Barclays represented as being in charge of Markov. The email stated that "We have credit approval for the 200m – we should probably run the

[collateral asset] names by Magnetar – do you have something ready to go?"  In response, Gianatasio wrote: "I want to make sure that we understand what our relationship with Magnetar is going to be going forward.  I do not plan on getting approval from Magnetar for every trade… I want to be very clear about that.  We are engaged with DB and as such are required to get warehouse approval from DB only."

96.    These emails show that State Street was willing to cede its role to select the CDO's assets to both Magnetar, a hedge fund that wanted to "short" the assets in Carina, as well as to Deutsche Bank ("DB") which—like Barclays here—served as the synthetic counterparty to the Carina CDO, and was thus "short" the assets in the Carina CDO.  While Gianatasio expressed an initial concern about getting Magnetar's approval "for every trade"—a concern that was ultimately disregarded—his email also acknowledges that Deutsche Bank, with whom State Street was "engaged," was actively involved in selecting the assets that Deutsche Bank was shorting as Carina's synthetic counterparty.

97.    Similarly, as noted in the Consent Order, on July 14, 2006, a Magnetar trader sent an email to Gianatasio stating: "Seems like you're making good progress.  If it's not too much trouble, I'd like to establish a bit more of a dialogue between us.  Discuss ramping up strategy, talk about each list as it goes out, plan for non-sub/mid-prime sectors, market conditions, that sort of thing.  Just talk briefly a few times a week.  Would be much appreciated."  Gianatasio replied, "Absolutely."  In other words, Gianatasio, who was responsible for "spearheading" State Street's ABS CDO effort, had allowed State Street's selection of collateral to be influenced by an outside firm with interests adverse to the CDO's investors.

98.    As noted in the Statement of Facts, State Street also learned that Magnetar would be taking a "short" position to bet against Carina CDO.  Indeed, in an August 3, 2006 email to

Deutsche Bank concerning Magnetar's role in Carina CDO, Gianatasio noted that State Street was "not comfortable with [Magnetar] shorting into the deal."  Yet just several months later, in a December 6, 2006 email to Gianatasio, the Magnetar trader stated:  "As we did last time, I would like to strategize and discuss names for the CDO bucket before we execute any trades. Thought that worked out well for Carina I.  I will be taking the other side of this first trade as approved such that I am effectively pairing of the risk…."  In response, Gianatasio stated, "I'm happy to discuss the CDO bucket with you.  As we've talked about in the past we do quite a bit of analysis on CDO managers and transactions and it's often hard to find deals we like, so our universe of available deals to go long is somewhat limited."

99.     As demonstrated by the emails cited in the Statement of Facts (and as admitted by State Street), State Street ceded its purportedly "independent" role as Collateral Manager in the Carina CDO to Magnetar—a party that State Street ***knew*** was betting against the performance of the CDO and the interests of the CDO's noteholders.  State Street likewise ceded its authority as Collateral Manager in the Markov CDO to Barclays in the same manner it acquiesced to Magnetar's shorting of Carina.  Markov differs from Carina only in that the party influencing and betting against Markov's collateral portfolio was not an external hedge fund like Magnetar, ***but rather Barclays itself***.

100.    As reflected in the emails cited in the Statement of Facts, State Street abdicated its duty to act as an independent manager in Carina because the potential fees it would earn as collateral manager were "ENORMOUS."  As noted in an email from Michael O'Hara, State Street's Managing Director of the Core Bond Group/Head of Active U.S. Fixed Income and another of the "Key Personnel" State Street and Barclays represented was responsible for Markov, to senior personnel within State Street's Fixed Income Unit concerning the potential deal with Deutsche Bank:

[Deutsche Bank has] approached us on [a] reverse inquiry with an ENORMOUS mezzanine CDO opportunity.  It seems a large U.S. hedge fund has asked DB to structure a deal around a $70 million equity order and Deutsche has proposed that SSGA manage it.  An equity order of that size makes the trade $1.5 to $2 billion in size.  This would be the largest mezzanine CDO ever done.  Proposed fees are 20 basis points running, or $3 million per year at $1.5 billion.  Smells like a lay-up to me but we need to respond very quickly.

101.    While State Street was willing to readily jettison its obligations to act as an independent Collateral Manager for the "ENORMOUS" $3 million opportunity—a decision that a senior State Street executive described as a "lay-up"—the fees to be paid to State Street for performing this same puppet role in Markov were potentially even greater.  While State Street was poised to earn "ENORMOUS" fees on the $1.5 billion Carina CDO, the potential fees for State Street on Markov—a $2 billion deal—was even more.

102.    In fact, State Street's motive to abandon its duties to act as independent collateral manager in return for the outsized fees it garnered from managing CDOs like Markov is confirmed by evidence from other litigation against State Street, including internal State Street documents and deposition and trial testimony by the very same State Street executives who served as the "Key Personnel" on the Markov deal.

103.    That litigation includes both government and private actions arising out of misrepresentations and other violations of law in connection with State Street's management of several bond funds that were heavily invested in subprime-related assets that suffered hundreds of millions of dollars in losses in 2007.  In one such action brought by the SEC, State Street agreed to pay $250 million to settle allegations that it violated the federal securities laws by misleading investors concerning its management and the performance of the Limited Duration Bond Fund, which was, unbeknownst to State Street's clients, heavily invested in the very types of RMBS that were referenced or included in Markov.  *See Order Instituting Cease-and-Desist*

43

Proceedings, *In re State Street Bank & Trust Co.*, Securities Act of 1933 Release No. 33-9107, Admin. Proceeding File No. 3-13776 (Feb. 4, 2010).

104.    Similarly, in a private action by Prudential Retirement Insurance and Annuity Co. ("Prudential"), Judge Richard J. Holwell held that State Street violated provisions of the Employee Retirement Income Security Act ("ERISA") by imprudently managing two related bond funds that were likewise improperly exposed to the same (but higher-rated) types of subprime-related securities as those that were included in or referenced by Markov.  *See In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, No. 07-cv-8488, 2012 WL 333774 (S.D.N.Y. Feb. 1, 2012).

105.    As reflected in documents and testimony made public through that litigation, State Street's CDO management business was one of the State Street divisions that were directed by State Street's Chief Executive Officer, William Hunt, in the start of 2006 to **triple** the fixed income group's revenues and assets under management within three years.  As part of that strategy, internally termed the "G3" initiative, State Street was to become "[m]ore aggressive," and, as reflected in a video presentation made available to State Street employees in August 2006, to "take more active risk" and to move away from the company's historic reputation as a conservative risk manager.  This move that was exemplified by the slogan, "we are not your grandfather's fixed income department."  As confirmed by State Street Senior Managing Director Michael Wands—one of the "Key Personnel" in charge of Markov—these pronouncements were "directed toward SSgA employees" and were not to be "distributed or displayed to anyone outside SSgA."

106.    As part of the G3 initiative, State Street executives focused on the development of three "showcase" products that would grow the business—the Limited Duration Bond Fund, Absolute Return Funds, and State Street's management of CDOs such as Markov.  State Street

viewed its CDO management business as among its "most profitable," as CDOs provided a "[q]uick and efficient way to increase AUM [assets under management]" that would "[e]arn attractive and stable management fees."   According to a February 2006 email written by Flannery, another of the State Street "Key Personnel" in charge of Markov, "These deals are very profitable to us."

107.   Indeed, Barclays represented to BayernLB that the Markov CDO was initiated by State Street as a means for State Street to increase its assets under management.

108.   Driven to reach an ambitious target to triple State Street's fixed income group's revenues within three years, State Street executives were readily willing to sacrifice their role as an independent collateral manager, and to instead take direction from hedge funds and investment banks whose interests were adverse to CDO investors in order to generate fees.   As set forth in the emails cited in the Consent Order's Statement of Facts (which were admitted by State Street), State Street's conduct in permitting Magnetar to influence the selection of assets in the Carina CDO was carried out by the very State Street executives responsible for Markov, including Flannery, Gianatasio, and O'Hara.   In testimony before Judge Holwell, Flannery admitted that State Street's role as collateral manager was largely dictated by investment banks like Barclays: "[I]n the CDOs, we were hired by an investment bank to manage the assets within a separate legal structure, the collateralized debt obligation.   And so the features or the types of assets and amounts of assets that would go into the CDO structure *was really more directed by the investment bank* in order to take guidelines from the ratings agency."

109.   By December 2006, State Street executives were discussing the contents of the CDO bucket in a new CDO—a Carina II CDO—with traders at Magnetar who were scheming to bet against it.   At around this same time, State Street began discussions with Barclays about serving as Collateral Manager for Markov.

**F.     STATE STREET KNEW THAT BARCLAYS WAS SHORTING
THE SECURITIES REFERENCED BY MARKOV, YET
PERMITTED MARKOV TO INCLUDE ASSETS THAT HAD
BEEN REJECTED BY STATE STREET'S OWN CDO ANALYSTS**

110.    State Street also knew that the subprime mortgage market was deteriorating before the sale of the Markov notes, that the assets selected for Markov were at high risk of default, and that hedge funds and Barclays were betting on that very possibility.  Significantly, State Street specifically concluded that the performance of BBB rated subprime securities in February 2007 was the result of trading activities by "hedge funds," which had caused the drop in the BBB tranche of the ABX Index in February 2007, "as a way to bet against the lowest quality housing-related subprime securities."  As Flannery testified in describing the drop in the ABX Index in February 2007, "it also was our belief, it was the belief of the team that this was a function of this being used to set up shorts"—a statement that reflects State Street's knowledge that the performance of the assets included in Markov was vulnerable to the "short" bets placed against them by banks like Barclays.

111.    Such a conclusion was not hard for State Street to reach.  Indeed, State Street *itself* helped one hedge fund, Magnetar, to make those very "short" bets by permitting it to influence the selection of the collateral in the Carina CDO just weeks before the Markov CDO closed.  Given State Street's knowledge of the eagerness of many hedge funds, including Magnetar, to wager on a decline in housing-related assets, State Street knew, or recklessly disregarded, that Barclays likewise sought to profit from Markov by including similarly high-risk synthetic assets that likewise tracked the BBB tranche of the ABX index.

112.    Indeed, an April 10, 2007 email from Flannery to State Street Corp. CFO Resch included detailed information about the subprime exposure of the assets contained in the CDOs managed by State Street and demonstrates that State Street was aware of the perilous state of the

RMBS market at that time.  In that email, Flannery stated that "it is fairly likely that we, and the markets, will be wrestling with mortgage-related issues for some time and risk levels (and premia) are elevated, so we may take some bruises along the way."  Flannery testified before Judge Holwell that the email reflected that it was State Street's clients, like BayernLB, which invested in the CDOs and other products managed by State Street—not State Street itself—that would suffer these "bruises."

113.    In fact, in its eagerness to please the investment banks that would hire State Street to serve as collateral manager on CDO deals and to obtain the fees those retentions offered—and in direct contradiction of the RMBS asset selection process represented by State Street in the Markov offering materials—State Street disregarded its own internal assessment of the credit quality of the RMBS assets when "selecting" them for inclusion in Markov.  Specifically, as reflected in documents and testimony in litigation against State Street, State Street's CDO department, headed by Frank Gianatasio and staffed by the "Key Personnel" responsible for Markov, *rejected* 11 of the 20 RMBS that comprised the "BBB" 2006-02 ABX index as presenting too great a credit risk.  Yet Markov included *15* RMBS issued from the very same RMBS trusts that comprised the 2006-02 ABX.  Moreover, the opaque Markov Chain CDOs referenced *seven* of the very same BBB securities that constituted the 2006-02 ABX.  Barclays' influence on Markov's collateral selection is the only way to explain why Markov included RMBS that State Street's own CDO credit analysts had rejected.

114.    State Street's views on the credit quality of lower-rated tranches of specific RMBS trusts informed its views as to the quality of those RMBS trusts, such that State Street refused to purchase higher-rated RMBS tranches issued by the same trusts if State Street's credit analysts had rejected the lower-rated tranches.  Certainly, by March 2007, State Street was well aware that higher-rated RMBS were just as vulnerable as the lower tranches contained in the

ABX 2006-02 index. State Street acknowledged in an internal presentation that the impact of market declines for RMBS first experienced in February 2007 "has been manifest in March in the higher end of the capital structure, specifically triple and double-A securities."  Here, each of the tranches issued by bonds in the ABX 2006-02 index that were referenced in Markov was no more than three (out of 13 to 17) notches higher in the capital structure than the specific ABX 2006-02 composite obligations, and represented—from State Street's perspective—a nearly identical credit risk.

115.   State Street's reliance on Barclays' views as to what assets to include in Markov may also be explained by the State Street CDO department's lack of understanding of the products it was purportedly in charge of selecting and some of the basic tools industry experts like Barclays used to bet against those assets.  For example, Frank Gianatasio, the head of State Street's CDO department, did not understand that the ABX index was not itself rated, but was derived from the individual ratings of the RMBS securities that served as reference obligations for the index.

116.   In sharp contrast to its representations to BayernLB concerning State Street's capabilities and proficiencies in analyzing RMBS collateral to be selected for Markov, State Street employees internally derided the quality of the technology used by State Street to perform that role.  Indeed, while the Markov Pitchbook represented that State Street employed an "[i]nternally developed, proprietary web-based surveillance platform," used "[m]ultiple levels of analysis at both deal and tranche level allow[ing] for early detection of negative collateral performance," and performed "[u]pdated stress testing based on current collateral characteristics for underperforming deals," State Street did not have sufficient infrastructure to carry out these tasks.  For example, in a 2006 email to Flannery, Michael Wands, State Street's director, North American Fixed Income, explained that State Street's fixed income department was ill-equipped

to perform its job (such as the analysis it had advertised qualified State Street to serve as Collateral Manager for Markov):

> In general I cannot stress enough that it is my belief that there is a continued lack of understanding, particularly from senior people that are involved with fixed income, as to the seriousness of the two problems that our group is faced with: (1) the inadequate portfolio analytics that are used to manage the mandates and strategies that we are involved in, and (2) the severely flawed and inadequate infrastructure that the funds are built on due to lack of more direct involvement with IT and Ops in the past.

117.    A separate document from 2006 labeled "Global Fixed-Income Plan" likewise highlighted the inadequacy of State Street's RMBS fixed income analysis platform, stating that "It is our opinion that growing our business on this type of foundation introduces a significant amount of risk.  Quite frankly, managing our current business on this type of platform is extremely risky."

## VIII.  DEFENDANTS' FALSE AND MISLEADING MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT IN THE OFFERING MATERIALS

118.    Barclays' bet against Markov and Barclays' ability to guarantee that its wager would succeed was concealed by Defendants' misrepresentations.  Specifically, the Offering Materials and other communications on which Plaintiff relied in purchasing the Markov notes contained numerous misrepresentations of material fact and omitted to state material facts necessary to make the statements therein not misleading.  Those misrepresentations and omissions concerned: (i) the fact that State Street had ceded control over the selection of Markov assets to Barclays, (ii) the due diligence process State Street purportedly used to select the Markov assets, (iii) the true nature of the collateral backing Markov and Barclays' disbelief in the credit ratings assigned to that collateral, (iv) Barclays' improper use of its ability to withhold "consent" to control State Street's selection of Markov's collateral assets, and (v) Barclays'

scheme to design Markov to fail so that Barclays could profit from its "short" position and reduce its own exposure to similar or correlated CDO and RMBS positions on its books.

### A. Barclays and State Street Misrepresented State Street's Role as a Purportedly Independent Collateral Manager

119.    Barclays and State Street represented in the Offering Materials that State Street would serve as the Collateral Manager that would select Markov's assets.   The Pitchbook represented that "State Street Global Advisors, a division of State Street Bank & Trust Company (SSgA) will act as collateral manager for Markov," and touted State Street's expertise and experience in managing other CDOs.   A visual depiction of Markov's "Structural Overview" likewise reflected this purported role, showing State Street *alone* in charge of the "management" of Markov.   According to the Pitchbook, State Street's CDO "philosophy" was to "[m]anage portfolios that do not rely on credit or interest rate structural elements" such as "excessive CDO buckets."

120.    The Pitchbook also provided detail concerning the process by which State Street was to perform this role, including the four steps that State Street purportedly followed to select the assets to be included in Markov—(1) Develop Macroeconomic View, (2) Identify Portfolio Opportunities, (3) Security Selection, and (4) Surveillance Process.   Among other things, State Street stated that in managing CDO collateral, it performed a qualitative analysis on the underwriting standards and creditworthiness of collateral; used delinquency, default and recovery projections and considered the level of credit enhancement; performed a quantitative analysis that employed a regression analysis to predict defaults in each loan pool; and predicted cash flows that were tested in multiple stress scenarios.   Indeed, 35 pages of the 68-page Markov Pitchbook were devoted to State Street's role and expertise as Collateral Manager in the deal.

121.   The Offering Circular contained similar misrepresentations, describing State Street's fixed income process as "designed to produce consistent returns" by "pursu[ing] an asset management style that is disciplined and seeks to control risk."   According to the Offering Circular, State Street:

> seeks to provide an efficient process to identify and execute potential structured product investment opportunities. The investment process addresses not only the front-end analysis and purchase decisions, but also the ongoing surveillance of the portfolio. This process is designed to ensure that appropriate due diligence is conducted prior to any security purchase, and appropriate monitoring of security performance is conducted on a regular basis for as long as the security remains in the portfolio.

122.   The Offering Circular also repeatedly represented that **State Street** would "select" the assets to be included in Markov, and would use its skill and competency in doing so faithfully on behalf of Markov and its noteholders.   For example, the Offering Circular represented that, at closing, the "issuer [Markov] will have Acquired, or will have entered into binding agreements to Acquire, a portfolio of Collateral Assets **selected by the Collateral Manager**"; that the " Initial Synthetic Asset Counterparty will enter into CDS Assets with the Issuer **at the request of the Collateral Manager**"; that the "performance of the Collateral Assets and Eligible Investments depends heavily on **the skills of the Collateral Manager in analyzing, selecting and managing the Collateral Assets and Eligible Investments**"; that "credit ratings of the Collateral Assets will be **used by the Collateral Manager only as a preliminary indicators of investment quality**"; that the "lack of a Collateral Manager, even for a limited period of time, could have a material adverse impact on the Noteholders"; and that the collateral assets at the time of the CDO's closing "were **selected by an Affiliate of the Collateral Manager** subject to the consent of the Warehouse Provider."

123.   The Collateral Management Agreement between State Street and Markov, which was provided to BayernLB and discussed at length in the Offering Circular, contained additional

representations and promises concerning State Street's role as Collateral Manager.  Specifically, in that Agreement, State Street represented that it would "perform its obligations hereunder in good faith, using a degree of skill and attention no less than customarily used by institutional investors of national standing in the management of assets of the nature and character of the Collateral Assets" and that its "undertakings herein and under any other Transaction Document are subject to this standard of care."

124.    Under the agreement, State Street was to provide management services, including: (a) determining the specific Collateral Assets, Eligible Investments and Synthetic Asset Reserve Investments, to be Acquired or Disposed of by the Issuer, and effect such Acquisitions or Dispositions, taking into consideration, among other factors, the payment obligations of the Issuer on each Payment Date or any Redemption Date under the Indenture in so doing, and (b) acting on behalf of the Issuer with respect to the Issuer's rights and obligations under any Synthetic Asset Agreement and supervising and directing the investment and reinvestment of the CDO collateral "in accordance with the requirements set forth on Annex B hereto, the applicable provisions of the Indenture and any Synthetic Asset Agreement."  In turn, Annex B requires the "Issuer or any person acting on its behalf" to satisfy the following requirements, among others:

> The Issuer or any person acting on its behalf decides whether to buy, sell, enter into or terminate Collateral Assets *solely with the objective of maximizing the Issuer's return* (applying criteria like those used by fixed income portfolio managers)….

***

> The Issuer or any person acting on its behalf *does not Acquire a Collateral Asset in the expectation that it or any obligation or security to which it refers will default or for the purpose of restructuring an obligation, security or arrangement or an obligor, issuer or counterparty*.

125.    Further, the Collateral Management Agreement represented that State Street was charged with "monitoring the Collateral Assets, the Eligible Investments, the Synthetic Asset

Reserve Investments and any Synthetic Asset Agreement, the Deposit Agreement and any Hedge Agreement on an ongoing basis, and [] providing to the Issuer, and to the Collateral Administrator on behalf of the Issuer, reports, schedules and other data to the extent the Issuer, or the Collateral Manager on behalf of the Issuer, is required to prepare and deliver such information under the Indenture, any Synthetic Agreement or the Collateral Administration Agreement, consistent with the requirements thereof."

126.    The above representations concerning State Street's role as an independent collateral manager with sole responsibility for selecting Markov's collateral assets to protect the interests of Markov investors—and whose very function was to protect against the risk that Barclays (in its role as Markov's swap counterparty) would be unable to select CDO collateral in a disinterested manner—were materially false and misleading.

127.    Significantly, State Street has already admitted that these representations were material to investors.  Specifically, in connection with the Consent Order entered into between State Street and the Massachusetts Securities Division in connection with State Street's alleged misconduct in its role as Collateral Manager for the Carina CDO, State Street **admitted** that the Collateral Manager's role and importance to CDO investors "**cannot be overstated**":[1]

> The Investment Manager of a CDO is responsible for the selection, acquisition, management and disposition of collateral assets.  Its services are governed by an Investment Management Agreement signed by the manager and the CDO.  The Investment Manager's selection, acquisition and management of collateral assets is required to conform with certain eligibility criteria (addressing asset type, credit ratings, and risk profile) set forth in documents setting the terms of the CDO investment, such as the Trust Indenture.
>
> In terms of the selection process, the Investment Manager must conduct appropriate due diligence on each asset before it is recommended for inclusion into the collateral pool. ***The significance of the Investment Manager's front-end analysis cannot be overstated since it is the Investment Manager's duty to***

---

[1] Consent Order, *In re State Street Global Advisors (Carina CDO, Ltd.)*, Docket No. 2011-0023 (Mass. Sec. Div. Feb. 28, 2012)

***ensure that each asset selected for inclusion in the collateral pool comports with the predefined standards of quality and risk established by the eligibility criteria.***

In terms of the acquisition and retention of collateral assets, the Investment Manager is also responsible for monitoring the performance of each asset once it is included in the CDO in order to ensure that the asset's performance remains within an acceptable range.

Moreover, an Investment Manager often creates or contributes to the sales and marketing materials (e.g., termsheets, flipbooks and offering circular) and participates in meetings with actual or potential investors.

128.    Contrary to Barclays' and State Street's representations in the Markov Offering Materials, State Street ceded control over the selection of Markov assets to Barclays, and Barclays used its control to structure a rigged bet that would pay off when the collateral assets failed.  As in the Massachusetts Securities Division's action involving Carina, the analysis governing the investment decisions for Markov's collateral was not based on State Street's purported expertise and judgment, but was in fact driven by Barclays' desire to profit from its "short" bet on Markov's collateral.

**B.    Barclays and State Street Misrepresented the Nature and Use of Barclays' Purported "Consent" Rights**

129.    The representations in the Offering Materials concerning Barclays' purported right to withhold "consent" to an asset selected by the Collateral Manager were also false and misleading.  In particular, the Offering Materials represented that the assets selected by State Street for inclusion in Markov were subject to the "consent" of Barclays in its role as "Warehouse Provider."  Given the Offering Materials' extensive description of State Street's role in selecting Markov's collateral assets, as well as the common understanding of the role of warehouse providers in industry practice, such consent was understood to serve as a means for Barclays to "reject" bad assets (to which, as Warehouse Provider, Barclays would have direct exposure between the purchase of the assets and the formation of the CDO), not—as in fact

occurred—for Barclays to force Markov to purchase risky assets that Barclays wanted to move off its own books, or to bet against in its capacity as swap counterparty.  Indeed, based on the extensive disclosures in the Offering Materials and the context in which representations concerning Barclays' "consent" rights were made, investors understood that State Street, as Collateral Manager, would initially select assets based on their credit quality and expected performance (as determined by State Street through the extensive investment process described above), and that Barclays would confirm this initial judgment, given the risk it bore in having to retain (or "warehouse") the assets until the CDO closed.

130.    In truth, however, Barclays wielded its "consent" power in a manner that vitiated State Street's purported role as an independent Collateral Manager and the duties State Street had promised to perform under the Collateral Management Agreement.  Rather than provide an additional layer of protection to Markov investors, Barclays used its consent power to cause Markov to include assets Barclays believed would fail, not good assets, so that Barclays could maximize its profits on its "short" interest in Markov's collateral.

C.    **Barclays and State Street Misrepresented State Street's Competency to Serve as Collateral Manager for Markov and to Challenge Barclays' Valuations of Markov's Synthetic Assets**

131.    The Defendants compounded their misrepresentations that State Street would serve as an independent Collateral Manager by misrepresenting State Street's purported capabilities to perform that role.  Indeed, the Defendants represented that State Street employed a sophisticated technology platform to perform an advanced credit analysis to select and perform ongoing surveillance of Markov's collateral.  Among other things, the Defendants represented that State Street employed a Fixed Income Surveillance Database that was an "[i]nternally developed, proprietary web-based surveillance platform," enabled "[m]ultiple levels of analysis at both deal and tranche level [which] allow[ed] for early detection of negative collateral

55

performance," and had "[c]ustomized risk reporting by asset class."  Further, the Defendants represented that State Street performed an "On-Going Analysis" that included a "[m]onthly review of watch list securities," "Originator and Servicer due diligence conducted through on-site visits, with in-depth analysis of management, financial condition, technology, staffing and loss mitigation efforts," and "[u]dated stress testing based on current collateral characteristics for underperforming deals to determine breakeven CDR [constant default rate] under SSgA stress scenarios."

132.   Not only were these representations rendered false and misleading by State Street's willingness to allow Barclays to influence the selection of Markov's assets, but State Street did not, in fact, perform the credit analysis described above because it lacked the ability to do so.   Moreover, these representations concealed the fact that State Street was unable to challenge Barclays' valuations of Markov's synthetic collateral, which Barclays used to its advantage in order to manipulate Markov's performance.

### D.   Barclays Knew that the Credit Ratings Assigned to Markov's Underlying Collateral Assets Misrepresented Their True Risk

133.   Barclays knew that the collateral assets backing Markov were assigned credit ratings that fundamentally misrepresented their true risk and that, therefore, the credit ratings assigned to the Markov notes were likewise false and misleading.  Specifically, to ensure the sale of Markov notes, Barclays represented in the Offering Materials that the assets included in or synthetically referenced by Markov would have high-quality credit ratings, such as single-, double- and even triple-A credit ratings, and that the average portfolio-wide credit rating would be between single- and double-A.  Further, Barclays represented that Markov's tranched notes, including the AAA rated notes purchased by BayernLB, were sufficiently removed from expected collateral losses to warrant the credit ratings they had been assigned.  Of course, the

high-quality ratings of the Markov notes purchased by BayernLB were a function of the ratings assigned to the CDO's underlying collateral.

134.    Among other things, the Markov Pitchbook represented that the average credit rating of Markov's entire portfolio would be between AA- and A+, and that no assets in the portfolio would be rated lower than A- (Pitchbook, at 9-10).  The Markov Offering Circular made substantively identical, but more detailed, representations concerning the ratings assigned to Markov's collateral, including in sections describing the operative guidelines determining collateral portfolio construction (including guidelines related to credit ratings), numerous guidelines setting limits on various kinds of assets, and numerous other guidelines that proscribed portfolio-wide credit ratings (Markov Offering Circular, at 124-28, 145-52).  For example, the Markov Offering Circular represented that none of Markov's collateral assets would be rated less than "A3" by Moody's or "A-" by S&P.  Similarly, the Markov Offering Circular represented that the portfolio's "Weighted Average Rating Factor" – a number representing a calculation of the aggregate credit ratings of Markov's collateral – would not exceed 62 (indicating average ratings of between AA - and A+; ratings exceeding 62 indicate lower credit quality).  Significantly, the "Weighted Average Rating Factor" was a measure purportedly used to ensure that the collateral assets permitted to be selected or referenced in Markov by State Street were of sufficiently high quality.

135.    Barclays, however, in fact believed that the credit ratings assigned to Markov's collateral fundamentally misrepresented the risk posed by those assets.  This was especially true in the case of the credit ratings assigned to the tranches of the Mezzanine CDO securities, which were backed by BBB rated RMBS tranches, most of which Barclays understood to be headed for default and total or near-total loss. Barclays' belief that BBB rated RMBS securities were

destined to default motivated Barclays to construct Markov's synthetic reference portfolio with $550 million of Mezzanine CDO tranches that Barclays, through Markov, bet against.

136.    Markov's Offering Materials contained additional representations concerning the safety and quality of the offered Markov notes that Barclays knew provided investors with a false and misleading impression of the true risk of the offered notes.  For example, the Markov Pitchbook contained representations concerning Markov's tranche structure and ratings, including that the Class A-1 notes purchased by BayernLB warranted the AAA ratings they had received based on, among other things, the 15% loss protection in Markov's capital structure. Markov's Offering Circular contained identical representations concerning Markov's tranche structure and tranche ratings.

137.    The credit ratings assigned to these tranches were highly material.  Indeed, the issuance of the Markov CDO's notes was conditioned on their being assigned the ratings represented in the Offering Materials.  In the event they did not receive those grades (termed a "Ratings Confirmation Failure"), Markov would have been obligated to undertake a "Mandatory Early Redemption" and use its available funds to repurchase Markov's notes in order of seniority.  Barclays knew that CDO tranche structures and the credit ratings of each of those tranches, and in particular the $635 million of highly rated Mezzanine CDO tranches referenced by Markov, were materially false and misleading, and did not reflect the true, severe risks of default and loss those assets posed.  Barclays knew that these ratings, which were based on ratings models—which used as their primary inputs (1) the credit ratings of the underlying collateral and (2) the historical rates of default and loss with respect to like collateral bearing like credit ratings—did not capture the true risk of these assets because the underlying credit ratings were inaccurate, and the historical rates of default did not reflect, among other things, the poor quality of underwriting of the loans backing the RMBS assets and the impact of a

continuing decline in housing prices.  Barclays knew that the inaccurate credit ratings assigned to Markov's underlying collateral would render the ratings assigned to the offered Markov notes to be materially false and misleading.

**E.      Barclays Knew That the Credit Ratings Assigned to the Markov Chain CDOs Disguised Their True Risk**

138.    Barclays also represented that the $300 million of Markov Chain CDOs tranche exposures, constituting 15% of Markov's total collateral exposure, bore the highest possible credit rating: AAA.  These representations were false and misleading.  First, Barclays knew the ratings of Mezzanine CDO junior tranches did not reflect the true risk of those assets because the rating agencies' models did not sufficiently take into account the poor quality of the collateral backing RMBS assets or the impact of a continuing decline in housing prices.

139.    Further, Barclays knew the ratings assigned to the Markov Chain CDOs were misleading because the Markov Chain CDO structure did not protect against collateral losses to the same extent as other Mezzanine CDO tranches with AAA ratings.  Specifically, while typical Mezzanine CDO tranches that received "AAA" ratings were protected by subordination levels of at least 20% (which was the level of subordination that purportedly protected the AAA notes purchased by BayernLB from loss), four of the Markov Chain CDOs (Markov Chain CDOs IA, IIA, IIIA, and IVA) began to become impaired when aggregate losses in their underlying collateral BBB rated RMBS portfolios reached 16%.  Four other Markov Chain CDOs started taking losses when underlying portfolio losses reached 14% (Markov Chain CDOs IB, IIB, IIIB, and IVB), and four other Markov Chain CDOs experienced their first losses when underlying portfolio losses reached 12% (Markov Chain CDOs IC, IIC, IIIC, and IVC).  The lower levels of protection from underlying portfolio losses than typical levels of subordination in Mezzanine CDOs were particularly remarkable given Barclays' knowledge

that, by the beginning of 2007, BBB rated tranches were at extremely high risk of default, which meant that greater, not less, protection against loss was warranted.

140.    Last, Barclays and State Street misrepresented the safety and quality of the Markov Chain CDOs by representing that State Street had selected the RMBS collateral that was referenced by the Markov Chain CDOs.   Specifically, materials provided by Barclays concerning Markov's underlying collateral, including the Markov Chain CDOs, stated that the Markov Chain CDOs were "SSgA [State Street] Selected."   Yet the Markov Chain CDOs included at least seven RMBS assets from the "BBB" ABX index, which consisted of 20 reference obligations, 11 of which had been rejected by State Street's own credit department.

### F.    Barclays Misrepresented That Markov Was a "High Grade" CDO

141.    Barclays represented that Markov was a "High Grade" CDO with underlying collateral that was of high quality, none of which was rated less than A-/A3 by S&P/Moody's, and that Markov had average portfolio-wide S&P credit ratings of between AA- and A+.   Under the "definitions" provided in the Markov Offering Circular, an "ABS CDO High Grade Securities" was defined as a CDO backed by a portfolio of asset-backed securities with ratings of at least 'A3' by Moody's and 'A-' by S&P at the time of acquisition, whereas "ABS CDO Mezzanine Grade Securities" were backed by a portfolio where a "significant portfolio of asset-backed securities are rated *below* 'A3' by Moody's and 'A-' by S&P at the time of acquisition."

142.    For the reasons stated above, Barclays knew that these definitions created a misleading impression of the credit quality of "CDO High Grade Securities," as the ratings of the assets comprising the underlying portfolio misrepresented their true credit risk.   The inaccurate impression created by the inflated credit ratings of the Markov CDO's underlying collateral was particularly misleading in the case of the highly rated tranches from Mezzanine CDOs (which were themselves backed by portfolios of BBB rated RMBS).   Indeed, Markov's

$2 billion collateral portfolio consisted of approximately $635 million of junior tranches from Mezzanine CDOs, including $85 million in "cash" securities and $550 million in synthetic securities, and thus Markov's performance was materially dependent upon the performance of its substantial Mezzanine CDO collateral assets, which were highly dependent on the performance of the BBB RMBS tranches.

143.    State Street likewise did not believe Markov to be a "High Grade" CDO and had expressly represented that as Collateral Manager, State Street avoided "excessive CDO buckets."  Yet Markov featured one of the largest such buckets available for "High Grade" CDOs (35%), and 32% of Markov's collateral, or $635 million, consisted of CDO securities. While it was customary for CDO collateral managers to invest in the equity tranches of the CDOs they managed—and State Street had in fact made similar investments in at least two other CDOs in which it served as collateral manager—*State Street refused to purchase the equity tranches of Markov*.

### G.    Barclays Misrepresented the Purported Superiority and Advantages Provided By Markov's Synthetic Collateral

144.    In the Markov Pitchbook, Barclays represented that Markov's use of synthetic collateral provided "[c]ertain benefits" including the "[f]lexibility to purchase unfunded synthetic assets," and that one of "Certain Structural Advantages" provided by Markov was that "[t]he use of CDS Assets enables SSgA to design a portfolio from a broader pool of collateral than available in cash."  These representations that using synthetic collateral would benefit Markov investors were materially misleading.  Specifically, Barclays was not using synthetic collateral to allow Markov to be collateralized by superior securities that were not available in cash form, but rather to expose Markov and Markov's investors, including Plaintiff, to *inferior*

collateral (particularly, BBB rated tranches of Mezzanine CDOs) that Barclays wished to bet against.

### H. Barclays Misrepresented Markov's Quality by Intentionally Using Erroneous Default and "Loss Upon Default" Assumptions in "Modeling" Markov's Performance

145.   In marketing Markov's notes, Barclays provided Plaintiff with statistical analyses and models purporting to demonstrate Markov's safety and its ability to withstand collateral losses.   The analysis provided by Barclays purported to show: (1) the degree of collateral asset defaults that would be required for investors in Markov's tranches to fail to receive the full promised yield; and (2) the degree of collateral asset defaults that would be required for Markov Class A-1 tranche investors to experience principal loss.   Specifically, with respect to the Class A-1 tranche purchased by Plaintiff, Barclays represented that Markov's Class A-1 tranche could withstand cumulative collateral defaults of 15% before suffering principal loss.

146.   These representations were materially misleading.   Barclays' representations were premised on at least two assumptions concerning (1) the loss that a collateral asset would experience upon default and (2) the timing of collateral defaults.   The specific assumptions that Barclays used to model these factors were themselves misleading, because they contradicted Barclays' own, decidedly more negative views concerning both the expected extent of loss upon default and the timing of default.   For the reasons set forth above, Barclays knew that RMBS losses would be much more severe and immediate than reflected in Barclays' modeling assumptions.

147.   By using low loss assumptions, Barclays made it appear as though Markov notes purchased by BayernLB were impervious to higher levels of default than Barclays knew them to be.   Specifically, as discussed above, Barclays knew that the underlying appraisals used in

underwriting the loans were wildly inaccurate, and that therefore loss recovery through foreclosure would be much higher than reflected in Barclays' models. Accordingly, Barclays knew that the level of credit enhancement for the Markov notes purchased by BayernLB was woefully insufficient.

148.    Further, Barclays knew that Markov's underlying collateral would default almost immediately and that investors in Markov would therefore be unable to benefit from any "excess spread" that would otherwise have been generated if collateral losses occurred more gradually over time. The "excess spread"—a typical structural protection for CDO investors that was included in Markov—represents the difference between (1) the cash flow generated by a CDO's collateral assets and (2) the CDOs' obligations to pay interest to the CDO's noteholders, and is used to cover future collateral losses. By assuming a comparatively gradual rate of loss, Barclays' models showed that investors would benefit from the build-up of excess spread generated over time. Barclays knew, however, that the losses on the Markov assets would occur almost immediately, and in a "lumpier" fashion all at once, and that therefore the CDO would not have been in existence long enough to build up any available excess spread to absorb those losses. In truth, Barclays was expecting Mezzanine CDO junior tranches, constituting $635 million of Markov's collateral, to experience extremely high rates of default and loss, and projected that these defaults would occur almost immediately.

## IX. BARCLAYS AND STATE STREET EXECUTIVES RESIGNED OR WERE FORCED OUT AFTER MARKOV COLLAPSED

149.    Markov had the shortest lifespan of any CDO in history. On November 16, 2007, *just over six months after Markov was issued*, the CDO experienced its first event of default ("EOD"). Pursuant to Section 5.2 of the Indenture, the EOD provided Barclays, as Markov's controlling noteholder, the ability to instruct the trustee to (a) declare the principal of and

accrued and unpaid interest on all the notes to be immediately due and payable and (b) terminate the reinvestment period, requiring that Markov liquidate its collateral and distribute any recovery through the CDO waterfall to noteholders.  On January 22, 2008, **_Barclays, as the sole member of the controlling class, directed the sale and liquidation of the CDO collateral_** in accordance with Sections 5.4(a)(ii) and 5.5(a)(ii) of the Indenture.   At the time, only one other CDO manager, ACA Capital, had as many CDOs in liquidation, although the $4.4 billion value of State Street's liquidating CDOs greatly exceeded ACA Capital's $3.2 billion in CDOs.   State Street's other CDOs in liquidation included Carina and another CDO underwritten by Deutsche Bank—the investment bank that enlisted State Street to orchestrate Magnetar's bet against the Carina CDO.

150.   Shortly following Markov's default, executives at both Barclays and State Street with responsibility for the banks' CDO business suddenly "resigned" or were otherwise removed from their positions.   In November 2007, as Markov was experiencing an event of default, reports surfaced that Vincent Balducci, Barclays' U.S. head of credit derivatives, and John Kreiter, Barclays' U.S. head of credit trading, including U.S. RMBS trading, were both stripped of their responsibilities.   The two later left Barclays.   In January 2008, former Barclays' co-president Grant Kvalheim was asked to leave the firm.   Earlier, in August 2007, Edward Cahill, Barclays' European head of CDOs, left abruptly and without explanation.

151.   At State Street, three of the "Key Personnel" in charge of Markov—Sean Flannery, CIO; Paul Greff, who led the firm's fixed-income team; and Michael O'Hara, head of active fixed-income—left State Street the same month Markov defaulted.   In January 2008, two other Markov "Key Personnel" were terminated—Frank Gianatasio, the head of State Street's CDO group, and Michael Wands, director, North American Fixed Income—and State Street CEO William W. Hunt and COO Otello Sturino resigned.

**X.   BARCLAYS AND STATE STREET CONTINUE TO CONEAL THEIR MISCONDUCT AND REFUSE TO PROVIDE BAYERNLB WITH ACCESS TO DOCUMENTATION CONCERNING MARKOV'S COLLATERAL**

152.   Following Markov's closing, BayernLB made repeated requests to State Street and Barclays for information concerning the performance of Markov's collateral assets. Following the event of default in November 2007, BayernLB requested from the Markov trustee, State Street and Barclays information concerning the disposition and pricing of the collateral assets, particularly the synthetic assets referenced by Markov.  Those requests were repeatedly denied.  Instead, Barclays and State Street continued to conceal their misconduct, including Barclays' role in the selection of Markov's collateral assets, and denied BayernLB's requests for information concerning the CDO's performance, including the pricing of certain of Markov's synthetic assets and other information concerning their values when the swaps were terminated. Indeed, Barclays and State Street refused to provide underlying documentation, which was not obtainable by BayernLB, concerning many of the CDO securities purchased or referenced by Markov. Thus, Barclays and State Street had specialized and unique access to and possession of information about Markov's collateral assets, and BayernLB depended on State Street to perform its role faithfully as Barclays and State Street had represented.

**XI.   BAYERNLB'S REASONABLE RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

153.   BayernLB reasonably and actually relied on Barclays' and State Street's misrepresentations concerning Markov in the Offering Materials and in numerous other communications between BayernLB and marketing and other personnel at Barclays and State Street.

154.   Specifically, in connection with its evaluation of potential investments in CDO securities, such as the Markov notes, BayernLB conducted its own analysis, employing detailed

guidelines and criteria to ensure the investment was appropriate and suitable within the risk parameters established by BayernLB for such investments.

155.    Among other things, in connection with its investment in the Markov notes, BayernLB reviewed the Offering Materials, including the Offering Circular and Pitchbook, the Indenture and other legal documents, ratings letters from Moody's and Standard & Poor's, and asset-level information about the Markov collateral portfolio provided by Barclays.  Through that review, BayernLB conducted an independent analysis that confirmed that the investment— as represented by Defendants—was appropriate.  Critical to that determination were Barclays' and State Street's numerous representations concerning State Street's Collateral Manager role, which BayernLB understood greatly mitigated the risk of the investment.

156.    BayernLB did not know, and could not have known, that: (i) State Street had ceded and would continue to cede control over the selection and management of Markov's collateral assets to Barclays; (ii) Barclays had and would exploit its control over the selection of Markov collateral to conduct a proprietary trading strategy to bet against assets included in or referenced by Markov that it knew would fail; and (iii) as a result, the Markov CDO notes purchased by BayernLB were not the investment Defendants represented them to be, and were in fact a fundamentally flawed, rigged bet that BayernLB was guaranteed to lose.

## XII.    BECAUSE OF DEFENDANTS' CONDUCT, BAYERNLB LOST ITS ENTIRE INVESTMENT

157.    As a result of Defendants' misconduct as alleged herein, investors in Markov notes began to suffer massive losses shortly after the notes were issued.  On November 16, 2007, just over six months after Markov's May 1, 2007 closing, Markov suffered an "event of default."  On January 22, 2008, Barclays, exercising its rights as holder of Markov's controlling super senior tranche, directed the trustee to liquidate the collateral capable of being sold.  The

proceeds from the liquidation were insufficient to satisfy Markov's obligations, and each class of "funded" tranche notes—including BayernLB's Class A-1 Markov notes—suffered 100% losses.

**FIRST CAUSE OF ACTION**

**(Violation of Section 10(b) of the Securities Exchange Act of 1934**
**Against Barclays and State Street)**

158.   Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

159.   As alleged above, Barclays and State Street carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive BayernLB and other Markov investors; and (ii) cause BayernLB to purchase or otherwise invest in Markov CDO notes.

160.   Barclays and State Street, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interest commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the purpose of the Markov CDO, the CDO's collateral selection process, the role of State Street as Collateral Manager, the nature and quality of the CDO's collateral portfolio, and the risk profile of the CDO notes, as set forth herein.

161.   Barclays and State Street employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of conduct that misrepresented the nature of the Markov notes and Barclays' disguised bet that those investments would fail. Barclays and State Street made, or participated in making, materially misleading statements of fact and omitted to state material facts necessary to make their statements concerning Markov not misleading.

162.   Barclays and State Street had actual knowledge of the misrepresentations and omissions of material facts as alleged herein, or acted with reckless disregard for the truth in

that they failed to discover or disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and omissions were knowingly or recklessly made with the purpose and effect of concealing the true design and purpose of the Markov CDO, State Street's abdication of its role as an independent Collateral Manager, the actual bases and methods used to select and manage Markov's collateral portfolio, and the true nature and quality of that collateral.

163.    As a result of Defendants' misrepresentations, the price of the Markov CDO notes was artificially inflated. BayernLB invested in the Markov notes in direct reliance on Defendants' misrepresentations, as set forth above, and unaware of the true facts concealed by Defendants' misrepresentations, which were in the exclusive control and knowledge of Defendants and were not and could not have been discovered through the exercise of due diligence or by any means available to Plaintiff.  Had Plaintiff known the truth concealed by Defendants, BayernLB would not have purchased the Markov notes.  As a direct and proximate cause of Defendants' wrongful conduct, BayernLB suffered damages in connection with its investment in the Markov notes.

164.    As of the date of the filing of this action, less than five years have elapsed since the date of Defendants' violation, and less than two years have elapsed since the time when BayernLB discovered, or using reasonable diligence could have discovered, the facts constituting the violation.

## SECOND CAUSE OF ACTION

### (Violation of Section 20(a) of the Exchange Act
### Against Barclays Bank PLC, State Street Bank & Trust Company and
### State Street Corporation)

165.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

166.    Defendants Barclays Bank PLC, State Street Bank & Trust Company and State Street Corporation are liable as control persons of Barclays (in the case of Barclays Bank plc) and State Street (in the case of State Street Bank & Trust Company and State Street Corporation) given their ownership and control of these Defendants and knowledge of the participation in these Defendants' primary violations of Section 10(b) of the Exchange Act.

167.    Barclays Bank PLC ("BBPLC") owns its subsidiary Barclays, and thus serves as a controlling person of Barclays within the meaning of Section 20(a) of the Exchange Act. Through its subsidiary, BBPLC conducts investment banking operations in the United States. BBPLC and Barclays share a common United States address (200 Park Avenue, New York, NY 10166) and common officers.  Barclay's financial results are consolidated into and reported as part of BBPLC's financial results.

168.    Defendant BBPLC had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and did influence and control, directly or indirectly, the decision-making of Barclays, including the content and dissemination of the material misrepresentations alleged herein. In addition, BBPLC served in various capacities in the Markov CDO transaction, including as its role as counterparty to the synthetic swaps Markov entered into, and as the Deposit Agreement Counterparty (which holds and distributes interest on funds used to satisfy Markov's obligations under its synthetic swaps), the RA Swap Counterparty (which holds and distributes funds used to provide certain noteholders with coupon payments within a certain defined accrual range), and the Maturity Swap Counterparty (which holds and distributes certain funds according to Markov's waterfall structure), among other things.  BBPLC also acted as the Valuation Agent for Markov and manipulated the valuations of Markov's assets.  Defendant BBPLC participated directly with Barclays in the creation, arranging, marketing and sale of the Markov CDO. BBPLC aided

Markov's creation by warehousing Markov's collateral and by entering into $1.8 billion in credit default swaps with Markov that enabled Barclays to bet against the CDO. BBPLC then sought to "fund" this bet by marketing Markov notes outside the United States to non-U.S. investors, while Barclays marketed Markov notes inside the United States to U.S. investors. Through these roles, BBPLC acted as a culpable participant in Barclays' fraud.

169.    Defendants State Street Bank & Trust Company ("SSB&TC") and State Street Corporation control State Street within the meaning of Section 20(a) of the Exchange Act. State Street Bank & Trust Company owns and controls State Street, which is SSB&TC's asset management arm. In turn, SSB&TC is a wholly owned subsidiary of State Street Corporation, a publicly registered financial holding company. All three entities share a common address (One Lincoln Street, Boston, Massachusetts 02111) and overlapping officers. Both SSB&TC and State Street Corporation own and control State Street. Defendants SSB&TC and State Street Corporation had the power to influence and control and did influence and control, directly or indirectly, the decision-making of State Street, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. SSBT&C, "acting through its division State Street Global Advisors," is a party to the Collateral Management Agreement and the party identified, in such capacity, as the "Collateral Manager." Through their involvement in preparing the Offering Materials and other conduct, Defendants SSB&TC and State Street Corporation were aware of or directly participated in the fraud alleged herein, including by concealing adverse material information about the purpose of the Markov CDO, the CDO's collateral selection process, the independence of the collateral manager, the nature of the collateral, and the risk of investing in the CDO.

170.    As set forth above, Barclays and State Street each violated Section 10(b) and Rule 10b-5 by their acts and omissions. By virtue of their ownership and control of Barclays

and State Street and participation in the fraud, Defendants BBPLC, SSB&TC and State Street Corporation are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its acquisition of the Markov CDO notes.

171.    As of the date of the filing of this action, less than five years have elapsed since the date of Defendants' violation, and less than two years have elapsed since the time when BayernLB discovered, or using reasonable diligence could have discovered, the facts constituting the violation.

### THIRD CAUSE OF ACTION

**(Common Law Fraud Against
Barclays and State Street)**

172.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

173.    In connection with the issuance, marketing and sale of the Markov notes, Defendants Barclays and State Street drafted, created, prepared and disseminated to potential Markov investors, including BayernLB, materials that contained numerous misrepresentations of material fact and omitted to state material facts necessary to make the statements therein not misleading, including the "Pitchbook" dated March 2006, the Offering Circular dated May 1, 2007, the Collateral Management Agreement dated May 1, 2007, the Indenture dated May 1, 2007, and numerous other written and oral communications and solicitations.   The misrepresentations contained in such communications included the materially false and misleading representation that State Street would serve as a disinterested, independent third-party Collateral Manager that would select Markov's collateral; the bases and methods by

which State Street would purportedly evaluate and select collateral for inclusion in Markov; and, as result of Barclays' manipulation, the true nature and risk profile of the Markov notes.

174.    Barclays and State Street knew that their statements were false and misleading, or were reckless in not knowing that the statements were not true when made.  Defendants made these false and misleading statements with the intent and expectation that BayernLB would rely upon them.

175.    BayernLB believed Defendants' misrepresentations to be true and actually and justifiably acted in reliance thereon.    But for Defendants' false and misleading misrepresentations, BayernLB would not have invested in the Markov notes.

176.    As a direct, proximate and foreseeable result of Defendants' conduct, BayernLB was damaged in an amount to be determined at trial.  Plaintiff is also entitled to punitive damages.

### FOURTH CAUSE OF ACTION

**(Fraudulent Inducement Against
Barclays and State Street)**

177.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

178.    In connection with the issuance, marketing and sale of the Markov notes, Defendants Barclays and State Street drafted, created, prepared and disseminated to potential Markov investors, including BayernLB, materials that contained numerous misrepresentations of material fact and omitted to state material facts necessary to make the statements therein not misleading, including the "Pitchbook" dated March 2006, the Offering Circular dated May 1, 2007, the Collateral Management Agreement dated May 1, 2007, the Indenture dated May 1, 2007, and numerous other written and oral communications and solicitations.    The

misrepresentations contained in such communications included the materially false and misleading representation that State Street would serve as a disinterested, independent third-party Collateral Manager that would select Markov's collateral; the bases and methods by which State Street would purportedly evaluate and select collateral for inclusion in Markov; and, as result of Barclays' manipulation, the true nature and risk profile of the Markov notes.

179.   Barclays and State Street knew that their statements were false and misleading, or were reckless in not knowing that the statements were not true when made.  Defendants made these false and misleading statements with the intent and expectation that BayernLB would rely upon them.

180.   BayernLB believed Defendants' misrepresentations to be true and actually and justifiably acted in reliance thereon.   But for Defendants' false and misleading misrepresentations, BayernLB would not have invested in the Markov notes.

181.   As a direct, proximate and foreseeable result of Defendants' conduct, BayernLB was damaged in an amount to be determined at trial.  Plaintiff is also entitled to punitive damages.

## FIFTH CAUSE OF ACTION

### (Aiding and Abetting Fraud Against
### Barclays and State Street)

182.   Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

183.   State Street and Barclays provided substantial assistance to advance the fraud described herein.

184.   State Street aided and abetted Barclays in its fraudulent misrepresentations made to BayernLB, as described herein, including by agreeing to participate in the Markov

transaction as Markov's Collateral Manager.  State Street had knowledge of the fraud alleged herein and intentionally assisted in its commission.  As the Collateral Manager for Markov, State Street was fully aware of its duties to independently evaluate the assets to be included in Markov, and knew that Barclays' control over the selection of collateral assets was being used in a manner in direct conflict with the interests of Markov noteholders.

185.    As Collateral Manager for Markov, State Street had superior knowledge of the true quality and value of Markov's collateral portfolio and the actual risk of default for the assets in the portfolio.  State Street possessed knowledge that BayernLB did not have reasonable access to, and BayernLB, therefore, could not verify the representations made by the Defendants.

186.    State Street's participation was critical to the fraud.  Defendants' representations that State Street would serve as a disinterested party responsible for the selection of Markov's collateral concealed Barclay's effective control over Markov's collateral and enabled Barclays to exploit Markov as a vehicle through which to "short" that very collateral.

187.    State Street participated in, or had knowledge of, Barclay's reckless or intentional dissemination of false and misleading information to Markov investors.  It was foreseeable to State Street that BayernLB would be harmed as a result of State Street's assistance.

188.    Barclays also provided substantial assistance to State Street in order to advance the fraud described herein. Specifically, Barclays aided and abetted State Street's false and misleading statements concerning its role as Collateral Manager in Markov and the bases and methods State Street would employ in evaluating and selecting collateral to be included in Markov.  Barclays had knowledge of the fraud described herein and intentionally assisted in its commission.

189.    BayernLB has suffered damages as a direct, proximate, and foreseeable result of the fraud committed by Barclays and State Street, and Barclays' and State Street's knowing and active participation in each other's fraud.  Plaintiff is also entitled to punitive damages.

## SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation Against Defendant State Street)

190.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein, except any allegations that Defendants made any untrue statements and omissions intentionally or recklessly.  For the purposes of this Count, Plaintiff expressly disclaims any claim of fraud or intentional or reckless misconduct.

191.    This is a claim for negligent misrepresentation against State Street.

192.    As a result of its role as Collateral Manager for Markov, State Street had superior access to information and knowledge as to who had been responsible for selecting such collateral and the true quality and value of the collateral portfolio and knowledge as an expert concerning the actual risk of the assets in the portfolio.

193.    State Street also knew, or should have known, that Plaintiff did not have reasonable access to such information and, therefore, could not verify the representations made by the Defendants.

194.    State Street incorrectly represented that it was an independent third-party Collateral Manager, which would perform its collateral management duties independent of Barclays' interests and in the interests of the Plaintiff and other Markov investors.  State Street made materially inaccurate representations concerning how, and on what bases, State Street would evaluate and select Markov's collateral.

195.    State Street acted negligently in not knowing that the above statements were not true when they were made. State Street made these inaccurate statements with the intent and

75

expectation that BayernLB would rely upon them in evaluating a potential investment in Markov notes. Plaintiff believed Defendants' misrepresentations to be true and justifiably acted in reliance upon them. Plaintiff believed Defendant State Street was performing its duties independent of Barclays' interests and in the interests of Plaintiff and other Markov investors. Without these false and misleading representations, Plaintiff would not have agreed to make its Markov investment.

196.     State Street is liable to the Plaintiff for the damages caused by State Street's unlawful conduct in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty Against State Street)

197.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

198.     State Street's exercise of discretion as Markov's purportedly independent Collateral Manager gave rise to fiduciary duties obligating State Street to act in Markov investors' best interests in managing the collateral portfolio. As Collateral Manager, State Street was charged with selecting collateral assets for the Markov CDO based on the criteria stated in Markov's Indenture and in the Offering Materials, in "good faith, using a degree of skill and attention no less than customarily used by institutional investors of national standing in the management of assets of the nature and character of the Collateral Assets." As State Street admitted in the Massachusetts Securities Division Consent Order, the "significance of the Investment Manager's front-end analysis cannot be overstated since it is the Investment Manager's duty to ensure that each asset selected for inclusion in the collateral pool comports with the predefined standard of quality and risk established by the eligibility criteria."

199. State Street's superior expertise and knowledge of the collateral assets included in or referenced by Markov, the process used in selecting those assets, and the reasons it selected those assets, gave rise to a fiduciary duty to act in furtherance of BayernLB's interests and to disclose material information to Plaintiff. As Collateral Manager, State Street had essential and unique knowledge to which the Plaintiff did not have reasonable access. Plaintiff also did not have reasonable access to that information to verify State Street's representations which, unbeknownst to Plaintiff at the time, were partial, compromised, ambiguous, false, and incomplete. Furthermore, upon Markov's closing, State Street assumed a role in which BayernLB was totally dependent upon State Street's good faith performance of its duties as Collateral Manager.

200. State Street held itself out as performing a fiduciary role for BayernLB in its capacity as Collateral Manager for Markov in numerous direct communications with BayernLB, including during in-person meetings with BayernLB in March 2007, as well as other direct email and telephone communications from August 2007 through November 2007 and thereafter. Specifically, in March 2007, representatives of BayernLB met with representatives of State Street in Barclays' offices at 200 Park Avenue in Manhattan to discuss State Street's qualifications, expertise, and capacities to serve as Collateral Manager for Markov, as well as particular issues concerning the Markov CDO and its collateral portfolio. Similarly, in October 2007, representatives of BayernLB and State Street—including Gianatasio—held a conference call with BayernLB to discuss Markov's performance and recent market developments. During that call, State Street representatives discussed their purported systems and processes for monitoring and managing Markov's performance, and BayernLB representatives, in reliance upon State Street's superior expertise and knowledge, asked questions concerning Markov and its performance. In subsequent email communications, State Street representatives, including

Gianatasio, purported to provide information concerning Markov in response to BayernLB's requests.

201.   Throughout these interactions, BayernLB understood that State Street was—as it had represented to BayernLB—acting in BayernLB's best interests as an investor in Markov and had used its superior expertise, knowledge, purported role and discretionary authority in serving as the purported Collateral Manager for Markov.  Indeed, State Street's activities as Collateral Manager for Markov were functionally equivalent to those it performed on behalf of its ERISA clients that were invested in the Limited Duration Bond Fund, and were performed by some of the very same individuals whose actions Judge Holwell held gave rise to State Street's liability for breaching its ERISA fiduciary duties to Prudential.

202.   It was also reasonable for BayernLB to believe that State Street was serving as BayernLB's fiduciary in light of Barclays' conflicted roles in Markov, including as Markov's swap counterparty and the sole holder of Markov's super senior tranche and, thus, the effective sole holder of the Controlling Class, as defined in the Indenture, with the authority to direct Markov's activities in the event of default.  While Bank of New York Mellon, as trustee for Markov, was granted limited ability to bring litigation on behalf of Markov's noteholders, that power was severely curtailed and circumscribed by Barclays.  For example, Barclays, as the effective "Majority of the Controlling Class," was granted "the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee for exercising any trust, right, remedy or power conferred on the Trustee in respect of the Notes."

203.   As a result of its superior expertise, knowledge, purported Collateral Manager role and discretionary authority, State Street occupied a position of trust and influence, and Plaintiff reposed trust and confidence in State Street.

204.   Among other things, State Street breached its fiduciary duties to Plaintiff by acting in the interests of Barclays, as holder of the "short" position in Markov, instead of in the best interests of the CDO and its noteholders.   State Street also breached its duties by misrepresenting (i) State Street's role in selecting Markov's collateral and (ii) how, and on what basis, State Street would evaluate and select Markov's collateral, and by placing Barclays' interests before those of BayernLB and other Markov investors.

205.   As a direct, proximate and foreseeable result of State Street's breach of its fiduciary duties, BayernLB has been damaged in an amount to be determined at trial.   Plaintiff is also entitled to punitive damages.

## EIGHTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty Against Barclays)

206.   Plaintiff repeats and realleges the foregoing allegations in each of the preceding paragraphs, except as to the paragraphs that allege scienter, as though they were fully set forth herein.

207.   Barclays had actual knowledge of the facts, described directly above and throughout the complaint, that are pled in connection with State Street's breaches of fiduciary duty.  As described above, Barclays knowingly and substantially assisted State Street's breaches of fiduciary duty owed to the Plaintiff.   Accordingly, as a direct, proximate and foreseeable result of Barclays' conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff is also entitled to punitive damages.

## NINTH CAUSE OF ACTION

### (Breach of Contract Harming a Third Party Against State Street)

208.    Plaintiff repeats and realleges the foregoing allegations in the preceding paragraphs as though they were fully set forth herein.

209.    Markov and State Street entered into a contract, the Collateral Management Agreement, dated May 1, 2007, wherein State Street agreed to select collateral for Barclays' Markov CDO in a manner set forth in the contract between the parties and for the benefit of investors in Markov.

210.    As described above, the Collateral Management Agreement between State Street and Markov was intended for the benefit of Markov investors, including BayernLB, as set forth in the Offering Materials, in order to ensure that State Street would use its independent judgment and professional expertise to select collateral assets that would benefit Markov investors.  As alleged herein, State Street did not employ the bases and methods of collateral selection in the manner called for by the Collateral Management Agreement; the contract was breached; and as a result, Plaintiff suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)    Awarding compensatory and rescissory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)    Awarding punitive damages for Plaintiff's claims for common-law fraud, fraudulent inducement, aiding and abetting fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty;

(c)    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 23, 2012

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

Gerald H. Silk
Avi Josefson
Jai Chandrasekhar
Michael D. Blatchley
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:     (212) 554-1400
Fax:     (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
jai@blbglaw.com
michaelb@blbglaw.com


*Counsel for Plaintiff
Bayerische Landesbank, New York Branch*