UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

BAYERISCHE LANDESBANK, NEW YORK
BRANCH,

              Plaintiff,

   -against-

BARCLAYS CAPITAL INC., BARCLAYS BANK
PLC, STATE STREET GLOBAL ADVISORS, STATE
STREET BANK AND TRUST COMPANY, and
STATE STREET CORPORATION,

          Defendants.

------------------------------------------------------------X

12 Civ. 3294 (LLS)

**ORAL ARGUMENT
REQUESTED**

**JOINT MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ......................................................................... 1

FACTUAL BACKGROUND.............................................................................. 4

      A.    The Parties ........................................................................... 4

      B.    The Markov CDO ................................................................ 5

      C.    Bayerische Landesbank's Investment and Markov's
          Performance ........................................................................ 9

      D.    Events Leading up to This Action and the
          Amended Complaint ........................................................... 9

ARGUMENT...................................................................................................... 10

POINT I    THE COMPLAINT SHOULD BE DISMISSED FOR LACK
         OF STANDING ........................................................................... 10

POINT II   PLAINTIFF'S FRAUD-BASED CLAIMS SHOULD
         BE DISMISSED ......................................................................... 11

      A.    Relevant Standards ............................................................. 12

      B.    Plaintiff Fails to Plead Scienter .......................................... 13

          1.    Plaintiff Fails to Raise a Strong Inference of Scienter as to
             Barclays................................................................ 13

             a.    Plaintiff Fails to Plead Scienter Against Barclays
                Based on Conscious Misbehavior or Recklessness .. 13

             b.    Plaintiff Fails to Plead Motive to Defraud on the
                Part of Barclays.......................................... 23

          2.    Plaintiff Fails to Raise a Strong Inference of Scienter
             as to SSgA................................................................ 24

             a.    Plaintiff Fails to Plead Motive and Opportunity to
                Defraud on the Part of SSgA ..................................... 26

i

**Page**

          b.     Plaintiff Fails to Plead Scienter Against SSgA
                Based on Conscious Misbehavior or Recklessness ...     31

    C.     Plaintiff Fails to Plead Reliance as a Matter of Law ........................     35

    D.     Plaintiff Fails to Allege any Misrepresentation Attributable
         to Defendants ....................................................................................     38

    E.     Plaintiff Fails to Plead a Violation of Section 20(a) of the
         Exchange Act Against Barclays Bank and State Street Corporation.     41

POINT III     PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIMS
         SHOULD BE DISMISSED ...........................................................................     42

POINT IV     PLAINTIFF'S REMAINING CLAIMS AGAINST SSgA
         SHOULD BE DISMISSED ...........................................................................     42

    A.     Plaintiff Fails to Plead Negligent Misrepresentation
         Against SSgA ....................................................................................     42

    B.     Plaintiff Fails to Plead Breach of Contract Harming a
         Third Party Against SSgA .................................................................     44

CONCLUSION.....................................................................................................................     46

APPENDIX A......................................................................................................................     A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ashcroft v. Iqbal,
556 U.S. 662 (2009)..................................................................................... 12

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
493 F.3d 87 (2d Cir. 2007)..................................................................... 4, 13, 36

BAII Banking Corp. v. UPG, Inc.,
985 F.2d 685 (2d Cir. 1993)......................................................................... 45

Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC,
__ F.3d __, No. 11-4306-cv, 2012 WL 3156441 (2d Cir. Aug. 6, 2012) .............. passim

Bd. Of Trs. Of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO,
811 F. Supp. 2d 853 (S.D.N.Y. 2011)........................................................... 20

Boguslavsky v. Kaplan,
159 F.3d 715 (2d Cir. 1998)........................................................................ 41

Borochoff v. GlaxoSmithKline PLC,
No. 07 Civ 5574 (LLS), 2008 WL 2073421 (S.D.N.Y. May 9, 2008)................. 20

Brown v. E.V. Hutton Grp., Inc.,
991 F.2d 1020 (2d Cir. 1993)....................................................................... 38

Caiafa v. Sea Containers Ltd.,
525 F. Supp. 2d 398 (S.D.N.Y. 2007).......................................................... 22

CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.,
No. 07 Civ. 11078 (LTS) (AJP), 2009 WL 2033048 (S.D.N.Y. July 13, 2009) .... 38

Chill v. Gen. Elec. Co.,
101 F.3d 263 (2d Cir. 1996)......................................................................... 23

Citibank v. Plapinger,
66 N.Y.2d 90 (1985) ................................................................................... 36

City of Ann Arbor Emps. Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.,
703 F. Supp. 2d 253 (E.D.N.Y. 2010) .......................................................... 18

Danaan Realty Corp. v. Harris,
5 N.Y. 2d 317 (1959) .................................................................................. 36

**Page(s)**

ECA and Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009)..................................................................... 23, 26

Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,
    343 F.3d 189 (2d Cir. 2003)..................................................................... 35

Epirus Capital Mgmt., LLC v. Citigroup Inc.,
    No. 09 Civ. 2594 (SHS), 2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010)...............23, 26, 27

Emps.' Ret. Sys. of Gov't of V.I. v. Morgan Stanley & Co.,
    814 F. Supp. 2d 344 (S.D.N.Y. 2011)..................................................... 39

Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.,
    No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ............. 18

Freidus v. ING Groep N.V.,
    736 F. Supp. 2d 816 (S.D.N.Y. 2010)..................................................... 41

Geinko v. Padda,
    No. 00 C 5070, 2002 WL 276236 (N.D. Ill. Feb. 27, 2002).................................. 22

Greenbaum v. Svenska Handelsbanken, NY,
    26 F. Supp. 2d 649 (S.D.N.Y. 1998)....................................................... 11

Harsco Corp. v. Segui,
    91 F.3d 337 (2d Cir. 1996)....................................................................... 36

HSH Nordbank AG v. UBS AG,
    95 A.D.3d 185................................................................................................ 38

Hydro Investors, Inc. v. Trafalgar Power Inc.,
    227 F.3d 8 (2d Cir. 2000)....................................................................... 43

In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.,
    No. 03 MD 1529(LMM), 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007).............. 24

In re Appointment of Indep. Counsel,
    766 F.2d 70 (2d Cir. 1985)....................................................................... 10-11

In re AstraZeneca Sec. Litig.,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008), aff'd, 334 F. App'x 404 (2d Cir. 2009)..... 23

In re Citigroup, Inc. Sec. Litig.,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)..................................................... 32

In re MBIA, Inc. Sec. Litig.,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)..................................................... 41

**Page(s)**

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003), aff'd sub nom. Lentell v. Merrill Lynch &
    Co. Inc., 396 F.3d 161 (2d Cir. 2005)................................................................21-22, 28, 31

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003)...........................................    24

In re PXRE Grp., Ltd. Sec. Litig.,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009), aff'd sub nom Condra v. PXRA Grp. Ltd.,
    357 F. App'x 393 (2d Cir. 2009) ............................................    32

In re Scholastic Corp. Sec. Litig.,
    252 F.3d 63 (2d Cir. 2001)...............................................    14

In re Sec. Capital Assurance, Ltd. Sec. Litig.,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010) .....................................    21

In re Sharp Int'l Corp.,
    403 F.3d 43 (2d Cir. 2005)...............................................    42

In re Wachovia Equity Sec. Litig.,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)......................................    13

India.com, Inc. v. Dalal,
    412 F.3d 315 (2d Cir. 2005)...........................................    44-45

Janus Capital Group, Inc. v. First Derivative Traders,
    131 S. Ct. 2296 (2011)..............................................4, 38-39, 40

Kalin v. Xanboo, Inc.,
    526 F. Supp. 2d 392 (S.D.N.Y. 2007).....................................    41

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001).............................................    24, 28

Lama Holding Co. v. Smith Barney Inc.,
    88 N.Y.2d 413 (1996) ..................................................    35-36

Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.,
    821 F. Supp. 2d 616 (S.D.N.Y. 2011), aff'd, No. 11-4443, 2012 WL 1352590 (2d
    Cir. Apr. 19, 2012)....................................................    passim

Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.,
    No. 11-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012) ....................    passim

v

**Page(s)**

Lentell v. Merrill Lynch & Co. Inc.,
    396 F.3d 161 (2d Cir. 2005)....................................................................... 12

Lerner v. Fleet Bank, N.A.,
    459 F.3d 273 (2d Cir. 2006)....................................................................... 12

Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,
    673 F.3d 50 (2d Cir. 2012)........................................................................... 4

Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.,
    724 F. Supp. 2d 447 .........................................................................15, 25-26

MBIA Ins. Corp. v. Merrill Lynch,
    81 A.D.3d 419 (1st Dep't 2011) ............................................................... 41

MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,
    27 Misc. 3d 1233(A) (N.Y. Sup. Ct. 2010), aff'd as modified by 81 A.D.3d 419
    (1st Dep't 2011) ......................................................................................... 38

Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings,
    747 F. Supp. 2d 406 (S.D.N.Y. 2010), aff'd, Nos. 11-3311-cvm 11-3725-cv, 2012
    WL 2754933 (2d Cir. July 10, 2012) ........................................................ 35

N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.,
    No. 08 Civ. 5310 (DAB), 2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011) .............. 17

N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp. PLC,
    PLC, 720 F. Supp. 2d 254 (S.D.N.Y. 2010) ............................................. 41

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Worley,
    257 A.D.2d 228 (1st Dep't 1999) ............................................................. 13

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000)...........................................................13, 14, 18

O'Brien v. Nat'l Prop. Analysts Partners,
    936 F.2d 674 (2d Cir. 1991)....................................................................... 12

Pac. Invs. Mgmt. Co. v. Mayer Brown LLP,
    603 F.3d 144 (2d Cir. 2010), cert. denied, 131 S. Ct. 3021 (2011) ........ 39, 40

Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
Commerce,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)................................................... 15, 21

**Page(s)**

Plumbers Union Local No. 12 Pension Fund v. Swiss Reins. Co.,
    735 F. Supp. 2d 166 (S.D.N.Y. 2010)...................................................................... 33

Pope Invs. II LLC v. Deheng Law Firm,
    No. 10 Civ. 6608 (LLS), 2011 WL 5837818 (S.D.N.Y. Nov. 21, 2011) ............... 14, 18, 20

Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.
    683 F.3d 239 (6th Cir. 2012) ............................................................................. 17

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004)............................................................................... 12

S. Cherry St., LLC v. Hennessee Grp. LLC,
    573 F.3d 98 (2d Cir. 2009)............................................................................ 28, 32

Saltz v. First Frontier, LP,
    782 F. Supp. 2d 61 (S.D.N.Y. 2010), aff'd, No. 11-265-cv, 2012 WL 2096399 (2d
    Cir. June 12, 2012)........................................................................................... 35

San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996)............................................................................ 12, 14

Shapiro v. Cantor,
    123 F.3d 717 (2d Cir. 1997)........................................................................... 39-40

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994).............................................................................. 13

Space Coast Credit Union v. Barclays Capital, Inc.,
    No. 11 Civ. 2802 (LLS), 2012 WL 946832 (S.D.N.Y. Mar. 20, 2012)................. passim

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
    531 F.3d 190 (2d Cir. 2008)............................................................................... 14

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007)........................................................................................... 13

Three Crown Ltd. P'ship v. Caxton Corp.,
    817 F. Supp. 1033 (S.D.N.Y. 1993)....................................................... 22, 28-29, 31

Tsereteli v. Residential Asset Securitization Trust 2006-A8,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010)............................................................. 17-18

Warth v. Seldin,
    422 U.S. 490 (1975).......................................................................................... 10

**Page(s)**

Woodward v. Raymond James Fin., Inc.,
    732 F. Supp. 2d 425 (S.D.N.Y. 2010)........................................................ 15

Wright v. Ernst & Young LLP,
    152 F.3d 169 (2d Cir. 1998)..................................................................... 39

Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC,
    474 F. Supp. 2d 505 (S.D.N.Y. 2007), aff'd, 282 F. App'x 71 (2d Cir. 2008)....... 15, 18-19

**Rules and Statutes**

15 U.S.C. § 78u-4(b)(1)(B) ...................................................................... 13

15 U.S.C § 78u-4(b)(2)(A)........................................................................ 13

15 U.S.C § 78u-4(b)(3)(A)........................................................................ 13

Mass. Gen. Laws ch. 110A § 101(2) .......................................................... 30

**Other Authorities**

Restatement (Second) of Contracts § 309 cmt................................................ 45

Defendants Barclays Capital Inc. ("Barclays Capital") and Barclays Bank PLC

("Barclays Bank") (collectively "Barclays"), State Street Global Advisors, a division of State

Street Bank and Trust Company (collectively, "SSgA" or "State Street"), and State Street

Corporation (with Barclays, "Defendants"), submit this joint memorandum of law in support of

their motion to dismiss Plaintiff's Amended Complaint under Fed. R. Civ. P. 9(b) and 12(b)(6).[1]

## PRELIMINARY STATEMENT

Plaintiff is the New York branch of Bayerische Landesbank, a large German bank and

sophisticated investor that holds a multi-billion dollar position in fixed-interest securities and has

self-described expertise in asset-backed securities.  Bayerische Landesbank itself is not named as

a plaintiff.  Through its London branch, Bayerische Landesbank purchased notes issued by

Markov CDO I, Ltd. ("Markov"), a collateralized debt obligation ("CDO") that was structured,

offered, and underwritten by Barclays, and whose collateral assets were managed by SSgA.

When the financial crisis hit the global economy in late 2007 and early 2008, Markov, like many

other CDOs at the time, suffered serious defaults and was liquidated.  As a result, Bayerische

Landesbank, like many other CDO investors, lost its investment.

Attempting to sue through its New York branch, Bayerische Landesbank now cries fraud.

Plaintiff claims that Barclays secretly (and contrary to Markov's offering materials) controlled

the selection of Markov's collateral, and selected assets that Barclays "knew" would fail.

Plaintiff claims Barclays did this to profit from what Plaintiff describes as a "short" position that

Barclays held as counterparty to Markov's swaps.  Plaintiff also alleges that SSgA ceded its role

as Markov's collateral manager, supposedly allowing Barclays to build Markov to fail in order to

secure a management fee.

---

[1]      References to "¶ __" are to paragraphs in the Amended Complaint, and references to "Ex.
__" are to exhibits appended to the Declaration of Clair B. Kwon, dated August 14, 2012.

The Amended Complaint suffers numerous defects under Supreme Court and Second Circuit law.  First, just one week before this motion was filed, the Second Circuit specifically held that this Plaintiff, in another CDO case brought by Bayerische Landesbank's New York branch, lacks standing to sue because it is not separately incorporated and has no legal identity separate from Bayerische Landesbank.  Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, __ F.3d __, No. 11-4306-cv, 2012 WL 3156441 (2d Cir. Aug. 6, 2012).  As Plaintiff has elected not to name a plaintiff with standing to sue, the Amended Complaint fails at the threshold and should be dismissed.

Second, the Amended Complaint fails to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b) and, with respect to Plaintiff's federal securities claims, the Private Securities Litigation Reform Act of 1996 (the "PSLRA").  This is not a notice pleading case.  Plaintiff must plead particularized facts demonstrating the purported fraud and giving rise to a strong, cogent, and compelling inference of scienter (fraudulent intent).  Failure to do so requires dismissal, as the Second Circuit recently held in dismissing virtually identical allegations filed by another German bank that sued over a CDO investment.  Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., No. 11-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012).  The Circuit's decision in Landesbank was issued one month after this Court denied defendants' motion to dismiss in Space Coast Credit Union v. Barclays Capital, Inc., No. 11 Civ. 2802 (LLS), 2012 WL 946832 (S.D.N.Y. Mar. 20, 2012).  Landesbank is directly on point, and it makes clear that Plaintiff has failed to meet the strict requirements of Rule 9(b) and the PSLRA for pleading scienter.

As here, the plaintiff in Landesbank alleged that an underwriter "knew" the assets of a CDO would fail and, armed with such secret, adverse information, "bet against" the CDO in order to reap a profit, and further alleged that the collateral manager improperly ceded its

2

responsibilities to permit that to happen.  The Circuit held that dismissal under Rule 9(b) was required because the plaintiff failed to identify specifically any reports or statements that allegedly provided the defendants with such contrary information at the time the CDO was issued.  The same is true here.  Indeed, Plaintiff relies on the very same generalized allegations as in Landesbank when insisting that Barclays "knew" Markov's collateral would fail and that SSgA ceded control of collateral selection.  Moreover, the profit motive ascribed to Barclays is unquestionably insufficient, as expressly found in Landesbank and a long line of Second Circuit authority.

Similarly, Plaintiff has not pleaded particularized facts indicating that SSgA knowingly or recklessly participated in the alleged fraud.  Plaintiff's conclusory allegations that SSgA "must have" ceded control of collateral selection to Barclays do not raise a strong inference of scienter, particularly in light of Plaintiff's utter failure to show why SSgA would want Markov to fail.  Indeed, Plaintiff's allegations demonstrate that SSgA had a compelling economic reason for Markov to succeed:  the longer Markov survived, the more fees SSgA received.

Third, Plaintiff fails to plead reasonable and justifiable reliance as a matter of law.  Again, the Circuit's decision in Landesbank is directly on point.  The Circuit held that because of express disclaimers in the CDO offering materials—including that the CDO purchaser was a sophisticated investor, that the purchaser would conduct its own diligence, that the purchaser would not rely on any statement or advice by any party involved, and that there was no fiduciary relationship with any party—the plaintiff could not plead justifiable reliance as a matter of law.  Markov's Offering Circular contained disclaimers substantively identical to those that served as the basis for dismissal in Landesbank, counseling dismissal here as well.

Fourth, Plaintiff fails to point to any misrepresentation attributable to Defendants.  The CDO's Issuer, and only the Issuer, accepted responsibility for the Markov Offering Circular.

3

Barclays and SSgA expressly disclaimed making any representations in it, except for limited introductory information unchallenged by Plaintiff. Under the Supreme Court's decision in Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), and a long line of Second Circuit authority addressing primary securities liability for "secondary" (i.e., non-issuer) actors, no liability can lie against Defendants.

Finally, Plaintiff's remaining claims fail. Plaintiff fails to state claims for breach of fiduciary duty (against SSgA) or aiding and abetting breach of fiduciary duty (against Barclays) because Plaintiff fails to allege that SSgA owed Plaintiff any fiduciary obligations. See Space Coast, 2012 WL 946832, at *3. Plaintiff's negligent misrepresentation claim against SSgA fails under Landesbank, because Plaintiff cannot plead justifiable reliance on SSgA's alleged misrepresentations in light of the aforementioned disclaimers in the Markov Offering Circular. Finally, Plaintiff's claim against SSgA for breach of contract harming a third-party also fails, because the Amended Complaint does not indicate that any of SSgA's alleged breaches occurred during the period of time when the Collateral Management Agreement ("CMA") was in effect.

## FACTUAL BACKGROUND[2]

### A.   The Parties

Plaintiff is the New York branch of Bayerische Landesbank, the principal bank of the Free State of Bavaria. ¶ 15. Almost entirely government-owned, Ex. A, Bayerische Landesbank describes itself as "the leading Bavarian commercial bank for large and middle-market corporate customers in Germany and Europe and also for retail customers . . . [and] is a high-performance

---

[2]   For this motion only, Plaintiff's well-pleaded allegations are accepted as true. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 56 (2d Cir. 2012). This Court may consider any written instrument attached to the Amended Complaint; documents incorporated into the Amended Complaint by reference; legally required public disclosure documents filed with the SEC; and documents possessed by or known to Plaintiff and upon which it relied in filing suit. ATSI Comme'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

regional bank with a focus on Europe and international expertise." Ex. B. As of December 31,

2011, Bayerische Landesbank reported total assets of over € 309 billion and almost 11,000

employees. Ex. C. In 2007, Bayerische Landesbank was heavily involved in fixed-interest

securities (which include CDOs), and as of June 30, 2007, it held nearly € 99 billion in such

instruments. Ex. D. Also around that time, Bayerische Landesbank touted its "expertise in Asset

Backed Securities," and reported that it had redoubled its "efforts to beef up key sub-ordinate

departments, namely Real Estate Structured Finance, Real Estate Syndication/CMBS and Real

Estate Mergers & Acquisitions." Exs. E, F.

　　　Barclays Bank is a public limited company registered in England and Wales that provides

a range of global diversified financial services. Ex. G at 186. Barclays Capital is a U.S.

broker/dealer and has served as underwriter for many CDOs, including Markov. Id. at i.

　　　SSgA, a division of State Street Bank and Trust Company, is a leading provider of

financial services to institutional investors, with experience managing trillions of dollars for

institutional investors. Id. at 172. State Street Bank and Trust Company is a wholly owned

subsidiary of State Street Corporation. Id.

**B.　　The Markov CDO**

　　　A CDO is a financial instrument that sells interests (often in the form of notes) to

investors and pays the investors based on the performance of the underlying assets held by the

CDO. Aladdin, 2012 WL 3156441, at *1; ¶ 37. Markov was a "hybrid synthetic/cash" CDO,

meaning that the assets it held were not only "cash" assets (like securities or bonds), but also

"synthetic" or derivative instruments—instruments whose value was determined in reference to

other assets. Aladdin, 2012 WL 3156441, at *1; Ex. G at 124-25; ¶¶ 3, 42. Markov's

"synthetic" assets consisted of credit default swaps ("CDS") and other swaps that referenced

residential mortgage-backed securities ("RMBS") and other asset-backed securities (including

5

other CDOs). Ex. G at 124-25; ¶¶ 3, 42.

Like many CDOs, Markov's assets were backed by mortgage-related collateral. ¶ 3. Specifically, as with the majority of CDOs issued from 2005 through 2007, the primary source of Markov's collateral consisted of or referenced RMBS. ¶ 40; Ex. G at 35, 130.[3] And as with other CDOs, the Markov collateral also consisted of or referenced other CDOs that themselves referenced RMBS. ¶ 41; Ex. G at 38-40. Specifically, Markov's Offering Circular dated May 1, 2007, described that 10% of the assets backing Markov were "cash" assets, consisting of actual RMBS and other asset-backed securities like CDOs ($95 million in RMBS and $105 million in other CDO tranches). Ex. G at 124-25; ¶¶ 3, 54. The Offering Circular also described that the remaining 90% of assets were "synthetic"—they were not actually purchased and held by the CDO, but the CDO was a party to CDS and other swaps that referenced RMBS and other asset-backed securities ($1.25 billion in swaps referencing RMBS and $550 million in swaps referencing CDO tranches). Ex. G at 124-25; ¶¶ 3, 41, 42, 54. The Offering Circular further described that up to 15% of Markov's collateral would consist of synthetic CDOs specifically created for Markov, which Plaintiff refers to as "Markov Chain CDOs." Ex. G at 124, 293.

In addition to describing the types of collateral included in Markov's portfolio, the Markov Offering Circular also disclosed the process employed to select collateral assets for the CDO. Specifically, the Offering Circular disclosed that, as "Warehouse Provider" for Markov, Barclays would have consent power over collateral selection during the period prior to the CDO's closing date. See Ex. G at 53, 124, 304. The Offering Circular further disclosed that approximately 92.2% of the collateral for Markov's portfolio would be selected during this pre-closing period. See Ex. G at 53.

---

[3]     RMBS are securities backed by pools of mortgage loans, which entitle investors to a stream of income derived from the payments of principal and interest by the borrowers on these mortgages. ¶ 40.

The Amended Complaint describes the following[4]: through CDS and other swaps, a synthetic CDO like Markov effectively "insured" the value of its collateral assets and in return received regular payments from the swap counterparty—akin to insurance premiums—in exchange for that guarantee. ¶ 4. If the value of the referenced assets declined, the CDO was required to "swap" with its counterparty and make payments to cover any shortfall. Id. A decline in the value of the referenced assets caused a loss to the CDO and its noteholders, and in this sense the CDO and its noteholders were "long" the referenced assets and would benefit if the underlying mortgages performed. Id. The swap counterparty was "short" those same assets, and stood to profit if the underlying assets failed. Id.

According to Plaintiff, Barclays served as the "Synthetic Asset Counterparty" for Markov's swaps, and Barclays was "effectively 'short' 90% of the $2 billion notional value of the CDO" and "stood to profit if those assets failed." ¶ 5.[5]  Separately, Markov was structured so that if the referenced assets performed poorly and Markov's cash on hand was insufficient to

---

[4]    Plaintiff misunderstands how Markov and its swaps worked in many ways, but for purposes of this motion, Defendants address Plaintiff's allegations. See supra at 4 n.2.

[5]    Plaintiff's assertion contradicts the Offering Circular and Plaintiff's own allegations. The Offering Circular expressly described that Barclays would serve as the "Initial Synthetic Asset Counterparty" on the date of closing. Ex. G at 4 (emphasis added). Plaintiff likewise admits that underwriter banks "typically perform multiple roles," including "facilitating hybrid structures by acting as the initial protection buyer for [swaps] included in the synthetic collateral pool." ¶ 46 (emphasis added). This allowed banks to wait until the transaction closed before locating and securing synthetic asset counterparties. The Offering Circular also disclosed that Barclays, at the direction of State Street, had to use all commercially reasonable efforts to enter into "Mirror Swaps" with up to six other "Approved Dealers," effectively selling off what Plaintiff describes as Barclays' "short" position. Ex. G at 250; see also id. at 20, 57, 137. Plaintiff does not allege that the description of Barclays as the "Initial Synthetic Asset Counterparty" was false, or that it was not Barclays' intent to sell off to others what Plaintiff characterizes as a "short" position. Meanwhile, the Offering Circular provided clear warnings of potential conflicts of interest stemming from Barclays' position as "Initial Synthetic Asset Counterparty": that Barclays "will have the right to make determinations and to take actions or to decline to take actions which may have an adverse effect on the Issuer, Rated Noteholders or Income Noteholders"; and Barclays "may act in its own commercial interest" and "without regard to whether its interests conflict with those of the Noteholders or any other party." Ex. G at 55-57.

7

cover the swap counterpayments, Markov would issue Class S notes to the Synthetic Asset Counterparty, Ex. G at 17, 74—thus exposing the Synthetic Asset Counterparty to Markov's credit risk with potential for an amount up to $1.6 billion, just like the other noteholders. In this way, Markov's structure benefitted noteholders like Plaintiff: rather than allow the Synthetic Asset Counterparty to declare an event of default and order liquidation once the cash on hand became insufficient to cover the swap counterpayments, the Synthetic Asset Counterparty was obligated to accept Class S notes from Markov. Plaintiff admits that, as a Class S noteholder, Barclays would receive returns "if the synthetic assets performed." ¶ 44. In other words, Plaintiff admits that in the event Class S notes were issued to Barclays, Barclays' economic interests would be aligned with other noteholders.

Finally, as with most CDOs, the Offering Circular contained a series of express disclaimers to which each Markov purchaser agreed. In a section of the Offering Circular aptly entitled "Investment Decision: No Reliance," each purchaser "acknowledge[d] and agree[d]" that (i) neither Barclays nor SSgA was "acting as a fiduciary or financial or investment advisor for the purchaser"; (ii) purchaser "is a sophisticated investor" that is entering into this investment "with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks"; (iii) purchaser "is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral)" of either Barclays or SSgA other than what is in the Offering Circular; (iv) neither Barclays nor SSgA "ha[s] given to the purchaser (directly or indirectly through any other person) any assurance, guarantee, or representation whatsoever as to the expected or projected success" of Markov; and (v) "purchaser has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors," and "has made its own investment decisions (including decisions

regarding the suitability of any transaction pursuant to the documentation for the Applicable

Notes) based upon its own judgment and upon any advice from such advisers as it has deemed

necessary and not upon any view expressed" by Barclays or SSgA. Ex. G at 206-07.

**C.      Bayerische Landesbank's Investment and Markov's Performance**

Plaintiff's Amended Complaint studiously avoids mentioning which Bayerische

Landesbank entity purchased Markov notes and when. On May 1, 2007, Barclays issued to

Bayerische Landesbank's London branch two trade confirmations for $57.5 million par value in

Markov notes, at a purchase price of 99.71% of par value. Ex. I.

On November 16, 2007, amidst the collapse of the U.S. housing market and an

unprecedented financial crisis, Markov experienced its first event of default. ¶ 157. On January

22, 2008, as the financial crisis deepened, Markov went into liquidation. Id.

**D.      Events Leading up to This Action and the Amended Complaint**

In April 2011, Space Coast Credit Union ("Space Coast"), the successor-in-interest to

another Markov investor, filed a securities fraud action concerning Markov. See No. 11 Civ.

2802 (LLS). Space Coast alleged that SSgA secretly ceded control over asset selection to

Barclays, and that Barclays secretly chose RMBS and other collateral that Barclays "knew"

would fail in order to profit on its initial "short" position on Markov's CDS. This Court denied a

motion to dismiss the complaint, finding that Space Coast alleged facts giving plausibility to the

conclusion that there was a misrepresentation regarding the collateral selection process. Space

Coast, 2012 WL 946832, at *1. The Court also ruled, inter alia, that the issues of timeliness and

reliance in light of extensive risk disclosures in the Offering Circular could not be resolved as a

matter of law because they were fact specific. Id. at *1-2. The Court dismissed claims for

breach of fiduciary duty and aiding and abetting breach of fiduciary duty, holding that Space

Coast failed to allege that SSgA occupied a position of trust and confidence, and that Barclays

could not be liable for aiding and abetting when there was no underlying breach of fiduciary duty. Id. at 3. Space Coast did not discuss or require the pleading of scienter, and it did not address the Offering Circular's express disclaimers described supra at 8-9 and infra at 40.

One month after issuance of this Court's decision in Space Coast, Plaintiff filed this "me-too" action. Three months later, on July 24, 2012, Plaintiff served Defendants with the Complaint and an Amended Complaint. Like Space Coast, Plaintiff alleges that "contrary to the statements in Markov's offering materials [regarding collateral selection], Barclays itself selected and even created certain of the assets referenced by Markov because it knew those assets would fail, and that Barclays would profit as a result." ¶ 2; see also ¶¶ 119-32 (alleged misrepresentations regarding collateral selection).[6] SSgA was allegedly complicit in that scheme because it hoped to receive a management fee. Plaintiff asserts fraud-based claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and for common law fraud, fraud in the inducement, aiding and abetting fraud, and negligent misrepresentation (collectively, the "Fraud-Based Claims"). Plaintiff also asserts breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract claims.

## ARGUMENT

### POINT I

### THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF STANDING

It is axiomatic that standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498 (1975). Absent a plaintiff with standing to sue, a complaint must be dismissed. See In re Appointment of Indep.

---

[6]    The Amended Complaint also alleges that the Offering Circular misrepresented the credit ratings assigned to Markov's collateral (including the ratings assigned to the Markov Chain CDOs), ¶¶ 133-40; that Markov was a "High Grade CDO," ¶¶ 141-43; and the superiority provided by Markov's synthetic collateral, ¶ 144. Plaintiff further alleges that Barclays separately provided Plaintiff with misleading statistical analyses and models. ¶¶ 145-48.

Counsel, 766 F.2d 70, 75 (2d Cir. 1985).

The domestic branch of a foreign bank—like Plaintiff—is not a separate legal entity

under either state or federal law, and does not have independent status or standing to sue or be

sued.  See Greenbaum v. Svenska Handelsbanken, NY, 26 F. Supp. 2d 649, 652 (S.D.N.Y.

1998).  The Second Circuit has directly applied this well-settled rule to Plaintiff in another CDO

case, squarely holding that Plaintiff lacks standing to sue:

> [Bayerische's New York branch] is not separately incorporated, has no legal
> identity separate from Bayerische Landesbank, and therefore has no standing to
> assert a claim against Aladdin independent of Bayerische's claim.

Aladdin, 2012 WL 3156441, at *7.  The Circuit's ruling on Plaintiff's lack of standing to sue was

unequivocal and categorical: "Aladdin argues that Bayerische's New York branch lacks

standing to sue, and thus is not a proper party to this case.  We agree."  Id.  Here, as in Aladdin,

the Amended Complaint alleges only that Plaintiff "is licensed by the Office of the Comptroller

of the Currency with an office located in New York, New York.  BayernLB operates as a branch

of Bayerische Landesbank." ¶ 15; Aladdin, 2012 WL 3156441, at *7.

The Circuit noted that Plaintiff's "lack[] of standing to sue" did not affect the Aladdin

case, because Bayerische Landesbank had also been named as a plaintiff and Bayerische

Landesbank was a proper plaintiff.  Aladdin, 2012 WL 3156441, at *7.  Here, however, Plaintiff

chose not to name Bayerische Landesbank.  Because Plaintiff lacks standing to sue, and because

there is no plaintiff with standing, the Amended Complaint should be dismissed.[7]

## POINT II

## PLAINTIFF'S FRAUD-BASED CLAIMS SHOULD BE DISMISSED

Plaintiff's Fraud-Based Claims fail as a matter of law because they fail to allege

---

[7]     The Complaint does not, and cannot, allege that Plaintiff purchased the Markov notes.
Rather, the notes were purchased by the London branch of Bayerische Landesbank.  Ex. I.

particularized facts giving rise to scienter, they fail to allege reasonable or justifiable reliance, and Plaintiff does not point to any alleged misstatement attributable to Defendants.

A.     **Relevant Standards**

A complaint must be dismissed under Rule 12(b)(6) if it does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  But the Amended Complaint must meet a higher bar still, as this is not a notice pleading case.

Second Circuit precedent requires that Plaintiff's Fraud-Based Claims meet the heightened pleading requirements of Rule 9(b) and, for the Exchange Act claims, the PSLRA. Under Rule 9(b), Plaintiff must plead with particularity "in what respects the statements at issue were false" when made, San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir. 1996), and must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent," Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).  Plaintiff must plead the "who, what, when, where and how" of the alleged fraud.  Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011), aff'd, No. 11-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012).  While "[a]ny fraud must be pled with particularity, . . . the rule is applied assiduously to securities fraud." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 168 (2d Cir. 2005).

Rule 9(b) also requires Plaintiff to plead facts that give rise to a strong inference of fraudulent intent.  See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006); see also O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991) ("[W]e have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent.").  Allegations that securities failed to perform as predicted do not suffice;

12

pleading "fraud by hindsight" will not sustain a complaint.  See Novak v. Kasaks, 216 F.3d 300,

309 (2d Cir. 2000); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994).

Under the PSLRA, Plaintiff must "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading," and because Plaintiff pleads

on information and belief, Plaintiff must "state with particularity all facts on which that belief is

formed." 15 U.S.C. § 78u-4(b)(1)(B).  Plaintiff must also "state with particularity facts giving

rise to a strong inference that the defendant acted" with scienter. 15 U.S.C § 78u-4(b)(2)(A).

The inference of scienter must be "powerful," "cogent," "compelling," "strong in light of other

explanations," and "at least as compelling as any opposing inference one could draw from the

facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007).  If

these exacting requirements are not met, "the court shall . . . dismiss the complaint." 15 U.S.C

§ 78u-4(b)(3)(A).

## B.    Plaintiff Fails to Plead Scienter

Each of Plaintiff's Fraud-Based Claims requires the pleading of particularized facts

giving rise to a strong inference of scienter.  In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d

326, 348, 380 (S.D.N.Y. 2011) (Exchange Act and fraud claims); Nat'l Union Fire Ins. Co. of

Pittsburgh, Pa. v. Worley, 257 A.D.2d 228, 233 (1st Dep't 1999) (fraudulent inducement).  That

burden may be met only by alleging facts that (i) "constitut[e] strong circumstantial evidence of

conscious misbehavior or recklessness," or (ii) show the defendant had both "motive and

opportunity" to defraud.  ATSI Commc'ns, 493 F.3d at 99; Shields, 25 F.3d at 1128.  Plaintiff

does neither.

### 1.    Plaintiff Fails to Raise a Strong Inference of Scienter as to Barclays

#### a.    Plaintiff Fails to Plead Scienter Against Barclays Based on Conscious Misbehavior or Recklessness

Plaintiff primarily attempts to plead Barclays' scienter through the conscious misbehavior

13

prong. Specifically, Plaintiff claims that Barclays "knew" the quality of the RMBS included or referenced in Markov's collateral was different from what the Offering Circular represented and "knew" Markov would fail. ¶¶ 2, 65-87. This attempt fails for two fundamental reasons: (i) Plaintiff fails to identify specifically the reports or statements that supposedly provided Barclays with its "knowledge" that Markov's collateral would fail; and (ii) Plaintiff fails to tie its generic allegations of fraud regarding RMBS to the specific RMBS included or referenced in Markov.

First, under Second Circuit precedent, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309; accord Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008). An "unsupported general claim of the existence of confidential company . . . reports that revealed [contrary information] is insufficient to survive a motion to dismiss." San Leandro, 75 F.3d at 812. To move past the pleading stage, a plaintiff must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001).

This Court recently applied this bedrock principle in Pope Investments II LLC v. Deheng Law Firm, No. 10 Civ. 6608 (LLS), 2011 WL 5837818 (S.D.N.Y. Nov. 21, 2011) (Stanton, J.), where plaintiffs sued the professionals and firms who advised them in connection with securities transactions but their investment funds were embezzled by a third party. Id. at *1. The plaintiffs alleged that the defendants "knew" their funds would not flow as was represented, and "knew" that the non-party would maintain control over the funds, contrary to what was represented. Id. at *6. Applying the rule in Novak, this Court held that the allegations failed to give rise to a strong inference of scienter:

The amended complaint does not specifically identify any report or statement

14

from which defendants should have learned that Shao intended to embezzle the money or that the SMT Transactions were a sham, or that the invested funds were not flowing as intended. Accordingly, those allegations do not give rise to a strong inference that defendants knowingly misrepresented the legitimacy of the SMT Transactions.

Id.[8]

After this Court's decision in Space Coast, the Second Circuit specifically applied this long-standing rule in affirming the dismissal of a CDO case based on the identical assertion that an underwriter filled a CDO with RMBS collateral that the underwriter "knew" would fail and then "bet against" the CDO with the expectation that the CDO would fail. See Landesbank, 821 F. Supp. 2d at 619-20; Ex. J ¶¶ 12, 101-03. As here, the plaintiff alleged misrepresentations concerning, inter alia, the collateral selection process, credit ratings for the CDO, a "High Grade CDO" label, and the risks of investing in the CDO. Landesbank, 821 F. Supp. 2d at 620; Ex. J ¶¶ 7, 12, 78, 94, 107. To plead its claim that the underwriter "knew" the RMBS collateral would fail, the plaintiff, as here, alleged that the underwriter had (1) purchased billions of dollars of mortgages and then securitized them into RMBS, and in the process conducted due diligence on the mortgages including through outside firms like Clayton Holdings ("Clayton"); and (2) "formed close relationships" with various mortgage originators by funding their lending activities through warehouse financing. Landesbank, 821 F. Supp. 2d 619-20, 622; Ex. J ¶¶ 9,10, 12, 23, 33, 38, 39, 47, 55, 62, 69. While the plaintiff referred generally to "due diligence" and "due diligence reports" the underwriter allegedly had received, the only report specifically identified was entitled, "All Clayton Trending Reports 1st Quarter 2006 – 2nd Quarter 2007" (the

---

[8]     Accord Local No. 38 Int'l Bhd. Of Elec. Workers Pension Fund v. Am. Express Co., 724 F. Supp. 447, 459 (S.D.N.Y. 2010), aff'd, 430 F. App'x 63 (2d Cir. 2011); Woodward v. Raymond James Fin., Inc., 732 F. Supp. 2d 425, 436-37 (S.D.N.Y. 2010); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); Xerion Partners I LLC v. Resurgence Asset Mgmt, LLC, 474 F. Supp. 2d 505, 516-17 (S.D.N.Y. 2007), aff'd, 282 F. App'x 71 (2d Cir. 2008).

"Clayton Report"). <u>Landesbank</u>, 821 F. Supp. 2d at 622; Exs. K, L; Ex. J ¶ 33.  The Clayton

Report aggregates Clayton's recommendations to certain financial institutions regarding its

review of mortgages in 2006 and the first half of 2007, and was prepared in July 2007 <u>at the</u>

<u>earliest</u> as it describes "trends" continuing through the end of June 2007.  Ex. L at 1.  The Report

does not indicate whether the mortgages reviewed by Clayton were actually securitized, or if so

which RMBS (if any) they backed.

     The district court dismissed the complaint under Rule 9(b), noting that "the relevant

inquiry is whether Landesbank has specifically identified any contemporaneous report or

statement showing that Goldman knew [at the time the CDO was issued] about the toxicity of the

mortgages underlying" it.  <u>Landesbank</u>, 821 F. Supp. 2d at 622.  The district court found that the

plaintiff failed to do so for three reasons:  First, the plaintiff "only references the Clayton Report

without alleging who drafted it, who prepared it, or who, if anyone, at Goldman reviewed it."  <u>Id.</u>

Second, because the Clayton Report was prepared in July 2007 (at the earliest), it "cannot

support a fraud claim for securities sold" before then and the CDO at issue was sold in 2006.  <u>Id.</u>

Third, the complaint "fails to allege any connection between the mortgages reviewed in the

Clayton Report and those collateralizing" the CDO at issue.  <u>Id.</u>

     The Second Circuit affirmed dismissal of the fraud claims under Rule 9(b).  Repeating

the rule that "an allegation that defendants had access to information that was inconsistent with

their alleged misstatements must specifically identify the reports or statements containing this

information," the Circuit observed that only the Clayton Report was specifically identified.

<u>Landesbank</u>, 2012 WL 1352590, at *2.  The Circuit held that because the Report was dated <u>after</u>

the 2006 issuance of the CDO notes at issue, "the due diligence conveyed in that report therefore

does not bear on the defendants' knowledge at the time of issuance."  <u>Id.</u>  The Circuit further

held that "generalized references in the complaint to other due diligence reports commissioned

16

by Goldman are insufficient to sustain Landesbank's pleading burden as to intent." Id.

Second, in addition to the rule that a plaintiff must specifically identify reports or statements containing the adverse information supposedly possessed by a defendant, numerous courts—both within this Circuit and elsewhere—have required a plaintiff asserting fraud allegations related to RMBS to tie its allegations of fraud to the specific mortgages underlying the RMBS at issue. The United States Court of Appeals for the Sixth Circuit recently applied this requirement in a case where the plaintiff alleged, like here, that an underwriter "knew" its RMBS would fail because it "knew" mortgage originators were not following underwriting standards. The plaintiff relied, like here, on general reports that various mortgage originators— including originators that had originated the mortgages underlying the RMBS at issue—had engaged in unsound lending practices. Republic Bank & Trust Co. v. Bear Stearns & Co., Inc. 683 F.3d 239, 256 (6th Cir. 2012). But the plaintiff, like here, did not specifically link its allegations to the loans underlying the RMBS at issue:

> [Republic] made no effort to link its already-too-general allegations to the loans underlying the certificates, aside from commenting: 'The loan originators mentioned in these reports . . . have included originators of the mortgage loans that backed the certificates purchased by Republic.' . . . Republic does not connect the underwriters' alleged failure to follow their underwriting standards to the loans and securities involved in this case. . . . Rule 9(b) requires more. To survive Appellees' motion to dismiss, Republic would have to plead at least some facts connecting the loans at issue in this case to the underwriting practices it extensively documents. Failure to do so vitiates its claims.

Id. Courts within this District have dismissed complaints for the same reason.[9]

---

[9]     See Landesbank, 821 F. Supp. 2d at 622 (complaint "fails to allege any connection between the mortgages reviewed in the Clayton Report and those collateralizing" CDO); N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., No. 08 Civ. 5310 (DAB), 2011 WL 1338195, at *11 (S.D.N.Y. Mar. 31, 2011) (dismissing MBS complaint because "Plaintiff fail[ed] to make allegations specific to the . . . origination practices that relate to the only offering that is relevant here"); Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (allegations from public report are not sufficient to plead misstatement in connection with MBS where there is no "suggestion that the [examined] loans . . . were in the

Although Plaintiff must meet <u>both</u> of these requirements, Plaintiff satisfies <u>neither</u>. The Amended Complaint is replete with conclusory pronouncements of adverse information Barclays supposedly "knew," <u>see</u> Appendix A, but Plaintiff does not "specifically identify the reports or statements containing this information," <u>Novak</u>, 216 F.3d at 309; <u>Pope Invs.</u>, 2011 WL 5837818, at *6. Nor does Plaintiff ever tie its allegations of RMBS fraud to the mortgages underlying the RMBS actually included or referenced in Markov's collateral.

<u>Barclays' Securitization and Underwriting of RMBS</u>. Plaintiff's primary allegation is that as a "prolific underwriter and securitizer" of billions of dollars of RMBS (including some RMBS included or referenced in Markov), Barclays had "unique insight" into the poor quality of Markov's assets, because Barclays conducted due diligence or received due diligence reports from Clayton and other diligence providers regarding the mortgages Barclays purchased and securitized. ¶¶ 65-68, 76, 85.[10] These are the very allegations that were squarely found deficient in <u>Landesbank</u>. <u>See</u> <u>Landesbank</u>, 2012 WL 1352590, at *2 ("The generalized references in the complaint to other due diligence reports commissioned by Goldman are insufficient to sustain Landesbank's pleading burden as to intent."); Ex. J ¶¶ 12, 23, 29, 47, 55, 69. As demonstrated by the long line of cases cited <u>supra</u>, if Plaintiff seeks to rely on information supposedly learned by Barclays during the RMBS securitization process, Plaintiff "needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers

---

pools underlying the Certificates"); <u>City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.</u>, 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010) (requiring MBS plaintiffs to "plead how [the alleged false] statements and/or omissions are tied to the loans in which they invested"); <u>Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.</u>, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *13 (S.D.N.Y. Sept. 28, 2010) (dismissing MBS complaint because allegations were not specific to "any Mortgage Loans in the Securitizations" at issue).

[10]   According to Plaintiff, through its securitization of RMBS and the diligence process, Barclays supposedly learned that mortgages were not underwritten in accordance with mortgage originators' stated guidelines, mortgages were secured by properties with wildly inflated appraisals, and RMBS were much riskier than their credit ratings assigned. ¶¶ 66, 68, 76.

18

reviewed them"; "[a]n unsupported general claim of the existence of confidential company [data]

that revealed [unfavorable figures] is insufficient to survive a motion to dismiss." Xerion, 474 F.

Supp. 2d at 516-17.

As in Landesbank, the only report Plaintiff appears to identify specifically is the Clayton

Report. ¶ 67.[11] But Plaintiff fails to identify who drafted it, who prepared it, and who (if

anyone) at Barclays received it. Landesbank, 821 F. Supp. 2d at 622.  Moreover, as the Second

Circuit squarely held, the Clayton Report cannot demonstrate Barclays' alleged scienter, because

it was prepared in July 2007 at the earliest, supra at 16, after the May 2007 issuance of the

Markov notes—and thus it "does not bear on the defendants' knowledge at the time of issuance."

Landesbank, 2012 WL 1352590, at *2.  Further, the Clayton Report does not link any mortgage

reviewed by Clayton to any RMBS or CDO, let alone to any RMBS or CDO included or

referenced in Markov.  Landesbank, 821 F. Supp. 2d at 622.  Plaintiff's reliance on the Clayton

Report is thus plainly foreclosed.[12]

Barclays' Warehouse Lending.  Plaintiff similarly alleges that Barclays gained "unique

knowledge" of the poor quality of loans backing RMBS through its warehouse lending

relationships with various mortgage originators (including those that originated mortgages

---

[11]     Defendants presume Plaintiff is relying on the Clayton Report, because the data provided
matches that in the Clayton Report. ¶ 67; Ex. L at 3.  Plaintiff does not in fact provide any
description of the document relied upon, which is an independent defect requiring dismissal.

[12]     Unable to find a single confidential witness from Barclays or a single internal Barclays
document, Plaintiff proffers quotes from a handful of employees of New Century, a subprime
mortgage originator, who describe the "egregious nature of [New Century's] underwriting
practices." ¶ 74.  None of these persons ties what they say to Barclays—none states that
Barclays was told the information, much less who at Barclays was told and when—and none ties
what they say to the RMBS included or referenced in Markov.  At most, CW3 coyly states that
"banks like Barclays" "saw problems with the products." ¶ 75.  And CW4 merely provides his
belief that "New Century was able to sell approximately 90% to 95% if [sic] its loans to banks
like Barclays even though . . . the investment banks' due diligence revealed that the percentage
of defective loans was far greater than 10%." Id.  A New Century employee's belief based on
unspecified diligence provided to "banks" provides no evidence of Barclays' scienter, as in
Landesbank.

19

underlying the RMBS included or referenced in Markov's collateral). ¶ 69. Again, these same

allegations were made in Landesbank. Ex. J ¶¶ 9, 39. And again, these allegations fail because

Plaintiff never specifies where and how Barclays supposedly learned this contrary information;

not a single report or other source of information is identified, let alone specifically identified.

Conclusory allegations that "[d]efendants knew but concealed some things, or knew or were

reckless in not knowing other things are so broad and conclusory as to be meaningless." Pope

Invs., 2011 WL 5837818, at *6 (citation omitted).

Markov's Structure. Plaintiff also points to Markov's structure in an attempt to plead

scienter: that Markov contained a high percentage of securities from other CDOs as collateral,

and that Markov included CDO assets that were custom-built for Markov (the Markov Chain

CDOs). ¶¶ 53, 55, 56-58. But Markov's structure was fully disclosed to Plaintiff, and Plaintiff

does not and cannot claim otherwise. As this Court has held, a plaintiff cannot plead scienter

based on something defendants fully disclosed. See Borochoff v. GlaxoSmithKline PLC, No. 07

Civ. 5574 (LLS), 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008) (Stanton, J.) (rejecting

allegation that defendants intended to defraud by suppressing negative data because defendants

disclosed the relevant data); see also Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys.

v. Mechel OAO, 811 F. Supp. 2d 853, 876 (S.D.N.Y. 2011) (declining to find scienter where

defendants disclosed existence of allegedly improper contracts to plaintiff, because disclosures

"[ran] contrary to the suggestion that the Defendants were trying to conceal conduct they knew

to be unlawful").

Barclays' Purchase of EquiFirst. That Barclays purchased subprime originator EquiFirst

in January 2007 at a deeply discounted price does not raise any strong, cogent, or compelling

inference that Barclays knew "the subprime mortgage market was on the precipice of collapse."

¶¶ 77-79. At most, it reflects the severe global economic crisis that deflated the value of many

businesses. In any event, allegations that a defendant was aware of changing market conditions are plainly insufficient to plead scienter. See Canadian Imperial Bank of Commerce, 694 F. Supp. 2d at 300 ("[K]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud[.]"); In re Sec. Capital Assurance, Ltd. Sec. Litig., 729 F. Supp. 2d 569, 596 (S.D.N.Y. 2010) ("[T]he housing crisis was popular news by the end of 2006 and early 2007," so plaintiffs "were just as aware of the housing market crash as they allege Defendants were.").

Barclays' Lawsuit Against Bear Stearns. Plaintiff cites to an entirely unrelated lawsuit between Barclays, as liquidity provider, and Bear Stearns and claims Barclays admitted in the suit that it "knew" that "February 2007 was a time of 'extreme volatility and dropping prices in ABX indices.'" ¶¶ 80-81. Plaintiff fails to cite to any source for this statement (itself a pleading defect), but Barclays presumes Plaintiff refers to the complaint filed in Barclays Bank PLC v. Bear Stearns Asset Management Inc., No. 07 Civ. 11400 (LAP) (S.D.N.Y. Dec. 19, 2007). The statement cited by Plaintiff does not allege what Barclays knew about the market as of February 2007. Instead, it demonstrates how Barclays retrospectively viewed the market conditions when the complaint was filed in December 2007—more than seven months after Markov's closing and one month after Markov's Event of Default. In any event, as demonstrated supra, knowledge of a general economic trend cannot establish scienter.

The Corvus CDO. Like Space Coast, Plaintiff relies on a lawsuit from 2004 involving a separate Barclays CDO (Corvus) underwritten more than seven years before Markov. ¶¶ 60-64. Allegations of fraud in connection with other securities cannot be used to meet heightened pleading requirements for scienter in connection with the securities purchased by Plaintiff. See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 374 (S.D.N.Y. 2003) (allegations concerning securities other than those purchased by plaintiffs "fail

to meet the Rule 9(b) (let alone the PSLRA) pleading requirements necessary to allege that [defendants] made fraudulent statements in reports concerning" securities plaintiffs purchased), aff'd sub nom. Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161 (2d Cir. 2005).  Likewise, unproven allegations in lawsuits (including settled lawsuits) cannot be used to plead scienter in compliance with Rule 9(b) and the PSLRA.  See Three Crown Ltd. P'ship v. Caxton Corp., 817 F. Supp. 1033, 1040 n.11 (S.D.N.Y. 1993) ("Plaintiffs cannot be permitted to free ride off the press or the complaints of other parties filing similar lawsuits, rather they must prove to the court that their complaint is backed by specific facts supporting a 'strong inference' of fraud.").[13]

The LIBOR Investigation.  Grasping at straws, Plaintiff points to a recent industry-wide investigation by U.K. regulators into the setting of London Interbank Offered Rate ("LIBOR"). ¶ 8. This investigation had nothing to do with CDOs, much less Markov.  Plaintiff merely speculates that because "communications [were] sent to conceal the LIBOR fraud at the same time Barclays was scheming to defraud BayernLB," fraud must have occurred in Markov.  Id. (emphasis added).  That is nothing more than a riff on guilt-by-association: "you were accused of doing one thing wrong, so you must have done something else wrong."[14]

Allegations Concerning SSgA.  Finally, as described by SSgA, infra at 29-30, Plaintiff fails to plead facts giving rise to a strong inference of scienter through allegations that SSgA "abdicated" its role in collateral selection in connection with other CDOs underwritten by other

---

[13]    Accord Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007); Geinko v. Padda, No. 00 C 5070, 2002 WL 276236, at *6 n.8 (N.D. Ill. Feb. 27, 2002).

[14]    Further grasping at straws, Plaintiff notes that in November 2007, "reports surfaced" that the U.S. head of credit derivatives and the U.S. head of credit trading at Barclays were stripped of their responsibilities.  ¶ 150.  Such rank speculation—unidentified and unconfirmed reports that provide no explanation for the actions—cannot plead scienter, including because it has no tie whatsoever to Markov.  Likewise, the fact that in August 2007 and January 2008, the European head of CDOs and co-president of Barclays left the firm amidst an unprecedented financial crisis—again, with no reason being attributed—is not indicative of anything, let alone a strong, cogent, and compelling inference of scienter.  Id.

banks. ¶¶ 88-109. Beyond the reasons described by SSgA, Plaintiff's allegations have <u>nothing</u> to do with Barclays, and nowhere suggest that Barclays was aware of the supposed conduct.[15]

        b.     <u>Plaintiff Fails to Plead Motive to Defraud on the Part of Barclays</u>

The Amended Complaint alleges a simple motive on the part of Barclays: profit. ¶ 2 ("Barclays itself selected and even created certain of the assets referenced by Markov because it knew those assets would fail, and that Barclays would profit as a result."). According to Plaintiff, Barclays was motivated to increase profits through its so-called "short" position— which was fully disclosed in the Offering Circular—and by reducing its exposure to CDOs and RMBS. ¶¶ 3-5, 118. But under Second Circuit precedent, these do not amount to actionable motive. Rather, the Circuit has repeatedly held that a "generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor," is not enough. <u>Chill v. Gen. Elec. Co.</u>, 101 F.3d 263, 268 (2d Cir. 1996); <u>accord</u> <u>ECA and Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable . . . do not constitute 'motive' for purposes of this inquiry."). "Thus, arguing that the motive for defrauding investors was to increase the company's profits . . . is not sufficient." <u>In re AstraZeneca Sec. Litig.</u>, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008), <u>aff'd</u>, 334 F. App'x 404 (2d Cir. 2009); <u>see also</u> <u>Epirus Capital Mgmt., LLC v. Citigroup Inc.</u>, No. 09 Civ. 2594 (SHS), 2010 WL 1779348, at *6 (S.D.N.Y. Apr. 29, 2010) (motive of bank to profit from CDO too generalized to be sufficient).

Again, <u>Landesbank</u> is directly on point and makes clear that the Amended Complaint should be dismissed. Like here, the <u>Landesbank</u> plaintiff alleged that a CDO underwriter was

---

[15]     <u>Aladdin</u> only underscores that Plaintiff here fails to plead fraud with particularity. In <u>Aladdin</u>, Plaintiff did not assert any claims against the CDO's underwriter. And in that case, Plaintiff alleged only negligence and breach of contract claims, which are not subject to Rule 9(b). Indeed, the Circuit expressly observed that Plaintiff in <u>Aladdin</u> failed to state its claims with the particularity required under Rule 9(b). <u>Aladdin</u>, 2012 WL 3156441, at *19.

looking to profit because it had "bet against" the CDO. <u>Landesbank</u>, 821 F. Supp. 2d at 620.

Indeed, the allegations in <u>Landesbank</u> went one step further, claiming that the underwriter

entered into separate credit default swaps, outside the CDO, that "bet against" the CDO itself.

<u>Id.</u> Categorically rejecting these motive allegations as insufficient, the Second Circuit held:

> The complaint in this case does not ascribe to Goldman . . . any particular
> motive for committing fraud beyond a general profit motive common to
> all corporations, which does not suffice.

<u>Landesbank</u>, 2012 WL 1352590, at *2.  Under <u>Landesbank</u> and a long line of Second Circuit

cases, Plaintiff fails to allege an actionable motive on the part of Barclays.[16]

### 2.   Plaintiff Fails to Raise a Strong Inference of Scienter as to SSgA

The Amended Complaint attempts to plead scienter on the part of SSgA primarily

through motive and opportunity allegations, claiming that SSgA abandoned its role as collateral

manager and allowed Barclays to rig Markov to fail in order to secure a management fee.  But

allowing this generalized profit motive to create an inference of scienter "would essentially read

the scienter element out of existence."  <u>In re Merrill Lynch & Co. Research Reports Sec. Litig.</u>,

289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003).  As noted, the Second Circuit has consistently held

---

[16]     Moreover, Plaintiff's motive theory makes no sense. As the Offering Circular disclosed,
Barclays served as Markov's "<u>Initial</u> Synthetic Asset Counterparty," and Barclays had to use all
commercially reasonable efforts to enter into "Mirror Swaps" with six other dealers that
effectively would sell off Barclays' so-called "short" position. <u>See supra</u> at 7 n.5.  Plaintiff does
not allege that this description was false, and Plaintiff does not proffer any facts—much less
particularized facts— indicating that Barclays did not intend to sell off the so-called "short"
position after closing.  In any event, even if Barclays' position as "Initial Synthetic Asset
Counterparty" continued, if the referenced assets performed poorly and Markov's cash was
insufficient to make the counterswap payments, then Barclays was required to accept Class S
notes—thus exposing it to Markov's credit risk up to $1.6 billion.  If Barclays wanted Markov to
fail (as Plaintiff insists), then Barclays would not have structured Markov such that the Synthetic
Asset Counterparty had to accept Class S notes, which remained subject to Markov's credit risk.
<u>See Kalnit v. Eichler</u>, 264 F.3d 131, 140-41 (2d Cir. 2001) (where plaintiff's view of facts defies
economic reason, it does not yield reasonable inference of scienter); <u>accord In re Adelphia
Commc'ns Corp. Sec. and Derivative Litig.</u>, No. 03 MD 1529(LMM), 2007 WL 2615928, at *3
(S.D.N.Y. Sept. 10, 2007).

that allegations amounting to a general motive to generate profits are insufficient to give rise to a strong inference of scienter, most recently in Landesbank.

The Amended Complaint also does not contain particularized facts indicating that SSgA knowingly or consciously permitted Barclays to control collateral selection for Markov in order to construct the CDO to fail. Plaintiff points to other transactions—such as SSgA's role in managing Carina CDO, an entirely different transaction—and other litigation involving SSgA, and then elaborately misconstrues those facts to suggest implausibly that SSgA managed a wide swath of its business for the purpose of deceiving people. But conclusory allegations of deceptive conduct regarding different securities do not suffice. The Amended Complaint contains no specific allegation establishing what SSgA knew, or when or how SSgA knew it, that would demonstrate (if proven true at trial) that, with regard to its management of Markov, SSgA was conscious of (or reckless in connection with) the specific misstatements alleged in the pleading. See, e.g., Local No. 38 Int'l Bhd. Of Elec. Workers, 724 F. Supp. 2d at 459-62 (dismissing 10(b) claim because, in part, the "allegations do not establish what specific contradictory information the Individual Defendants received or when they received it."); supra at 15 n.8. While nearly all of Plaintiff's allegations concern other transactions and securities, the generalized references to sources of information that actually relate to Markov do not suffice to satisfy the Second Circuit's standard for pleading scienter through allegations of conscious or reckless misbehavior. Landesbank, 2012 WL 1352590, at *2 (dismissing claims because due diligence reports were either dated after the transaction at issue, or were mere "generalized references . . . insufficient to sustain Landesbank's pleading burden as to intent.").

Indeed, quite apart from failing to raise a cogent inference of fraudulent intent, the Amended Complaint compels the Court to draw a contrary, non-fraudulent inference which, in the language of Tellabs, is plainly more compelling than any negative inference Plaintiff could

hope to raise: that SSgA's interests were fully aligned with Markov investors and that SSgA had every incentive to manage Markov to be successful. Nothing offered by Plaintiff overcomes that inference. The Amended Complaint thus fails entirely to plead scienter with regard to SSgA.

a.   Plaintiff Fails to Plead Motive and Opportunity to Defraud on the Part of SSgA

A plaintiff seeking to raise an inference of scienter based on "motive and opportunity" to commit fraud must allege with specific facts that the defendant benefited "in some concrete and personal way from the purported fraud." ECA, 553 F.3d at 198. The Amended Complaint does not plausibly allege that SSgA stood to benefit in any "concrete and personal way from the purported fraud." To the contrary, Plaintiff's allegations demonstrate that SSgA's motive was to ensure that it selected assets that it believed would perform well and that SSgA's interests were fully aligned with investors.

The Amended Complaint insists that SSgA was motivated to abandon its independence as a collateral manager in return for the "outsized fees it garnered from managing CDOs like Markov." ¶ 102. But generalized allegations of a corporate profit motive are insufficient to raise a strong inference of scienter. See, e.g., Landesbank, 2012 WL 1352590, at *2 (holding that CDO investors' allegations of "a general profit motive common to all corporations . . . do[] not suffice"); Epirus, 2010 WL 1779348, at *6 (holding motive to profit from a CDO too generalized to be sufficient).

More importantly, the structure of the fee SSgA was entitled to receive for managing Markov shows why even its general motive in securing fees depended on the CDO performing well—squarely at odds with the motive to defraud Plaintiff ascribes to it. The Markov Offering Circular disclosed to potential investors that SSgA's collateral management fee was a function of the performance of the CDO's portfolio of assets over time. See Ex. G at 278, 298-99. As a

26

result, SSgA's fees increased the longer the CDO performed well, but decreased if the CDO performed poorly or failed. And in the event of a default under the Indenture governing the Markov notes, SSgA could be removed entirely as manager. See Ex. M at 15-16. In this way, SSgA's interests were aligned with the interests of the Markov noteholders, in that SSgA stood to benefit from the CDO's long-term success. Furthermore, a substantial portion of the collateral management fee for Markov was subordinate to the payments to noteholders, meaning that SSgA would only receive that portion of its fee after all of the noteholders had received payments, but would forfeit that portion of its fee before the noteholders suffered any losses. See Ex. G at 93-101, 299. Thus, the very fee structure to which Plaintiff points as providing a "motive" for fraud in reality gave SSgA the opposite incentive—to select collateral assets for Markov that it expected to perform well over time—since doing so would benefit both SSgA and investors at the same time.

Similarly, Plaintiff claims that SSgA was improperly motivated by its "G3" initiative, which included "an ambitious target to triple State Street's fixed income group's revenues within three years." ¶ 108. Plaintiff further asserts that State Street treated CDOs as a "showcase" product in order to meet this goal. ¶ 106. But this is just another way of alleging generally that SSgA was motivated by an interest in securing profits, which is not enough for motive-and-opportunity pleading. Landesbank, 2012 WL 1352590, at *2; Epirus, 2010 WL 1779348, at *6. In any event, viewed through the Tellabs lens, the suggestion that SSgA would seek to grow a "showcase" service line and triple its revenues by allowing arranging banks to rig SSgA-managed CDOs to fail defies logic. SSgA depended upon the continued success of its CDOs in order to continue receiving fees for managing them. Even according to the Amended Complaint, SSgA sought to "earn attractive and stable management fees" from its CDO business. ¶ 106 (emphasis added). It is unreasonable to suggest that SSgA could have planned to grow its CDO

management business by allowing SSgA-managed CDOs to fail shortly after their inception, leaving investors with millions in losses. Moreover, as the manager of other CDOs and investment funds, SSgA had a strong reputational interest in Markov's performance. See S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 113 (2d Cir. 2009) (noting that implausibility that defendant "would deliberately jeopardize its standing and reliability, and the viability of its business" weighed against inference of scienter). Nothing in the Amended Complaint overcomes the more compelling inference that SSgA had a reputational interest in Markov's success—and no plausible interest in abandoning its post as a collateral manager in order to allow the CDO to fail.[17] See Kalnit, 264 F.3d at 140-41 (where plaintiff's view of facts defies economic reason, it does not yield reasonable inference of fraudulent intent).

Throughout the Amended Complaint, Plaintiff seeks to bolster its illogical motive allegations against SSgA by citing other CDO transactions and other litigation involving SSgA's fixed income funds. Not only do these allegations fail to create a compelling inference of scienter, but simply referring to other transactions cannot satisfy the stringent pleading standards of Rule 9(b) or the PSLRA, which require Plaintiff to plead facts specific to Markov. Allegations regarding other matters and involving other securities are not sufficient to plead scienter with respect to SSgA's management of Markov. See In re Merrill Lynch, 273 F. Supp. 2d at 374 (stating that allegations of fraud in connection with other securities do not satisfy Rule 9(b) or the PSLRA with respect to securities purchased by plaintiff); see also Three Crown Ltd., 817 F. Supp. at 1040 n.11 (stating that allegations regarding other lawsuits cannot substitute for

---

[17]    Plaintiff suggests a ProPublica article supports an inference of scienter. ¶¶ 89-90. Not only does the article completely lack any particular allegations as to SSgA's management of Markov collateral, but it actually supports a contrary inference. Indeed, the article states that "State Street wanted their deals to do well . . . there was a lot of 'reputational risk to be concerned about.'" See Ex. N at 11. The article also quotes SSgA's Frank Gianatasio regarding the collateral management team's state of mind with respect to its CDOs—"We were comfortable with every transaction we put into our CDOs." See id. at 12.

specific facts supporting a strong inference of scienter in the case at bar).

Carina Consent Order.  For example, the Amended Complaint devotes more time to allegations about Carina CDO, and a Consent Order that SSgA entered into with the Massachusetts Securities Division on February 28, 2012 regarding its management of Carina CDO ("Carina Consent Order" or "Consent Order"), than it does to any specifics of SSgA's management of Markov.  The Amended Complaint disingenuously claims the Carina Consent Order demonstrates that "State Street ceded its purportedly 'independent' role as Collateral Manager in the Carina CDO to Magnetar [the CDO's equity investor]—a party that State Street *knew* was betting against the performance of the CDO and the interests of the CDO's noteholders," ¶ 99 (emphasis in original), and further alleges that "State Street abdicated its duty to act as an independent manager in Carina because the potential fees it would earn as collateral manager were 'ENORMOUS.'" ¶ 100.  These allegations—which in any event relate to an entirely different CDO transaction, and have nothing at all to do with Markov—would be insufficient even if they were accurate.  But they are not accurate.

Nothing in the Consent Order in any way suggests that SSgA abdicated its asset selection duties or permitted Magnetar to overrule its judgment, much less that SSgA knew that the equity investor, Magnetar, stood to profit by the failure of the CDO.  The Consent Order explicitly states that "SSgA managed the selection, acquisition and sale of collateral assets for the CDO." See Ex. O ¶ 40.  The Amended Complaint simply omits this language.[18]

---

[18]    The Amended Complaint suggests it was somehow inappropriate for SSgA to seek consent from Deutsche Bank in selecting assets for the Carina CDO.  ¶ 96.  To the contrary, SSgA was required to seek consent from Deutsche Bank for assets selected during the Carina warehouse period, just as SSgA was required to seek consent from Barclays for assets selected during the Markov warehouse period.  Barclays' consent right over collateral selection was explicitly disclosed in Markov's Offering Circular—an inconvenient fact that Plaintiff prefers to minimize because it disposes of Plaintiff's claim that SSgA did anything other than act in accordance with its role as Markov's collateral manager as disclosed in the Offering Circular.

The Amended Complaint mischaracterizes other crucial aspects of the Consent Order. The Consent Order does not indicate that SSgA knew Magnetar was betting against the performance of Carina CDO or the interests of the CDO's noteholders. The Consent Order merely states that SSgA became aware that Magnetar was interested in taking a short position against a few of the specific assets included in the CDO's portfolio, to which SSgA's Frank Gianatasio crucially replied, "We are not comfortable with [Magnetar] shorting into the deal." See Ex. O ¶ 71. The Consent Order also does not indicate that SSgA was willing to give up its role as an independent collateral manager in return for "ENORMOUS" fees. An email cited in the Consent Order simply describes the Carina CDO as an "ENORMOUS mezzanine CDO opportunity." See id. ¶ 30.

The Consent Order has no bearing on Markov, and Plaintiff's selective use of the statements contained in the Consent Order cannot substitute for particularized allegations concerning SSgA's actions with regard to Markov. The two factual settings are critically distinct: in the Consent Order, for example, there is no allegation that Magnetar selected or in any way influenced asset selection for Carina. Moreover, in the case at bar, there is no allegedly undisclosed third party at all: Barclays had consent power over asset selection, and this fact was explicitly disclosed to Markov's investors. See Ex. G at 53, 124, 304; see also ¶ 129. The legal settings also are distinct: the Consent Order does not even allege that SSgA acted with scienter in connection with its management of the Carina CDO; scienter is not a required element of Mass. Gen. Laws ch. 110A § 101(2) or § 101(3). In short, allegations concerning Carina CDO provide no support for any allegations of fraudulent intent on the part of SSgA, even if the allegations were relevant to Markov at all.

---

See Ex. G at 53, 124, 304; see also ¶ 129. Plaintiff cannot raise a strong inference of scienter against SSgA based on facts about Markov's structure that were explicitly disclosed to Markov's investors. Supra at 20.

Fixed Income Litigation.  The Amended Complaint's allegations regarding litigation involving SSgA's fixed income funds, ¶¶ 102-04, also—like Carina CDO—have nothing to do with Markov.  Those actions involve entirely different investment strategies, with different investment objectives, and thus any comparison of SSgA's investment choices in one product versus the other is meaningless.  See In re Merrill Lynch, 273 F. Supp. 2d at 374; see also Three Crown Ltd., 817 F. Supp. at 1040 n.11.  In any event, these allegations serve to emphasize the more compelling inference that SSgA managed asset selection in Markov based on its belief in the soundness of the investments.  For example, Plaintiff asserts that SSgA's fixed income funds were "exposed to the same . . . types of subprime-related securities as those that were included in or referenced by Markov." ¶ 104.  This concession merely confirms that State Street held subprime exposure across its investment funds and only makes it even less plausible that SSgA would have allowed other banks to rig hidden bets against these assets through SSgA-managed CDOs.

Plaintiff's motive allegations simply make no sense.  SSgA's economic interest in expanding its CDO business over time would not have been advanced by allowing Barclays or any party to control collateral selection in order to fill Markov or any CDO it managed with assets likely to fail.  Instead, SSgA's motives were consistent with the interests of investors:  to see Markov succeed.  No particularized allegations overcome that more plausible, compelling inference, in part because no particularized allegations address Markov at all.  The Amended Complaint thus does not plead a strong inference of scienter based on motive and opportunity.

> b.     Plaintiff Fails to Plead Scienter Against SSgA Based on Conscious Misbehavior or Recklessness

Plaintiff also has not alleged particularized facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  Where, as here, Plaintiff has not adequately

31

alleged motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." In re PXRE Grp., Ltd. Sec. Litig., 600 F. Supp. 2d 510, 535 (S.D.N.Y. 2009), aff'd sub nom Condra v. PXRA Grp. Ltd., 357 F. App'x 393 (2d Cir. 2009). Allegations of conscious misbehavior or recklessness must reveal "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Citigroup, Inc. Sec. Litig., 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010) (citation omitted); see also S. Cherry, 573 F.3d at 109 (stating that recklessness is "not merely a heightened form of negligence.") (citation omitted).

As described supra at 25-26, Plaintiff was required to identify specific contradictory information that was available to SSgA at the time that its allegedly misleading public statements were made. See also In re PXRE Grp., 600 F. Supp. 2d at 536 (holding that allegations must show "(1) specific contradictory information [that] was available to the defendants . . . (2) at the same time they made their misleading statements.") (citation omitted). But although Plaintiff has extracted partial excerpts from documents related to other matters, the Amended Complaint lacks even a single particularized alleged fact relating to the Markov transaction itself, or suggesting that SSgA consciously or recklessly participated in making misstatements concerning Barclays' alleged scheme to construct Markov to fail.

Statements by SSgA CIO Sean Flannery. The Amended Complaint cites Sean Flannery's testimony from litigation involving SSgA's fixed income funds, insisting it reveals that SSgA knowingly ceded control of asset selection for its CDOs to investment banks. In fact, the testimony cited in the Amended Complaint does not address Markov in particular, and does nothing more than describe the basic structure of a CDO: "[I]n the CDOs, we were hired by an investment bank to manage the assets within a separate legal structure, the collateralized debt

obligation. And so the features or the types of assets and amounts of assets that would go into

the CDO structure *was really more directed by the investment bank* in order to take guidelines

from the ratings agency." ¶ 108 (emphasis in original). This language does not in any way

amount to an admission that SSgA ceded control of asset selection for its CDOs to investment

banks; it merely describes—accurately—the role of a structuring bank in a CDO. See Ex. P at

130-31 ("Securities firms underwrote the CDOs: that is, they approved the selection of collateral,

structured the notes into tranches, and were responsible for selling them to investors."). 

Moreover, that role was explicitly disclosed to Markov's investors in the Offering Circular. The

Offering Circular clearly disclosed Barclays' consent power over the collateral selections made

by SSgA, see Ex. G at 53, 124, 304, as well as the specific eligibility criteria pursuant to which

SSgA could select assets, see Ex. G at 125-29.

The few other Flannery statements cited in the Amended Complaint are similarly

misconstrued and also have nothing to do with Markov. For example, Plaintiff cites:

- Testimony that SSgA believed a February 2007 drop in the BBB-rated tranche of the ABX Index was due to shorting by hedge funds. The Amended Complaint leaps from that general observation to the conclusory assertion that SSgA must also have known that "Barclays likewise sought to profit from Markov by including similarly high-risk synthetic assets that likewise tracked the BBB tranche of the ABX index." ¶ 111. But the cited testimony has nothing to do with Markov or Barclays, and Plaintiff never explains how a general theory about hedge funds shorting the ABX Index in early 2007 suggests in any way that SSgA knew about a purported scheme by Barclays—an investment bank, not a hedge fund—to construct a specific CDO to fail.

- An April 10, 2007 email, in which Flannery states that "it is fairly likely that we [State Street], and the markets, will be wrestling with mortgage-related issues for some time and risk levels (and premia) are elevated, so we may take some bruises along the way." ¶ 112. Like the testimony discussed above, however, this email merely contains general facts about conditions in the markets, not specific contrary knowledge sufficient to plead conscious misconduct or recklessness with regard to Markov. See Plumbers Union Local No. 12 Pension Fund v. Swiss Reins. Co., 753 F. Supp. 2d 166, 185 (S.D.N.Y. 2010) (citation omitted) ("Merely alleging that there were signs of problems in the subprime mortgage market is not sufficient to show that the . . . defendants knew that [their] disclosures were false or misleading.").

  Fixed Income Analytics. The Amended Complaint asserts that SSgA must have allowed

33

Barclays to select the collateral assets for Markov, because SSgA's CDO department lacked the tools necessary to select the assets itself. This allegation implausibly suggests that Barclays (and other CDO arranging banks) retained SSgA to manage several CDOs during this period despite the asserted fact that SSgA was unable to perform that service. In support, Plaintiff cites an SSgA document, vaguely placed in "2006," which sets forth general goals for improving the fixed income portfolio analytics at SSgA. ¶ 116. The document cited in the pleadings does not state that SSgA was unable to perform its collateral selection work. Neither the Amended Complaint nor the cited document contains specific facts indicating that SSgA did not conduct any of the steps it disclosed it would follow in analyzing and selecting collateral assets for Markov or any other investment. Markov is not even mentioned in the document, and there is no indication in the Amended Complaint or on the face of the document that it comes from the period during which SSgA was selecting the collateral assets for Markov. Similarly, the Amended Complaint cites a 2006 "Global-Fixed Income Plan" in support of this same generalized allegation, but the cited document does not reflect a specific date indicating that it is even contemporaneous to asset selection for the CDO. ¶ 117. While the inference urged on this Court based on the Amended Complaint's selective use of these documents is highly speculative and lacking in any specific connection to Markov, a far more plausible inference is that SSgA, like all asset managers, constantly strove to improve its analytics.

Selection of ABX Bonds. Plaintiff's other attempts to give the appearance of conscious misbehavior amount to little more than misdirection. In Paragraph 113, for example, the Amended Complaint seeks to give the appearance that SSgA selected bonds for Markov it previously had rejected for other investment funds. But the Amended Complaint only says that Markov included "15 RMBS issued from the very same trusts" as RMBS referenced in the 2006-02 ABX Index. Particular RMBS trusts typically issued several tranches of notes bearing

34

different credit ratings and reflecting different degrees of risk.  The fact that the notes may have

been issued by the same RMBS trusts merely would mean that SSgA approved certain tranches

of notes issued by those trusts—say, higher-rated AAA-rated notes—but rejected the lower-rated

BBB-rated notes.  Nothing about the routine process of rejecting lower-rated investments, while

accepting higher-rated ones, implies a fraud has taken place.[19]

In sum, nowhere does the Amended Complaint provide a plausible—much less

compelling—allegation that SSgA knowingly or recklessly participated in a fraud.  To the

contrary, the Amended Complaint compels the opposite:  that SSgA had a motive to manage

Markov to be successful.  As a result, the Amended Complaint does not satisfy the Tellabs

standard for pleading scienter.  Further, since the scienter standard for common law fraud and

fraudulent inducement claims in New York is essentially the same as that under the federal

securities laws, Plaintiff's state law fraud claims should also be dismissed.  See Saltz v. First

Frontier, LP, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010), aff'd, No. 11-265-cv, 2012 WL 2096399

(2d Cir. June 12, 2012); see also Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, 747 F.

Supp. 2d 406, 414 (S.D.N.Y. 2010), aff'd, Nos. 11-3311-cvm 11-3725-cv, 2012 WL 2754933

(2d Cir. July 10, 2012), ("[T]he elements of Section 10(b) claims are essentially the same as

those for common law fraud in New York.").

## C.   **Plaintiff Fails to Plead Reliance as a Matter of Law**

Plaintiff's Fraud-Based Claims separately fail because Plaintiff cannot, as a matter of

law, plead reasonable or justifiable reliance.  Emergent Capital Inv. Mgmt., LLC v. Stonepath

Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003) (reasonable reliance required for Exchange Act

claims); Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996) (justifiable reliance

---

[19]    While Plaintiff also alleges that SSgA included in the Markov Chain CDOs seven of the
securities underlying the BBB ABX Index, it does not allege that those seven securities had
previously been rejected.

required for common law fraud claims). In <u>Space Coast</u>, this Court held that the issue of reliance in the face of extensive risk disclosures was an "intensely fact-specific" question. 2012 WL 946832, at *2. The Court did not, however, address the express disclaimers in Markov's Offering Circular. After <u>Space Coast</u>, the Second Circuit made clear in <u>Landesbank</u> that such disclaimers preclude a showing of reliance as a matter of law. <u>Landesbank</u>, 2012 WL 1352590, at *3.

It is well established that a plaintiff cannot allege reliance on a statement on which it has specifically warranted it would not rely. <u>Citibank v. Plapinger</u>, 66 N.Y.2d 90, 94-95 (1985). To permit otherwise would "condone [the warranting party's] own fraud in deliberately misrepresenting [its] true intention." <u>Id.</u> at 95. For that reason, "a specific disclaimer destroys the allegations in plaintiff's complaint" where a plaintiff has "announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded." <u>Danaan Realty Corp. v. Harris</u>, 5 N.Y. 2d 317, 320 (1959). The Second Circuit has adopted the same rule as to federal securities fraud. For instance, in affirming the dismissal of a securities fraud complaint, the Second Circuit concluded that "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation." <u>ATSI Commc'ns</u>, 493 F.3d at 105; <u>see</u> <u>Harsco Corp. v. Segui</u>, 91 F.3d 337, 341-42 (2d Cir. 1996) (holding that no-reliance warranty precludes liability for federal securities fraud as matter of law where agreement was negotiated by two sophisticated parties).

<u>Landesbank</u> again is directly on point. The Circuit squarely held that the express disclaimers in the Davis Square CDO's offering documents precluded a showing of reliance as a matter of law: "The relationship between Landesbank and the defendants was that of buyer and seller in a standard arm's length transaction; and by its own representations Landesbank

36

possessed sufficient expertise to evaluate the risks of its investment.  The complaint therefore

fails to plead justifiable reliance."  2012 WL 1352590, at *3.

      The express disclaimers in the Markov Offering Circular are substantively identical to

those in Landesbank:

- Landesbank noted that the Davis Square offering circular cautioned investors to consider and assess for themselves the likely level of defaults on the underlying collateral. 2012 WL 1352590, at *3. So too did the Markov Offering Circular: "AN INVESTMENT IN THE OFFERED NOTES IS NOT SUITABLE FOR ALL INVESTORS AND IS APPROPRIATE ONLY FOR AN INVESTOR CAPABLE OF (i) ANALYZING AND ASSESSING THE RISKS ASSOCIATED WITH DEFAULTS . . . ." Ex. G at iv.

- Landesbank pointed out that the Davis Square offering circular disclaimed the existence of a fiduciary relationship. 2012 WL 1352590, at *3. So did the Markov Offering Circular: "[T]he purchaser acknowledges and agrees that . . . none of the Issuer, the Initial Purchasers, the Deposit Agreement Counterparty or the Collateral Manager is acting as a fiduciary or financial or investment advisor for the purchaser." Ex. G at 206-07.

- Landesbank observed that the Davis Square offering circular required investors to represent that they were sophisticated and would do their own diligence in assessing their investment. 2012 WL 1352590, at *3. The Markov Offering Circular did the same: "the purchaser is a sophisticated investor familiar with transactions similar to its investment in the Applicable Notes" and further warned Plaintiff "TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE OFFERED NOTES," and that "PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED . . . . EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN ADVISORS AS NEEDED TO MAKE ITS INVESTMENT DECISION . . . ." Ex. G at iv, 207.

- Landesbank emphasized that investors in Davis Square had an opportunity to ask questions and request additional information concerning the offering. 2012 WL 1352590, at *3. Markov investors had the same opportunity: "The Issuer extends to the purchasers and to each prospective investor the opportunity to ask questions of, and receive answers from the Issuer concerning the Offered Notes and the terms and conditions of this Offering and to obtain any additional information it may consider necessary in making an informed investment decision and any information in order to verify the accuracy of the information set forth herein . . . ." Ex. G at 201.

Other courts have likewise dismissed complaints at the pleading stage for failure to allege

reliance given virtually identical disclaimers in CDO offering materials.  See <u>HSH Nordbank AG</u>

<u>v. UBS AG</u>, 95 A.D.3d 185 (1st Dep't 2012); <u>MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner</u>

<u>& Smith Inc.</u>, 27 Misc. 3d 1233(A) (N.Y. Sup. Ct. 2010), <u>aff'd as modified by</u> 81 A.D.3d 419

(1st Dep't 2011); <u>see generally</u> <u>CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.</u>, No. 07

Civ. 11078 (LTS) (AJP), 2009 WL 2033048, at *4 (S.D.N.Y. July 13, 2009) (dismissing fraud

claim where "[d]isclaimer preclude[d] any viable claim of reliance").[20]

## D.      <u>Plaintiff Fails to Allege Any Misrepresentation Attributable to Defendants</u>

Finally, Plaintiff's Fraud-Based Claims fail because the alleged misrepresentations were

not attributed to Defendants.  The Supreme Court made clear in <u>Janus</u> that only a party who

"makes" a statement may be liable for securities fraud, and typically "a statement was made

by—and only by—the party to whom it is attributed."  131 S. Ct. at 2302.  The <u>Janus</u> Court held

that a mutual fund's investment adviser, which assisted in the preparation of an allegedly

misleading prospectus, could not be liable for statements in that document because the

---

[20]      Relatedly, Plaintiff cannot seek to impose liability on Barclays in connection with any
alleged misrepresentation statement in a Marketing Book dated March 2007.  While Plaintiff
observes that the Marketing Book was prepared by Barclays, ¶ 17, through the separate Offering
Circular Plaintiff expressly disclaimed reliance on any other document, including the Marketing
Book:  "In connection with the purchase of the Applicable Notes, the purchaser acknowledges
and agrees that . . . the purchaser has . . . based its decision to purchase the Applicable Notes
upon the information contained therein and is not relying (for purposes of making any
investment decision or otherwise) upon any advice, counsel or representations (whether written
or oral) of [Barclays] . . . as to the Issuer, other than any in such Offering Circular."  Ex. G at
206-07.  The Offering Circular further expressly precluded reliance on statements outside of its
text, and superseded all prior materials provided to prospective investors, including the
Marketing Book.  Ex. G at iii.  Likewise, the Marketing Book itself expressly provided that it
would be superseded in its entirety by the Offering Circular, noting that it was "for informational
purposes only . . . .  The information contained herein is preliminary, subject to change without
notice, and is incomplete and condensed.  Such information is subject to the final expression of
the terms set forth in, and will be superseded in its entirety by, a final offering circular (the
'Offering Circular')."  Ex. H at 2.  Given these disclaimers, Plaintiff cannot seek to impose
liability on the basis of the Marketing Book.  See <u>Brown v. E.V. Hutton Grp., Inc.</u>, 991 F.2d
1020, 1032 n.4, 1033 (2d Cir. 1993) (where risk disclosure was adequate and prospectus warned
potential investors not to rely on representations obtained elsewhere, reliance on allegedly
contradictory "oral statements, without further inquiry, was . . . reckless and unjustifiable").

statements were attributed to the mutual fund and the mutual fund bore "ultimate authority" for

them. Id. at 2302.  Courts have extended this principle to common law fraud claims based on the

sale of securities.  See Emps.' Ret. Sys. of Gov't of V.I. v. Morgan Stanley & Co., 814 F. Supp.

2d 344, 353 (S.D.N.Y. 2011) ("With respect to the Offering Memorandum, it clearly states, on

its face, it is not a statement by Morgan Stanley.  It states, the 'Offering Memorandum . . . has

been prepared by the Co-Issuers' . . . and notes that '[t]he Co-Issuers accept responsibility for the

information contained in this document . . . .  The fact that the Offering Memorandum is not a

statement by Morgan Stanley is fatal to this part of Plaintiff's claim.").

     Under a related line of cases, also grounded in the limited private right of action under

Section 10(b) of the Exchange Act, a secondary actor—any entity that is not the corporate issuer

of a security, Pac. Invs. Mgmt. Co. v. Mayer Brown LLP ("PIMCO"), 603 F.3d 144, 148 n.1 (2d

Cir. 2010), cert. denied, 131 S. Ct. 3021 (2011)—"cannot incur primary liability under the

[Exchange] Act for a statement not attributed to that actor at the time of its dissemination . . . ,

that is, in advance of the investment decision."  Wright v. Ernst & Young LLP, 152 F.3d 169,

175 (2d Cir. 1998); accord Shapiro v. Cantor, 123 F.3d 717 (2d Cir. 1997); see also PIMCO, 603

F.3d at 148 ("Absent attribution, plaintiffs cannot show that they relied on defendants' own false

statements, and participation in the creation of those statements amounts, at most, to aiding

abetting securities fraud.").

     The Second Circuit has further explained that the attribution test must be satisfied even

where there is a "public understanding that a secondary actor is at work behind the scenes . . . .

Unless the public's understanding is based on the [secondary actor's] articulated statement, the

source for that understanding does not matter."  PIMCO, 603 F.3d at 158 n.6 (internal quotation

marks omitted).  For secondary actors who made no statements that were attributed to them, "no

matter how substantial [their] aid may be, it is not enough to trigger liability under Section

39

10(b)." <u>Shapiro</u>, 123 F.3d at 720.

Here, the alleged misrepresentations about which Plaintiff complains were the statements of the Issuer, Markov. The Offering Circular expressly stated that "THE ISSUER ACCEPT[S] RESPONSIBILITY FOR THE INFORMATION CONTAINED IN THIS DOCUMENT." Ex. G at ii. Similarly, Barclays and SSgA expressly disclaimed that they made "ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, TO ANY PERSON AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR," <u>id.</u> at iii, except for Barclays as to the specifically-defined "BARCLAYS INFORMATION" (which was limited information about Barclays' corporate structure and financial information, <u>id.</u> at 186), and except for SSgA as to the specifically-defined "COLLATERAL MANAGER INFORMATION (which was general information about SSgA, its ability to pursue its own commercial activities, and risks if SSgA resigned, <u>id.</u> at 48-49, 54-55, 172-73). Further and most critically, the Offering Circular expressly stated that "NOTHING CONTAINED IN THIS OFFERING CIRCULAR IS, OR SHALL BE RELIED UPON AS, A REPRESENTATION TO ANY PERSON BY" Barclays or SSgA, again except as to the "Barclays Information" and the "Collateral Manager Information." <u>Id.</u> at iii.

Given these express disclaimers of attribution for Barclays and SSgA, Plaintiff cannot point to any alleged misrepresentation by Defendants. <u>See Janus</u>, 131 S. Ct. at 2302-04; <u>PIMCO</u>, 603 F.3d at 158-59.[21]

---

[21]    As noted <u>supra</u> at 10 n.6, like Space Coast, Plaintiff asserts four categories of misleading statements beyond the collateral selection process. A misleading statement is another requirement for fraud-based claims. In <u>Space Coast</u>, this Court found only that alleged representations regarding the collateral selection process were pleaded with specificity, but this Court did not sustain any other alleged misrepresentations. <u>See Space Coast</u>, 2012 WL 946832, at *1. This Court should likewise dismiss any claims in this case based on alleged misrepresentations other than the collateral selection process. As for credit ratings and the designation of Markov as a "High Grade" CDO, it is undisputed that the Offering Circular

40

**E.    Plaintiff Fails to Plead a Violation of Section 20(a) of the Exchange Act Against Barclays Bank and State Street Corporation**

To establish a violation of Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) a control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks omitted). Because Plaintiff has not shown that Barclays or SSgA violated Section 10(b), Plaintiff's Section 20(a) claims against Barclays Bank and State Street Bank & Trust Company also fail.

Further, to be a "culpable participant," Plaintiff must plead "particularized facts of the controlling person's conscious misbehavior or recklessness." In re MBIA, Inc. Sec. Litig., 700 F. Supp. 2d 566, 598 (S.D.N.Y. 2010). Plaintiff has merely referenced documents that indicate State Street Corporation may have been aware that SSgA managed CDOs and invested in subprime. Those allegations, which do not even reference Markov, are not sufficiently particularized. See Kalin v. Xanboo, Inc., 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007) (dismissing section 20(a) claims for failure to plead particularized facts). For these same reasons, this Court

accurately reported the credit ratings provided by ratings agencies, and the resulting designation as a "High Grade CDO." The Offering Circular did not "vouch" for the ratings; to the contrary, they warned that "[c]redit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are not a guarantee of quality." Ex. G at 48. It is well settled that credit ratings are subjective opinions; such opinions can be false or misleading only if the opinion giver—the ratings agencies—did not truly believe them at the time they were given, and Plaintiff makes no such allegation. See N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010); Freidus v. ING Groep N.V., 736 F. Supp. 2d 816, 836 (S.D.N.Y. 2010); MBIA Ins. Corp. v. Merrill Lynch, 81 A.D.3d 419, 420 (1st Dep't 2011). As for the statistical analyses and models, Plaintiff does not even attempt to provide the "who, what, when, where and how"—what actually was provided, who provided it, when it was provided, or what it actually said. Such allegations are plainly insufficient under Rule 9(b). Plaintiff also vaguely refers to "private misrepresentations" by Barclays in "direct, private communications, including in-person meetings," ¶ 17, but again never provides the most basic "who, what, when, where and how."

41

in Space Coast dismissed precisely the same control person allegations against State Street Corporation.  Space Coast, 2012 WL 946832, at *2.[22]

## POINT III

## PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIMS SHOULD BE DISMISSED

In Space Coast, this Court dismissed the breach of fiduciary duty claims against SSgA, finding that allegations based on Defendants' "expertise and superior knowledge" were not sufficient to create a fiduciary responsibility.  Space Coast, 2012 WL 946832, at * 2.  So too here, as Plaintiff merely cites SSgA's "superior expertise and knowledge of the collateral assets included in or referenced by Markov" as the basis for its breach of fiduciary duty claim.  ¶ 199. Moreover, as described supra at 37, Bayerische Landesbank expressly disclaimed the existence of any fiduciary relationship with Defendants.  See Ex. G at 206-07.

Also as in Space Coast, the dismissal of the aiding and abetting claim against Barclays follows from the dismissal of the breach of fiduciary duty claim against SSgA.  Space Coast, 2012 WL 946832, at *2; see In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir. 2005) (claim for aiding and abetting breach of fiduciary duty requires breach of fiduciary duty by primary actor).

## POINT IV

## PLAINTIFF'S REMAINING CLAIMS AGAINST SSgA SHOULD BE DISMISSED

### A.      Plaintiff Fails to Plead Negligent Misrepresentation Against SSgA

In Landesbank, the Second Circuit affirmed the dismissal of a negligent misrepresentation claim against a CDO manager that is indistinguishable from the claim here, finding that the role of a CDO collateral manager did not create a special relationship with note

---

[22]      Plaintiff's Fraud-Based Claims fail for additional reasons, including inter alia that Defendants made no actionable misrepresentation, Plaintiff's claims are time-barred, and Plaintiff cannot establish reasonable reliance in light of the extensive risk disclosures in the Offering Circular.  Given this Court's ruling in Space Coast that such matters are fact-based, Barclays is not seeking dismissal on these grounds as a matter of law at the pleading stage.

holders sufficient to state a claim under New York law. Landesbank, 2012 WL 1352590, at *3.

The elements of a claim for negligent misrepresentation under New York law include, inter alia, that the defendant had a duty, as a result of a special relationship, to give correct information, and that the plaintiff reasonably relied on the information to its detriment. See Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000). In Landesbank, the Second Circuit held that there is no special relationship between a CDO collateral manager and a CDO investor sufficient to justify reasonable reliance, particularly where, as here, the CDO's offering documents explicitly disclaim such reliance. See Landesbank, 2012 WL 1352590, at *3. Landesbank found the requisite special relationship was absent because the CDO's offering documents disclaimed a fiduciary relationship between the CDO's collateral manager and the CDO's investors, id., and there could be no showing of special expertise on the part of the collateral manager sufficient to justify reliance because the CDO's investors had represented they were "sophisticated investor[s]" capable of conducting their own due diligence before making an investment decision. Id.

The same reasoning applies here in full force. Just as in Landesbank, the Markov Offering Circular explicitly disclaimed a fiduciary relationship between SSgA and Markov's investors. See Ex. G at 206-07. Furthermore, the Offering Circular, like that in Landesbank, required prospective investors to represent that they were "sophisticated investor[s]" capable of evaluating the risks of the transaction, that they had conducted their own due diligence before making an investment decision, and that they had not relied on any other representations of the collateral manager in deciding to purchase the Markov notes. See id. As a result, just as in Landesbank, the relationship between SSgA and Bayerische Landesbank with respect to Markov was that of a "buyer and seller in a standard arm's length transaction," and Plaintiff's negligent misrepresentation claim against SSgA should be dismissed. See Landesbank, 2012 WL

43

1352590, at *3.

**B.      Plaintiff Fails to Plead Breach of Contract Harming a Third Party Against SSgA**

Finally, Plaintiff's claim for breach of contract harming a third party against SSgA should

also be dismissed.  The Amended Complaint alleges that SSgA breached the terms of "the

Collateral Management Agreement, dated May 1, 2007, wherein State Street agreed to select

collateral for Markov in a manner set forth in the contract between the parties and for the benefit

of investors in Markov."  ¶ 209.  The Collateral Management Agreement between SSgA and

Markov was executed on the date that the CDO transaction closed, May 1, 2007.  Prior to that

closing date, SSgA's role in collateral selection was governed exclusively by the terms of an

engagement letter with Barclays (the "Engagement Letter"), executed in December 2006, and <u>not</u>

by the Collateral Management Agreement.  <u>See</u> Ex. Q at 1.  The pre-closing period is the period

during which virtually all of the collateral assets and reference assets for Markov were selected;

for example, the Offering Circular told investors that approximately 92.2% of the collateral for

Markov's portfolio would be selected prior to the closing date.  <u>See</u> Ex. G at 53.  SSgA was

acting pursuant to its obligations under the Engagement Letter, not the Collateral Management

Agreement, in that period.  The Amended Complaint does not allege that SSgA breached the

terms of its Engagement Letter with Barclays, nor can Plaintiff allege that it was an intended

beneficiary of that agreement, since that agreement explicitly forecloses liability to third parties.

<u>See</u> Ex. Q at 16; <u>see also</u> <u>India.com, Inc. v. Dalal</u>, 412 F.3d 315, 321-22 (2d Cir. 2005) (holding

that a contract clause expressly negating enforcement of the contract by third parties is

controlling).[23]  Because the Amended Complaint does not even provide sufficient allegations to

---

[23]      Here, the Engagement Letter explicitly provides: "Nothing in this Agreement, expressed
or implied, is intended to confer or does confer on any person or entity other than the parties
hereto or their respective successors and assigns, and to the extent expressly set forth herein, the
Indemnified Persons, any rights or remedies under or by reason of this Agreement or as a result

44

show that any of the allegedly breaching conduct occurred during a period after the closing date, and thus at a time when the Collateral Management Agreement was even in effect, Plaintiff's third-party beneficiary claim against SSgA fails entirely. Plaintiff simply has not properly alleged that SSgA did anything after May 1, 2007 in breach of the Collateral Management Agreement. And, no matter how the Court construes the allegations, the claim fails at least with respect to any allegations regarding SSgA's conduct prior to May 1, 2007, since the agreement in place during that period forecloses third-party beneficiary claims.

In addition to its failure to locate any actions by SSgA in the period when the Collateral Management Agreement was in effect, the Amended Complaint also mischaracterizes SSgA's obligations under that agreement. Paragraph 210 of the Amended Complaint claims that SSgA breached the Collateral Management Agreement because it "did not employ the bases and methods of collateral selection in the manner called for by the [CMA]." ¶ 210. But "failure to employ the bases and methods of collateral selection in the manner called for" is not a basis for liability under the agreement. And, as an alleged third-party beneficiary of the agreement, Plaintiff is bound by the limitations on liability contained in Section 13, as it is by all of the Collateral Management Agreement's terms. See BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 697 (2d Cir. 1993) (holding that a non-party "possessed no greater right to enforce a contract than the actual parties to the contract."); see also Restatement (Second) of Contracts § 309 cmt. b & c ("The right of a beneficiary is subject to any limitations imposed by the terms of the contract."). Plaintiff cannot simply assert that SSgA breached the Collateral Management Agreement without reference to the terms of that contract. Rather, it must fit SSgA's allegedly

---

of the services to be rendered by BBPLC or the Company hereunder." See Ex. Q at 16. This language mirrors the contract language deemed to expressly foreclose third-party liability in India, but is clearly distinguishable from the ambiguous contract language at issue in Aladdin, 2012 WL 3156441, at *16. Indeed, the Aladdin Court confirmed that the India language "definitely precluded any intent by the parties to confer a benefit on a third party." Id. at 19.

breaching conduct into one of the grounds for liability specifically identified in the agreement. It has not done so.

Even if Plaintiff had attempted to allege actions by SSgA that could give rise to liability under the Collateral Management Agreement, it would not have been able to do so. Section 13 of the CMA specifies only two grounds for liability by the collateral manager. See Ex. M at 21. First, the collateral manager can be liable if specific portions of the Offering Circular identified in Section 13 "contain[] any untrue statement of material fact or omit[] to state a material fact necessary in order the make the statements therein . . . not misleading." See id. At best, the Amended Complaint points only to a single statement from the Offering Circular that is the responsibility of the collateral manager under Section 13 of the CMA. See ¶ 121; Ex. G at 172 ("SSgA's fixed income process is designed to produce consistent returns . . . SSgA pursues an asset management style that is disciplined and seeks to control risk."). To the extent the Amended Complaint alleges that SSgA is liable under this standard, it alleges that SSgA participated in a fraud. And, indeed, the second basis for liability under the CMA is for "fraud, bad faith, willful misconduct, gross negligence or reckless disregard" on the part of the collateral manager. See Ex. M at 21. But the Amended Complaint does not sufficiently allege a fraud, in part because it fails to allege scienter or reliance. Its failure to do so is a second reason why Plaintiff has not adequately alleged a basis for liability under the Collateral Management Agreement. For this additional reason, Plaintiff's third-party beneficiary claim against SSgA should be dismissed.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety against all Defendants.

46

Dated:  New York, New York
        August 14, 2012

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP    ROPES & GRAY LLP

By: *Meredith Kotler by ck*              By: *Robert Jones by ck*
    Meredith Kotler                          Robert G. Jones
    Laura A. Zuckerwise                      Daniel J. Maher
    Clair B. Kwon

                                             Prudential Tower
One Liberty Plaza                            800 Boylston Street
New York, New York 10006                     Boston, Massachusetts   02199-3600
Telephone:  (212) 225-2000                   Telephone:  (617) 951-7564
Facsimile: (212) 225-3999                    Facsimile:  (617) 235-045

*Attorneys for Defendants Barclays Capital Inc., and*    *Attorneys for Defendants State Street*
*Barclays Bank PLC*                                      *Global Advisors, State Street Bank and*
                                                         *Trust Company, and State Street*
                                                         *Corporation*

## Appendix A

### Conclusory Allegations in Amended Complaint Regarding What Barclays "Knew"

| Paragraph | Allegation |
|---|---|
| 2 | "Barclays itself selected and even created certain of the assets referenced by Markov because it knew those assets would fail." |
| 77 | "Barclays knew that by 2007, the subprime mortgage market was on the precipice of collapse." |
| 133 | "Barclays knew that the collateral assets backing Markov were assigned credit ratings that fundamentally misrepresented their true risk." |
| 135 | "Barclays, however, in fact believed that the credit ratings assigned to Markov's collateral fundamentally misrepresented the risk posed by those assets. This was especially true in the case of the credit ratings assigned to the tranches of the Mezzanine CDO securities, which were backed by BBB rated RMBS tranches, most of which Barclays understood to be headed for default and total or near-total loss." |
| 137 | "Barclays knew that CDO tranche structures and the credit ratings of each of those tranches . . . were materially false and misleading, and did not reflect the true, severe risks of default and loss those assets posed.  Barclays knew that these ratings, which were based on ratings models . . . did not capture the true risk of these assets because the underlying credit ratings were inaccurate, and the historical rates of default did not reflect, among other things, the poor quality of underwriting of the loans backing the RMBS assets and the impact of a continuing decline in housing prices.  Barclays knew that the inaccurate credit ratings assigned to Markov's underlying collateral would render the ratings assigned to the offered Markov notes to be materially false and misleading." |
| 138 | "Barclays knew the ratings of Mezzanine CDO junior tranches did not reflect the true risk of those assets because the rating agencies' models did not sufficiently take into account the poor quality of the collateral backing RMBS assets or the impact of a continuing decline in housing prices." |

| 139 | "Barclays knew the ratings assigned to the Markov Chain CDOs were misleading because the Markov Chain CDO structure did not protect against collateral losses to the same extent as other Mezzanine CDO tranches with AAA ratings." |
|-----|------|
| 142 | "Barclays knew that these definitions [of High Grade CDO] created a misleading impression of the credit quality of "CDO High Grade Securities," as the ratings of the assets comprising the underlying portfolio misrepresented their true credit risk." |