**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BAYERISCHE LANDESBANK, NEW YORK BRANCH, <br><br>            Plaintiff, <br><br>     v. <br><br> BARCLAYS CAPITAL INC., BARCLAYS BANK PLC, STATE STREET GLOBAL ADVISORS, STATE STREET BANK AND TRUST COMPANY, and STATE STREET CORPORATION, <br><br>            Defendants. | Civil Action No. 12-3294 (LLS) (KNF) <br><br><br> **ECF CASE** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

# TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| **I.** | | INTRODUCTION ................................................................................ | 1 |
| **II.** | | STATEMENT OF FACTS .................................................................... | 3 |
| | **A.** | The Markov CDO ............................................................................ | 3 |
| | **B.** | Barclays Foresees the Housing Collapse and Secretly Bets Against Markov ........ | 4 |
| | **C.** | Barclays Enlists State Street to Carry Out the Fraud ................................. | 6 |
| | **D.** | Markov's Collateral Could Not Have Been Chosen By State Street, Because State Street Had Either Rejected or Was Unable to Analyze the Collateral ........................................................................ | 9 |
| | **E.** | Defendants' Misrepresentations .......................................................... | 11 |
| | **F.** | BayernLB's Reliance and State Street's Fiduciary and Contractual Role ........... | 12 |
| | **G.** | Markov Defaults, BayernLB Loses Its Entire Investment, and the Barclays and State Street Executives Responsible for Markov Resign .............................. | 13 |
| | **H.** | Procedural History ........................................................................ | 14 |
| **III.** | | ARGUMENT .................................................................................... | 14 |
| | **A.** | Defendants Do Not Dispute the Falsity of Their Statements ............................ | 15 |
| | **B.** | The Complaint Adequately Alleges Defendants' Scienter ............................... | 15 |
| | | **1.** The Law Has Not Changed Since The Court Sustained *Space Coast* ..... | 15 |
| | | **2.** Plaintiff Has Adequately Pled Barclays' Motive and Opportunity ......... | 18 |
| | | **3.** Plaintiff Has Adequately Pled Barclays' Conscious Misconduct............ | 21 |
| | | **4.** State Street's Scienter ............................................................. | 24 |
| | | **5.** Plaintiff Is Not Required to Plead Violations of Mortgage Underwriting Standards with Respect to Specific Mortgages ................. | 27 |
| | **C.** | Plaintiff Has Adequately Pled Reliance................................................ | 29 |
| | **D.** | The Alleged Misrepresentations Are Attributable to Defendants........................ | 34 |
| | **E.** | Plaintiff Has Sufficiently Pled Section 20(a) Claims ................................ | 37 |

**F.**     BayernLB Adequately Pleads a Negligent Misrepresentation Claim................... 38

**G.**     The Standards Governing BayernLB's Breach of Fiduciary Duty, Aiding
           and Abetting Breach of Fiduciary Duty, and Breach of Contract Claims ........... 40

**H.**     BayernLB Adequately Pleads Breach of Fiduciary Duty Against State
           Street and Aiding and Abetting Breach of Fiduciary Duty Against
           Barclays......................................................................................................... 41

**I.**     BayernLB Adequately Pleads Breach of Contract Harming a Third Party .......... 44

**J.**     Plaintiff Has Standing to Maintain This Action .................................................. 48

**IV.**  CONCLUSION............................................................................................................ 49

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Ambac Fin. Grp., Inc. Sec. Litig.,*
    693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................................................................21

*Anwar v. Fairfield Greenwich, Ltd.,*
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)....................................................................46

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)..........................................................................................41

*Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC,*
    --F.3d--, 2012 WL 3156411 (2d Cir. Aug. 6, 2012) ..................................... *passim*

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................................41

*In re BISYS Sec. Litig.,*
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)....................................................................38

*Borochoff v. GlaxoSmithKline PLC,*
    No. Civ. 5574(LLS), 2008 WL 2073421 (S.D.N.Y. May 9, 2008).......................16

*Caiola v. Citibank, N.A.,*
    295 F.3d 312 (2d Cir. 2002).............................................................................31, 32

*Caisse Nationale de Credit Agricole-CNCA, New York Branch v. Valcorp., Inc.,*
    No. 92 Civ. 1689 (KTD), 1992 WL 245500 (S.D.N.Y. Sept. 17, 1992) ..........48, 49

*Camofi Master LDC v. College P'ship, Inc.,*
    452 F. Supp. 2d 462 (S.D.N.Y. 2006)....................................................................46

*In re Citigroup Bond Litig.,*
    723 F. Supp. 2d 566 (S.D.N.Y. 2010)....................................................................31

*In re Citigroup Inc. Sec. Litig.,*
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)....................................................................21

*City of Roseville Employees' Retirement System v. Energy Solutions, Inc.,*
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)...............................................................36, 37

*CompuDyne Corp. v. Shane,*
    453 F. Supp. 2d 807 (S.D.N.Y. 2006)....................................................................37

*Dandong v. Pinnacle Performance Ltd.,*
    No. 10 Civ. 8086(LBS), 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) ...19, 20, 21, 33

*Dodona I, LLC v Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012)................................................................28

*EBC I, Inc. v. Goldman Sachs & Co.*,
    5 N.Y.3d 11 (N.Y. 2005) ................................................................41, 42

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F. 3d 189 (2d Cir. 2003)................................................................34

*Epirus Capital Mgmt., LLC v. Citigroup Inc.*,
    No. 09 Civ 2594(SHS), 2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010)................................27

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
    No. 02 Civ. 1312 (LMM), 2002 WL 31426310 (S.D.N.Y. Oct. 29, 2002) ............................31

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
    12 N.Y.3d 553 (N.Y. 2009) ................................................................43

*Fleisher v. Phoenix Life Ins. Co.*,
    --F. Supp. 2d.--, 2012 WL 1538357 (S.D.N.Y. May 3, 2012)................................48

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    No. 09 Civ. 4050(PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)........................27, 29

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)................................................................19

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................30, 32

*Global Intellicom, Inc. v Thomson Kernaghan & Co.*,
    No. 99 CIV 342(DLC), 1999 WL 544708 (S.D.N.Y. July 27, 1999)................22, 25, 26, 27

*Greenbaum v. Svenska Handelsbanken, NY*,
    26 F. Supp. 2d 649 (S.D.N.Y. 1998)................................................................49

*Hoff v. Popular, Inc.*,
    727 F. Supp. 2d 77 (D.P.R. 2010)................................................................20

*HSH Nordbank AG v. UBS AG*,
    941 N.Y.S.2d 59 (N.Y. App. Div. 2012) ................................................................32, 33

*Hunt v. Enzo Biochem, Inc.*,
    530 F. Supp. 2d 580 (S.D.N.Y. 2008)................................................................33

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010)................................................................29

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011)..........................................................................34, 35, 36, 37

*Jaquith v. Newhard*,
   No. 91 Civ. 7503 (PKL), 1993 WL 127212 (S.D.N.Y. Apr. 20, 1993)...................................30

*JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*,
   189 F. Supp. 2d 24 (S.D.N.Y. 2002)........................................................................31

*Kimmell v. Schaefer*,
   89 N.Y.2d 257 (N.Y. 1996) ...........................................................................38, 39

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*,
   No. 10 Civ. 7549, 2011 WL 4495034 (S.D.N.Y. Sept. 28, 2011), *aff'd*, No. 11-4443,
   2012 WL 1352590 (2d Cir. Apr. 19, 2012) ........................................................ *passim*

*In re Lehman Bros. Sec. & ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010).....................................................................29

*In re MBIA Sec. Litig.*,
   700 F. Supp. 2d (S.D.N.Y 2010)..........................................................................31

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
   881 N.Y.S.2d 364 (Sup. Ct. 2009)........................................................................31

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   No. 08-CV-8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010)..........................................29

*N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC*,
   720 F. Supp. 2d 254 (S.D.N.Y. 2010).....................................................................29

*In re National Century Financial Enterprises Inc.*,
   846 F. Supp. 2d 828 (S.D. Ohio 2012) ..................................................................36

*Nathel v. Siegal*,
   592 F. Supp. 2d 452 (S.D.N.Y. 2008)....................................................................34

*New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.*,
   No. 08 Civ. 5310(DAB), 2012 WL 1076143 (S.D.N.Y. Mar. 29, 2012) ...............................29

*In re NovaGold Res., Inc. Sec. Litig.*,
   629 F. Supp. 2d 272 (S.D.N.Y. 2009).....................................................................41

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..............................................................................24

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
   19 N.Y.3d 584 (N.Y. 2012) ..............................................................................43

*In re Parmalat Sec. Litig.*,
   383 F. Supp. 2d 616 (S.D.N.Y. 2005).................................................................37

*In re Parmalat Sec. Litig.*,
   497 F. Supp. 2d 526 (S.D.N.Y. 2007).................................................................37

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011).............................................................................28

*Quickie, LLC. v. Medtronic, Inc.*,
   No. 02 Civ. 1157(GEL), 2004 WL 74309 (S.D.N.Y. Jan.15, 2004) .....................46

*Rescuecom Corp. v. Google Inc.*,
   562 F.3d 123 (2d Cir. 2009)..............................................................................15

*Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010)................................................................29

*Roni LLC v. Arfa*,
   18 N.Y.3d 846 (N.Y. 2011) ..............................................................................42

*S. Cherry St. LLC v. Hennesse Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009).........................................................................20, 24

*S & K Sales Co. v. Nike, Inc.*,
   816 F.2d 843 (2d Cir. 1987)..............................................................................44

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)................................................................................24

*Shahzad v. Meyers*,
   No. 95 Civ. 6196 (DAB), 1997 WL 47817 (S.D.N.Y. Feb. 6, 1997) .....................21

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010)...........................................................20, 21

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001)................................................................................39

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002)..........................................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).....................................................................................23, 24

*Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*,
   136 F. Supp. 2d 253 (S.D.N.Y. 2001)................................................................46

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   692 F. Supp. 2d 387 (S.D.N.Y. 2010) ................................................................................28, 29

*United States v. Blum*,
   62 F.3d 63 (2d Cir. 1995) ...................................................................................................20

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
   712 F. Supp. 2d 958 (N.D. Cal. 2010) ...............................................................................29

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y.2003) .................................................................................38

**STATUTES**

15 U.S.C. § 78j(b) ...............................................................................................14, 31, 36, 37

15 U.S.C. § 78t(a) .............................................................................................................14, 37

15 U.S.C. § 78u-4(b)(1)(B) ....................................................................................................15

## I.      INTRODUCTION

Defendants' motion to dismiss must be denied because this Court has already sustained virtually all of the claims asserted in this action against the same Defendants based on the same transaction. Nothing has changed since this Court denied these same Defendants' motion to dismiss in *Space Coast* – not the facts, and not the law. Defendants' motion to dismiss this action simply rehashes the same arguments that the Court has already considered and rejected. Defendants' argument to the contrary is based on two non-controlling decisions of other courts issued after this Court's decision in *Space Coast*, neither of which mandates a different result here. Thus, Defendants' motion is no more than a dilatory maneuver and should be denied.

This Court has already sustained fraud-based claims in *Space Coast*, and Defendants concede the falsity of their misrepresentations on which Plaintiff Bayerische Landesbank, New York Branch ("BayernLB" or the "New York Branch") relied. Defendants do not even try to distinguish *Space Coast*, and instead pretend that the Court neglected to consider the numerous arguments they repeat here, simply because each failing argument was not expressly rejected in the order.  For example, Defendants focus on Plaintiff's allegations of scienter, but BayernLB's Complaint actually goes beyond the allegations in *Space Coast* that were found sufficient to allege scienter and provides additional detailed allegations of the Defendants' role in the Markov CDO transaction, knowledge of the true quality of the assets backing Markov, and parallel misconduct by the same Defendants involving the sale of other complex structured securities. Indeed, Defendants' suggestion that they were somehow unaware of their own roles in the transaction borders on the absurd, and is contradicted by a secret agreement between Barclays and State Street that Defendants submit with their motion. That agreement details that Barclays secretly controlled the selection of collateral for the Markov CDO, precisely as Plaintiff alleged. Likewise, this Court has already rejected Defendants' arguments concerning reliance in *Space*

*Coast*, and Defendants offer no persuasive reason to reach a different result here. Although Defendants deny responsibility for making the misrepresentations that give rise to Plaintiff's claim, remarkably, that same agreement between Barclays and State Street ***proves*** that Defendants prepared the Markov offering documents containing the misstatements at issue, and the offering documents were also prominently attributed to Defendants on their face. Thus, Defendants argument is contrary to both the Court's holding in *Space Coast* and their own document submitted in support of their motion.

Although this Court dismissed control-person claims against State Street Corporation in *Space Coast*, the Complaint in this action includes additional allegations of State Street Corporation's culpable participation in the fraud that satisfy any pleading burden that may apply in this regard. Plaintiff has also more than adequately pleaded claims for breach of fiduciary duty, negligent misrepresentation, and breach of contract. Indeed, the only relevant new case law, a recent ruling from the Second Circuit, supports sustaining the breach of fiduciary duty claim that was dismissed in *Space Coast*.

Defendants' challenge to Plaintiff's standing misreads a recent, non-controlling Second Circuit summary order, which actually supports Plaintiff's standing. Plaintiff BayernLB is the New York branch of Bayerische Landesbank in Germany. Defendants' assertion that the proper plaintiff would be Bayerische Landesbank in Germany ignores the clear statement in the very Second Circuit decision they cite that Plaintiff is the same legal entity as the German bank and that the German bank and its New York branch have identical legal claims. Thus, the New York branch is a proper plaintiff.[1]

---

[1]   In any event, Rule 17(a)(3) clearly provides that misnaming the proper plaintiff is not grounds for dismissal where the "real party in interest" can be substituted.

## II.   STATEMENT OF FACTS

This action arises out of the total investment losses suffered by BayernLB on the $57 million in AAA-rated notes it purchased from Barclays Capital Inc. issued by Markov CDO Ltd. ("Markov"). Markov was a collateralized debt obligation ("CDO") that had the shortest lifespan of any CDO on record, ***defaulting just six months after it was issued***. ¶149.[2] Defendants misrepresented the single most important fact about Markov: that the selection and management of the CDO's collateral assets was delegated to State Street Global Advisors ("State Street")—a purportedly experienced CDO manager with a "fiduciary heritage" whose ***sole*** obligation was to maximize return to benefit Markov and its noteholders, independent of Barclays. ¶¶2, 27, 124-26. Defendants also misrepresented State Street's due diligence, the true nature of Markov's collateral and Barclay's disbelief in the collateral's credit ratings, Barclay's improper use of its right to "consent" to control the selection of the collateral, and Barclay's scheme to design Markov to fail so Barclays could profit from a short position. ¶¶118-48.

### A.   The Markov CDO

Barclays—which structured, underwrote, and sold Markov's notes to investors, collecting millions of dollars in fees in the process—developed Markov as a way to bet against the impending housing collapse. ¶¶48' 65-83. Specifically, Barclays marketed Markov as a "High Grade" synthetic CDO that used synthetic assets (such as credit default swaps), and did not actually purchase, but instead "referenced," assets (such as residential mortgage backed securities ("RMBS")) through credit derivative transactions in which the CDO effectively "insured" the value of the referenced assets in return for periodic payments from the synthetic

---

[2] All citations in the form "¶__" are to the Amended Complaint ("Complaint") (ECF No. 6) filed on July 26, 2012.  Unless otherwise indicated, citations to "¶__" are to the Complaint, and all references to "Ex. __" are to the exhibits attached to the Declaration of Avi Josefson submitted herewith.  All emphasis is added unless otherwise indicated.

swap counterparty. ¶¶47-48. Because its assets were "synthetic," Barclays was able to build an approximately $2 billion portfolio with **cash** funding of only $400 million that was raised through the sale of Markov notes, including the AAA notes purchased by BayernLB. ¶¶48-49. Markov's noteholders, like BayernLB, were "long" Markov's synthetic assets, benefitting if those assets performed, while Barclays took the "short" position as swap counterparty, and would profit if the synthetic assets defaulted.[3] ¶4.

Barclays was not only "short" Markov's synthetic assets, but also controlled Markov's unfunded Super Senior Class S notes, which were obligated to fund Markov's swap obligations if defaults on the synthetic collateral required payments above the $400 million in "principal" funds from the sale of Markov notes. ¶¶49-51. Because of this arrangement, when Markov closed, Barclays was "in the money" on its notional $1.8 billion short position to the tune of $400 million, as it was entitled to the $400 million in cash and invested cash collateral that had been raised by selling Markov's notes to fund the swaps. ¶¶48-50. And, since it was also Markov's swap counterparty, Barclays had no actual exposure to loss as the holder of the Super Senior notes. ¶49. Because of this conflict in Barclays' roles, State Street's role as independent collateral manager was essential. ¶52.

### B.    Barclays Foresees the Housing Collapse and Secretly Bets Against Markov

As Barclays and State Street were pitching Markov to BayernLB in New York in March 2007, Barclays knew that the housing market was beginning to crack. ¶¶65-76; 77. While investors like BayernLB did not know what was in store, Barclays' entrenched position in the subprime mortgage market provided Barclays an exclusive insight into the deteriorating RMBS

---

[3] Barclays was also the valuation agent for Markov's synthetic collateral and was therefore able to value the swaps to its own advantage and cause Markov to fail overcollateralization and other structural "tests" intended to protect investors. State Street abdicated its role to guard against this risk. ¶¶51, 131-32.

market and how to profit from its collapse. ¶¶65-76; 77.

The Barclays personnel in charge of Markov, Kristopher Kraus, Edward Dale, Stephen King, and Rohit Chaku, modeled Barclays' scheme to profit from Markov by looking to another synthetic CDO transaction that their boss, Vince Balducci, had devised several years before. ¶64. Specifically, Balducci had orchestrated Barclays' effort to rid itself of unwanted assets by "dumping" them into a synthetic CDO named Corvus that Barclays designed and managed. ¶¶60-62. In October 2001, wanting to rid Barclays of certain exposures, Balducci decided to "hit the red eject button" on the Corvus CDO and began replacing its "good assets" with "bad assets." ¶62. (Barclays settled claims brought by Corvus investors shortly before trial. ¶63.)

By the beginning of 2007, Barclays was in a similar situation, as it faced tremendous risk from its newly acquired and increasingly perilous subprime exposure, and needed a similar escape hatch. ¶¶78-83. Through its review of the *$13 billion* in subprime loans it had securitized from eight of the originators whose loans underlay the RMBS referenced by Markov and its other extensive involvement in the subprime market, Barclays was keenly and uniquely aware of just how bad the subprime market had become and knew that the RMBS it could unload in Markov were doomed to fail. ¶66. Among other things, the singular insight that prompted Barclays to bet against the subprime market through Markov was informed by:

- The extensive due diligence Barclays performed on the individual loans in *166 RMBS* involving eight originators whose loans backed the RMBS referenced by Markov, which confirmed that RMBS backed by this collateral were far riskier than represented. ¶¶66-68. Barclays knew that *30%* of all loans reviewed by one of Barclays' due diligence providers from 2006 to mid-2007 failed the originators' underwriting guidelines, yet Barclays knowingly "waived in" and securitized approximately *28%* of these loans. ¶67.[4]

---

[4] In fact, Barclays represented to RMBS investors that it "conduct[ed] comprehensive due diligence on each purchased pool which [was] *more complete in scope and significantly more thorough than due diligence conducted by other buyers of [home equity loans]*," including on-site review by a Barclays employee of every "exception" loan included in Barclays RMBS. ¶68.

- The due diligence Barclays performed in extending billions of dollars of warehouse credit to several of the originators, including New Century, whose loans backed the RMBS purchased or referenced by Markov. ¶¶69-71.

- Barclays' forced acquisition from New Century in March 2007 of nearly *$1 billion* in loans on an "as-is" basis without any customary representations and warranties in order to avoid the risk of recovering nothing on the nearly $1 billion in warehouse lines of credit it had extended to the failing lender.[5]

- Barclays' fear in February 2007 that it would lose hundreds of millions of dollars as a result of its exposure as a lender to Bear Stearns hedge funds that soon imploded in July 2007. This experience convinced Barclays it would need to set up its own short position to protect itself from its own subprime mortgage exposure. ¶¶80-83.[6]

Barclays' decision to bet against investors through Markov was not out of character. Indeed, Barclays' internal emails reflect a corporate culture where fraud was simply part of doing business. In June 2012, U.S. and U.K. regulators fined Barclays $450 million after Barclays admitted to a multi-year effort to secretly and unlawfully manipulate the London Interbank Offered Rate ("LIBOR")—a critical interest rate for securities and loans, including RMBS and swaps included in Markov. Citing scores of Barclays emails, including one sent at the same time Barclays was devising Markov, the U.K. Chancellor of the Exchequer concluded that Barclays' "only motive was greed. . . . They knew what they were doing [was] wrong." ¶8.

### C.   Barclays Enlists State Street to Carry Out the Fraud

Building on its experience with Corvus, Barclays developed Markov as a way to earn virtually risk-free profits while reducing its own mortgage-related exposure. ¶88. But instead of

---

[5] Barclays' decision to bet against subprime mortgages through Markov was also influenced by its purchase in January 2007 of subprime lender EquiFirst, which it was able to acquire for $76 million—or *less than one-third* what it had agreed to pay just 10 weeks before—because of the spiking borrower defaults that began to imperil Equifirst. ¶¶78-79.

[6] State Street became aware of the imploding housing market by at least February 2007. Sean Flannery, one of State Street's "Key Personnel," testified that his team believed that the dramatic decline in the BBB tranche of the ABX index in February 2007 was a "function of this being used to set up shorts," revealing that State Street knew that certain investors were shorting subprime, which significantly affected the performance of the RMBS assets that were included or referenced by Markov. ¶110.

serving as the collateral manager for the deal (as Barclays had done in Corvus), Barclays enlisted State Street, which was more than willing to serve as Barclays' prop in order to avoid being frozen out of the CDO collateral management business, and to succeed in State Street's goal of **tripling** its business within three years. ¶105. Indeed, allowing third parties to dictate the selection of collateral had become a way of business at State Street, and virtually the only way it could avoid being "frozen out" of the CDO collateral-management business altogether—a risk that threatened the "very profitable" fees this business generated. ¶90.[7]

Consistent with this profit motive, State Street jumped at the opportunity to serve as collateral manager for Carina, a $1.5 billion CDO with such enticing fees that it was considered a "lay-up." ¶101. In Carina, State Street CDO head Frank Gianatasio allowed a hedge fund, Magnetar, to significantly influence Carina's collateral, even though Gianatasio knew Magnetar was effectively shorting Carina. ¶98. In a July 14, 2006 email, Gianatasio "absolutely" agreed to "[d]iscuss ramping up strategy [and] talk about each [asset] list as it goes out . . . a few times a week" with Magnetar. ¶97. Gianatasio replied to the hedge fund's December 6, 2006 email about shorting the next State Street-managed CDO that "I'm happy to discuss the CDO bucket with you." ¶98.

In fact, as revealed in the "Engagement Letter" dated December 8, 2006—**a mere two days after** Gianatasio wrote that he would be "happy" to discuss the CDO assets Magnetar would short—State Street contractually ceded to Barclays far greater control over its purported "selection" and due diligence of Markov's collateral assets than was ever disclosed to investors. ECF No. 17-17 (DX Q), at 2. The Engagement Letter, which was not submitted by Defendants in

---

[7] The CDO-management business was one of the three pillars of Barclay's strategy to triple its business and one of State Street's three "most profitable" "showcase" products; it was "very profitable to us," as Flannery stated in a February 2006 email. ¶106.

*Space Coast*, shows that Barclays controlled nearly every aspect of the selection of Markov's collateral portfolio. Specifically, under the Engagement Letter, Barclays' "***responsibilities***" included:

- "***advising*** [Markov] and [State Street] ***on the selection and acquisition***, with a veto right on acquisitions during the term of this Agreement" and

- "advising [Markov] and [State Street] on the recommended scope of due diligence for the Collateral."

ECF No. 17-7 (DX Q), at 2.

In sharp contrast to the prominent role Barclays played under the Defendants' "Engagement Letter," the ***only*** disclosure in the Offering Circular concerning the pre-closing asset-selection process stated that ***State Street*** would "***select***" the assets and that Barclays' was solely a warehouse provider: "the Collateral Assets to be Acquired by the Issuer ***were selected by the Collateral Manager*** subject to the consent of the Warehouse Provider prior to the Closing Date." ECF No. 17-7 (DX G), at 124. Defendants never disclosed Barclays' "***advisory***" role to BayernLB. Indeed, Barclays' "advisory" role reveals the falsity of State Street's numerous representations concerning its investment processes, which State Street led BayernLB to believe were conducted independently of Barclays and "designed to ensure that appropriate due diligence is conducted prior to any security purchase, and appropriate monitoring of a security performance is conducted on a regular basis." ¶121; Ex. A, at 172-73. According to Defendants' own document, however, the extent of State Street's due diligence was dictated by Barclays, which was responsible for ***advising*** State Street on how much diligence was "***recommended***"— an instrumental role in selecting the collateral that was concealed from BayernLB.

State Street's Flannery testified about how this hidden arrangement worked, echoing Gianatasio's deference to CDO "shorts" and stating that banks like Barclays tightly controlled

the collateral-management process and that State Street's role was minimal:

- [I]n the CDOs, we were hired by an investment bank to manage the assets . . . . And so the features or the types of assets and amounts of assets that would go into the CDO structure *was [sic] really more directed by the investment bank* in order to take guidelines from the ratings agency. ¶108.

In February 2012, State Street *admitted*—in a consent order settling an investigation by the Massachusetts Securities Division into State Street's representations concerning its purported management of Carina—that the importance of its role as an independent collateral manager "*cannot not be overstated*." ¶127. In that action, the Massachusetts Securities Division alleged violations of securities laws for statements that are nearly *identical* to those alleged as false in this action. *Compare* Consent Order, *In re State Street Global Advisors (Carina CDO, Ltd.)*, Docket Number 2011-0023 (Mass. Sec. Div. Feb. 28, 2012) (Ex. B) at pp. 3-4, 13, 14, 16-17 *with* ¶¶1, 6, 23-24, 124, 131-32. In the settlement, State Street admitted to a statement of facts that includes emails among three of the "Key Personnel" in charge of Markov, including Gianatasio, Flannery, and Michael O'Hara, and shows how State Street ceded its asset-selection role to Deutsche Bank in Carina, just as it abdicated that role to Barclays in Markov.

### D. Markov's Collateral Could Not Have Been Chosen By State Street, Because State Street Had Either Rejected or Was Unable to Analyze the Collateral

An investigation into Markov's collateral, with the benefit of discovery and testimony from other litigation involving State Street's fixed income group, reveals that the assets would not have been chosen had State Street performed the independent analysis it promised investors:

- Contrary to State Street's representation that it avoided excessive CDO buckets, Markov had one of the largest such buckets available for "High Grade" CDOs (35%), and 32% of Markov's collateral, or $635 million, consisted of other CDOs, nearly all of which were BBB rated and posed an extremely high credit risk. ¶¶141-43.

- Another 15% of Markov's collateral consisted of $300 million of Markov Chain CDOs—bespoke synthetic transactions that could not be modeled or replicated—that were among Markov's riskiest assets. While Defendants

represented that the synthetic assets included in these Chain CDOs were "State Street selected," in fact, State Street could not and did not select these assets, as it lacked the necessary expertise to evaluate them. ¶114.[8]

- Four of the securities that Barclays "shorted" as synthetic counterparty to Markov were underwritten by Barclays; 21 of the securities referenced in the Markov Chain CDOs were underwritten by Barclays; and, in all, Barclays was short $80 million in securities Barclays itself had underwritten containing loans from New Century, Countrywide, and Option One—lenders that had originated hundreds of millions of dollars in loans securitized by Barclays and known by Barclays, based on its due diligence, to be defective. ¶85.

In fact, the *only* Barclays-underwritten securities included in Markov were ones Barclays wanted to move off its own books. For example, the only Barclays-underwritten RMBS purchased as a cash asset (and not synthetically referenced) consisted of New Century loans (acquired by Barclays just as the lender was imploding) and was sold to the CDO via a private placement, out of the public's view. ¶86.

Even worse, Barclays included in Markov two securities issued from a CDO that Barclays *itself* had created—the Pampelonne CDO II. ¶87. The securities Markov purchased from Pampelonne CDO II, which closed just two months before Markov, represented 20% of all "cash" CDO securities and the only "High Grade" CDO purchased by Markov. The Pampelonne CDO II, in turn, bought $20 million of Markov notes that Barclays could not otherwise sell. ¶87. In light of the hundreds of thousands of CDOs and RMBS underwritten by banks other than Barclays that State Street could have selected if acting independently, these selections cannot be explained by any independent analysis. ¶¶87, 89-91. Indeed, as reflected in evidence from litigation against State Street, State Street's CDO department *rejected* some of the very assets

---

[8] Gianatasio admitted in testimony that he did not understand basic analytical tools used in evaluating RMBS. ¶115. Similarly, a 2006 email from Michael Wands, one of the Markov "Key Personnel," to Flannery complained of the "seriousness" of the "inadequate portfolio analytics" used by State Street's fixed income department. ¶116. According to another internal 2006 State Street document, the inadequacy of State Street's RMBS analysis platform "introduce[d] a significant amount of risk" and "[q]uite frankly, managing our *current* business on this type of platform is extremely risky." ¶117.

that were included in Markov as presenting too great a credit risk; only Barclays' influence can explain these assets' inclusion in Markov. ¶¶113-14, 140.

State Street had no reason to care that Barclays was choosing Markov's assets. In an internal email from Flannery to State Street CFO Edward Resch on April 10, 2007, just weeks before Markov closed, Flannery explained that State Street's *clients* would suffer some "bruises" from the disruption in the RMBS market, but that State Street itself (as asset manager) was not similarly exposed. ¶¶30, 112. Indeed, State Street *refused* to purchase Markov's equity tranche (which would have helped align its interests with Markov's noteholders), even though collateral managers commonly did so, and State Street had done so in other CDOs it managed. ¶143.

### E.    Defendants' Misrepresentations

Defendants concealed the true nature of the Markov CDO and the fact that State Street had abdicated its duties as an independent collateral manager in misrepresentations contained in Markov's marketing materials and other governing documents, as well as statements made in direct email, telephonic, and in-person communications.[9]

In fact, representatives from BayernLB met with representatives from State Street at Barclays' offices to discuss State Street's qualifications to serve as collateral manager for Markov—a meeting that provided assurance to BayernLB that its $57 million investment in Markov was sound. ¶¶17, 27, 200. Indeed, over 35 pages in Markov's 68-page Pitchbook that Barclays provided to BayernLB were devoted to explaining State Street's role and expertise as independent collateral manager on behalf of Markov and its investors. ¶120. Defendants' misrepresentations also included:

---

[9] These included (a) a "pitchbook" dated March 2007 (the "Pitchbook"), (b) a "discussion sheet" dated March 2007, (c) an "offering circular" dated May 1, 2007 (the "Offering Circular"), (d) the Collateral Management Agreement between Markov and State Street Bank and Trust Company, acting through State Street Global Advisors, dated May 1, 2007 (the "CMA"), and (e) the Markov CDO I Indenture, dated May 1, 2007 (collectively, the "Offering Materials").

- That State Street's fixed-income process was "*designed to produce consistent returns*" by "pursu[ing] an asset management style that is *disciplined and seeks to control risk,*" and "ensure[d] that appropriate due diligence is conducted prior to any security purchase, and appropriate monitoring of security performance is conducted on a regular basis for as long as the security remains in the portfolio." ¶121. State Street explicitly affirmed that it verified the accuracy of these statements. Ex. A, at iii; 172-73.

- That Markov's cash and synthetic assets would be "*selected*" by State Street; that Markov's performance "depends heavily on the skills of the Collateral Manager in analyzing, selecting and managing the Collateral Assets"; and that State Street would "perform its obligations . . . in *good faith*, using a degree of skill and attention no less than customarily used" by institutional investors that deal in assets of the type of those selected for Markov. ¶122-23.

- That State Street would select the assets for Markov "*solely* with the objective of maximizing the Issuer's return," i.e., to benefit Markov's noteholders, and that it would not acquire any asset "*in the expectation that it or any obligation or security to which it refers will default*." ¶125.

- That State Street used a sophisticated platform to monitor Markov's collateral, including qualitative and quantitative analyses of underwriting standards and collateral creditworthiness, and used delinquency, default, and recovery projections and regression analyses to predict defaults in the RMBS's underlying loan pools and test cash flows in stress scenarios. ¶120.

Defendants also misrepresented the purported "consent" rights Barclays was granted as the warehouse provider for Markov's collateral assets. ¶¶129-30. While Defendants led BayernLB to believe that Barclays' "consent" rights would provide investors with an extra layer of protection, Barclays in fact used that power to influence State Street's selection of collateral assets and force Markov to purchase assets that were destined to fail. ¶¶129-30.

### F.   BayernLB's Reliance and State Street's Fiduciary and Contractual Role

BayernLB reasonably relied on Defendants' misrepresentations and reasonably expected that State Street was acting as a fiduciary in its best interests as a result of its direct communications with Defendants. ¶¶153-56. These included an in-person meeting at Barclays' offices in New York in March 2007 and a conference call with State Street representatives, including Gianatasio, in October 2007, during which BayernLB representatives asked questions

12

about Markov and its performance in reliance on State Street's superior expertise and knowledge. ¶¶27, 145-48, 200. In subsequent emails, State Street purported to respond to BayernLB's requests for additional information and assistance in analyzing its investment. ¶200.

Throughout this time, BayernLB understood that State Street—as it had indicated in the Offering Materials and in the Collateral Management Agreement ("CMA"), (ECF No. 17-13 (DX M)) (¶¶19, 51-52, 123, 125, 208-09)—was acting consistent with its "fiduciary heritage" and in the best interests of Markov investors. ¶201.[10]

### G. Markov Defaults, BayernLB Loses Its Entire Investment, and the Barclays and State Street Executives Responsible for Markov Resign

Markov defaulted just six months after BayernLB had spent nearly $60 million on its AAA notes, while Barclays reaped profits from Markov and reported record revenues the day after Markov defaulted. ¶¶20-21, 157. As the sole member of the controlling class of Markov notes, Barclays directed the sale and liquidation of the CDO collateral. ¶149.

Shortly after Markov's default, executives at Barclays and State Street responsible for their CDO businesses resigned or were forced out. ¶150. In November 2007, as Markov was defaulting, Balducci, Barclays' U.S. head of credit derivatives, who had conceived of Corvus and oversaw the key Barclays personnel responsible for Markov, and John Kreiter, Barclays' U.S. head of credit and RMBS trading, were both stripped of their responsibilities and later left the company. ¶150. At State Street, three of the "Key Personnel" in charge of Markov—Flannery, chief investment officer; Paul Greff, head of fixed income; and Michael O'Hara, head of active fixed income—left State Street the same month Markov defaulted. In January 2008, two other Markov "Key Personnel" were terminated—Gianatasio, the head of State Street's CDO group,

---

[10] The individuals responsible for Markov—including Flannery, Gianatasio, and Wands—are the same State Street employees whose actions Judge Holwell held to have breached ERISA fiduciary duty, and who served in a functionally *identical* capacity for Markov. ¶201.

and Michael Wands, director, North American Fixed Income—and State Street CEO William W. Hunt and COO Otello Sturino resigned. ¶151.

### H.    Procedural History

On April 26, 2011, the Space Coast Credit Union filed an action against the same Defendants named herein, alleging the same claims asserted by BayernLB over the identical conduct. *Space Coast Credit Union v. Barclays Capital Inc.*, No. 11-2802-LLS (S.D.N.Y. filed Apr. 26, 2011) (ECF No. 1). On March 20, 2012, this Court denied Defendants' motion to dismiss Space Coast's claims for violations of §10(b), common law fraud, fraudulent inducement, aiding and abetting fraud, negligent misrepresentation, and breach of contract. *Space Coast*, No. 11-2802-LLS, 2012 WL 946832 (S.D.N.Y. Mar. 20, 2012) (ECF No. 42). On July 26, 2012, BayernLB filed an amended complaint alleging claims for violations of §§10(b) and 20(a), fraud, fraudulent inducement, aiding and abetting fraud, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of duty, and breach of contract. *BayernLB*, No. 12-3294 (ECF No. 6). Rejecting Plaintiff's request to begin coordinating discovery in this action with *Space Coast* in light of the Court's denial of Defendants' motion to dismiss that action, Defendants moved to dismiss this action, raising arguments that were already considered and rejected by this Court. ECF No. 14.

## III.    ARGUMENT

In deciding Defendants' motion to dismiss Plaintiff's action for failure to state a claim, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009). The issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

## A.     Defendants Do Not Dispute the Falsity of Their Statements

As discussed in the Statement of Facts above, the Complaint alleges in detail that Defendants made false and misleading statements in the Offering Materials about (1) State Street's role as the purportedly independent collateral manager for Markov, (2) the due diligence State Street purportedly performed in selecting Markov's assets, (3) the true nature of Markov's collateral and Barclay's disbelief in the collateral's credit ratings, (4) Barclay's improper use of its ability to withhold "consent" to control State Street's selection of Markov's collateral, and (5) Barclays' scheme to design Markov to fail so that Barclays could profit from its short position and reduce its own exposure to similar CDO and RMBS positions. ¶¶118-56. These are the same statements in the same transaction that gave rise to the claims this Court sustained in *Space Coast*, 2012 WL 946832, at *1-2. Defendants' motion does not challenge the Complaint's allegations of false statements, which should therefore be deemed to be conceded.

## B.     The Complaint Adequately Alleges Defendants' Scienter

Plaintiff's claims under the Securities Exchange Act of 1934 ("Exchange Act") and for negligent misrepresentation, fraud, fraudulent inducement, and aiding and abetting fraud are subject to Rule 9(b), which requires that a complaint "state with particularity the circumstances constituting fraud" but also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Private Securities Litigation Reform Act of 1995 ("PSLRA"), which applies only to Plaintiff's claims under the Exchange Act, likewise requires those claims to allege Defendants' false statements and scienter with particularity. 15 U.S.C. § 78u-4(b)(1)(B), (2)(A). The Complaint easily satisfies these standards.

### 1.     The Law Has Not Changed Since The Court Sustained *Space Coast*

"To satisfy the scienter requirement, a complaint must allege facts (1) showing that the defendants had both motive and opportunity to commit the fraud *or* (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness." *Borochoff v. GlaxoSmithKline PLC*, 2008 WL 2073421, at *7 (S.D.N.Y. May 9, 2008) (Stanton, J.) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (emphasis added)). Here, Plaintiff satisfies both of these independent prongs. Indeed, this Court has already held in *Space Coast* that allegations substantially similar to those in this action adequately stated claims for fraud. *See* 2012 WL 946832, at *1-2. The Complaint here actually contains more detailed scienter allegations than the *Space Coast* complaint. For example, the Complaint alleges that Barclays securitized over $13 billion of mortgages originated by eight lenders whose loans were referenced by the Markov collateral, and that Barclays learned from its due diligence that nearly 30% of the loans reviewed by one major due-diligence contractor violated the lenders' underwriting guidelines, yet Barclays "waived in" and securitized 28% of the defective loans. ¶¶66-67. Barclays also extended over $6.6 billion of warehouse loans to mortgage lenders and learned from its due diligence of the lenders that they were issuing defective loans. ¶¶69-71. The Complaint also cites internal emails, as well as testimony and documents from other litigation involving State Street and Barclays, which demonstrate not only why Barclays was determined to bet against the housing collapse through Markov, but also how and why State Street ceded its role to Barclays to enable it to do so. ¶¶8, 94-102, 105-08,112-17. Thus, the facts are, if anything, stronger here than in *Space Coast*.

Defendants incorrectly imply that the relevant law has changed since this Court decided *Space Coast* because of the Second Circuit's non-precedential affirmance of Judge Pauley's decision in *Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*, 2011 WL 4495034 (S.D.N.Y. Sept. 28, 2011), *aff'd*, 2012 WL 1352590 (2d Cir. Apr. 19, 2012) (summary order) ("*LBBW*"). In reality, the Second Circuit's decision in *LBBW* in no way changed the law that

this Court already fully considered in denying the motion to dismiss in *Space Coast*. As an initial matter, the affirmance in *LBBW* was non-precedential, and ***Defendants already cited Judge Pauley's decision in* LBBW *in support of their motion to dismiss in* Space Coast**. *See Space Coast*, Joint Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Plaintiff's Complaint, at 5, 12 (S.D.N.Y. Dec. 23, 2011) (ECF No. 39), Ex. C. Thus, this Court has already considered *LBBW* and found that it does not support dismissal of the claims here.

Furthermore, the Second Circuit's decision in *LBBW* is clearly distinguishable from this case on its facts. There, the plaintiff simply alleged that Goldman Sachs and a CDO manager knew that the credit quality of assets underlying the CDO was worse than represented to investors. *See* 2012 WL 1352590, at *2. Thus, the claims in *LBBW* were not that the defendants made false statements and omissions about their own roles in the CDO transaction at issue, or in particular about which party selected the assets. And the court there held that the complaint did not adequately allege "that defendants had access to information that was inconsistent with their alleged misstatements [because the complaint did not] specifically identify the reports or statements containing this information." *Id.*

By contrast in this action, as in *Space Coast*, the gist of the claims is that Defendants represented that State Street would independently select the assets to be included in Markov, when in fact Barclays secretly controlled and manipulated the selection of the assets to benefit its short position. The Court has already held that substantially identical allegations in *Space Coast* that "Barclays believed [the assets] would fail" and that "[State Street] chose to cede power [over asset selection] to [Barclays], since [Barclays] would have used another collateral manager had [State Street] refused" were alleged with "plausibility . . . ." 2012 WL 946832, at *1. Like *Space Coast* and unlike *LBBW*, there can be no serious doubt that the Defendants here knew what their

own actual, undisclosed roles in Markov were. Indeed, the Engagement Letter revealed by Defendants for the first time in their motion to dismiss confirms that Barclays and State Street secretly agreed that Barclays would have far more control over the selection and due diligence of the Markov assets than Defendants represented to BayernLB. ECF No. 17-17, DX Q.

Thus, *LBBW* does not alter the result this Court reached in *Space Coast*. Indeed, Defendants' suggestion that the Second Circuit has somehow changed the law of scienter for CDO-related claims is belied by the more recent, precedential decision in *Aladdin*, where that court reversed the dismissal of BayernLB's gross-negligence claim based on a CDO manager's selection of assets for a CDO. *See Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, --F.3d--, 2012 WL 3156441, at *21 (2d Cir. Aug. 6, 2012) ("*Aladdin*"). Although not a fraud claim, according to the Second Circuit, "a claim for gross negligence will be sustained only if the plaintiff alleges facts plausibly suggesting that the defendant's conduct evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Id.* at *17. The *Aladdin* court held that the New York Branch adequately alleged conduct that "smack[ed] of intentional wrongdoing" by alleging that the CDO manager, contrary to its representations that it would act in investors' interests, actually selected assets adverse to their interests. *Id.* at *18. These allegations in *Aladdin* are similar to the New York Branch's allegations here that, contrary to Defendants' representations that State Street would act in investors' interests in selecting assets for Markov, State Street allowed Barclays to select assets adverse to investors' interests.

### 2. Plaintiff Has Adequately Pled Barclays' Motive and Opportunity

Barclays had both the motive and opportunity to commit fraud through its control of the collateral-selection process and the way the Markov CDO was structured, and Defendants merely rehash the same arguments in this regard that were already made in *Space Coast* and

rejected by the Court. *See Space Coast*, Joint Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint (ECF No. 29), Ex. D, 27-31. As discussed in the Statement of Facts above, Plaintiff has cited ample evidence in support of its allegation that Defendants engaged in a systematic design to defraud Plaintiff by designing Markov to fail. In particular, Defendants represented to the Markov investors in the Offering Materials that State Street independently selected the collateral for Markov and acted in the notes investors' interests in doing so, but Barclays secretly controlled the selection of the collateral and acted in its own interest as the short counterparty with interests adverse to the notes investors. ¶¶5-7, 52. Specifically, Barclays caused Markov to contain an extraordinarily high percentage of the riskiest types of CDOs, contrary to Defendants' representation that the collateral would not include "excessive CDO buckets" (¶55); and Barclays created "bespoke" synthetic CDOs for inclusion in Markov that were purportedly AAA rated, but actually consisted of much riskier BBB rated RMBS tranches hand-picked by Barclays (¶¶56-57).

Judge Sands' decision denying a motion to dismiss fraud claims in *Pinnacle* is dispositive on this issue. Plaintiffs there alleged that their "principal was invested not in highly secure 'underlying assets' but in custom-made synthetic CDOs that were at best risky and possibly rigged to fail." *Dandong v. Pinnacle Performance Ltd.*, 2011 WL 5170293, at *11 (S.D.N.Y. Oct. 31, 2011). The court found that plaintiffs pleaded "what amounts to self-dealing by Morgan Stanley, insofar as Morgan Stanley was betting against, or 'shorting,' the synthetic CDOs that it had itself created….Morgan Stanley's positions on both sides of the deal adequately alleges motive." *Id.* at *12; *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) (self-dealing sufficient to establish motive).

Barclays' motive is further evidenced by its own conduct concerning the Corvus CDO,

which Barclays loaded up with "bad" assets that it wanted to remove from its own balance sheet, including bespoke CDOs like the ones Barclays later created for Markov. ¶¶ 60-63. Like Markov, Barclays' dumping of bad assets into Corvus caused massive losses for the CDO's investors. ¶64. This near-identical scheme that Barclays perpetrated to defraud investors through the use and creation of a synthetic CDO is relevant and admissible evidence as to Barclays' motive with respect to Markov. *See, e.g.*, *United States v. Blum*, 62 F.3d 63, 68 (2d Cir. 1995) (evidence directly relevant to showing motive is plainly admissible under Federal Rule of Evidence 404(b)). This is particularly so because many of the same Barclays employees who perpetrated the Corvus fraud also perpetrated the Markov fraud. ¶64.

Moreover, Plaintiff here is not alleging a general corporate motive that all companies possess. ECF No. 14 ("Def. Mem.") at 23. Plaintiff alleges a complex scheme by Barclays and State Street deliberately designed to defraud investors. *See Pinnacle*, 2011 WL 5170293, at *12 (more than just generalized motive pleaded where self-dealing bank was shorting the synthetic CDOs it created). It is not the law that "the appearance of corporate profitability or the success of an investment" can be achieved by fraudulent means. *S. Cherry St. LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).[11] Rather, courts have long recognized the probative value of a motive to profit on a discreet transaction as evidence of fraud.[12] Defendants in this action secretly contrived a rigged bet where every dollar lost by Plaintiff was gained by Barclays. This

---

[11] Defendants' recycled argument from *Space Coast* that Barclays lacked any motive from its "short" interest in Markov because it allegedly only served as the "Initial" Synthetic Asset Counterparty likewise fails here. Defs. Br. at 24 n.16; ECF No. 39, at 10. While Defendants are not permitted to allege their own facts on a motion to dismiss, Defendants' Exhibit Q makes clear that Barclays had "**sole discretion**" to determine whether to dispose of its short interest. Ex. Q, at ¶2(k).

[12] *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010) (allegation that defendants artificially inflated share price to effect a merger sufficed to allege scienter); *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 92 (D.P.R. 2010) (corporation's desire to inflate the stock price in order to accomplish a specific stock offering sufficiently alleged scienter).

"transcend[s] a generic corporate desire" to profit, *SLM Corp.*, 740 F. Supp. 2d at 558, and instead evidences a plan to defraud investors. *See Pinnacle*, 2011 WL 5170293, at *12.

### 3. Plaintiff Has Adequately Pled Barclays' Conscious Misconduct

As discussed above, Plaintiff has adequately alleged Defendants' motive and opportunity to commit fraud in the Markov transaction, but motive is not required for a finding of scienter. *See In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 266 (S.D.N.Y. 2010) ("[E]ven when motive is lacking, plaintiffs may establish a 'strong' inference of scienter . . . by 'alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'").

Wholly independent of motive and opportunity, the Complaint's allegations give rise to a strong inference that Defendants knew, or recklessly disregarded, that Markov was designed to fail. Plaintiff alleges particularized facts in support of this strong inference. And again, Defendants merely rehash the same arguments in this regard that were rejected by the Court in *Space Coast*. *See* Ex. D, at 31-34.

Importantly, the essence of Barclays' fraud is that it concealed its role in selecting the collateral for Markov, and that role was necessarily within its knowledge. ¶¶2, 53-58. The "conscious misbehavior" scienter standard is met when a defendant knew that its statements about its own conduct were false by virtue of its role in a transaction.[13]

Barclays' prior conduct with respect to the Corvus CDO (discussed above in §II; *see* ¶¶60-64) is as relevant to Barclays' knowledge that Markov was built to fail as it is to Barclay's motive. *See, e.g., Global Intellicom, Inc. v Thomson Kernaghan & Co.*, 1999 WL 544708, at *9

---

[13] *See, e.g., In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (finding scienter where plaintiffs alleged defendant was "underwriter of the CDOs…knew the inputs and assumptions that went into creating these assets and thus was in the best position to recognize the threats they faced as the subprime mortgage market deteriorated"); *Shahzad v. Meyers*, 1997 WL 47817, at *8 (S.D.N.Y. Feb. 6, 1997) ("[A] fair inference can be drawn by the Court that if the Defendants were the underwriter, market maker, and owner, that the Defendants had knowledge that their representations were false.").

(S.D.N.Y. July 27, 1999) (allegations that the defendants had an incentive to short-sell stock due to a favorable conversion ratio, could do so without detection, and had a long history of similar schemes in other companies adequately pleaded scienter).

Plaintiff also alleges that Barclays knew of the excessively risky nature of the RMBS underlying Markov because Barclays had purchased and securitized over $13 billion in loans from eight originators whose loans backed the RMBS referenced by Markov. ¶66. Due diligence performed on those loans for Barclays from 2006 to mid-2007 revealed that almost 30% of the loans violated underwriting standards, but Barclays "waived in" and securitized approximately 28% of the loans known to be defective. ¶67. Yet Barclays represented to investors that its due diligence was "comprehensive" and "more complete in scope and significantly more thorough than due diligence conducted by other buyers of [home equity loans]." ¶68.

The Complaint ties these allegations about Barclays' defective due diligence of Barclays-underwritten RMBS directly to Markov by alleging that Barclays underwrote four RMBS shorted by it as Markov's CDS counterparty, 21 RMBS referenced in the Markov Chain CDOs, and eight RBMS indirectly referenced in the Markov Chain CDOs. ¶85. Thus, Barclays knew from its due diligence that these RMBS contained many defective loans.

Further evidence of Barclays' knowledge that the loans underlying Markov were defective is its warehouse-lending relationships with the mortgage originators, including New Century, which originated $750 million of loans referenced by Markov's synthetic assets. ¶¶ 69-72. The Complaint quotes former New Century employees who confirmed that New Century originated loans without regard to underwriting standards or credit quality, that Barclays was a main purchaser of New Century's loans, and that banks like Barclays saw the problems with the loans but nevertheless bought 90% to 95% of the loans despite their own due diligence showing

22

that far more than 10% of the loans were defective. ¶¶74-75. In March 2007, Barclays agreed to cancel $900 million of warehouse loans to New Century in exchange for the New Century mortgage loans Barclays had financed, without New Century providing customary representations and warranties about the loans' compliance with underwriting standards, because New Century threatened to enter bankruptcy and leave Barclays to recover what it could from the bankruptcy. ¶83. Barclays included an RMBS it had underwritten containing New Century loans in Markov's "cash" collateral, as well as the numerous New Century RMBS referenced in Markov's synthetic collateral. ¶¶72, 86.

Barclays' knowledge of the impending massive defaults on mortgages like those underlying Markov is further demonstrated by its April 2007 insistence on paying only $76 million for Equifirst, a subprime mortgage originator that Barclays had agreed to purchase for $225 million just weeks earlier in January 2007. ¶¶78-79.

During the same time period, Barclays learned from its dealings with two Bear Stearns hedge funds in February 2007 that there was then "extreme volatility and dropping prices in ABX indices that track the performance of bundles of asset-backed debt securities, particularly those tied to sub-prime mortgage debt." ¶80. Defendants' assertion that this allegation about February 2007 conditions relates to December 2007, when Barclays sued Bear Stearns (Defs. Mem. at 21), contradicts the Complaint and is not a proper inference on a 12(b)(6) motion.

Faced with this overwhelming evidence of scienter, Defendants do not provide any more plausible competing inference of innocence. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (if competing inferences of scienter and innocence are equally plausible, the tie goes to the plaintiff). Thus, Barclays' conscious misconduct is more than sufficient to satisfy the PSLRA's scienter pleading requirement; it is the only inference that can

be "rationally drawn from the facts alleged." *S. Cherry St.*, 573 F.3d at 111.

Finally, Barclays cannot contend that each Plaintiff's scienter allegations individually fails to raise the required inference because all of these allegations must be taken together to determine whether they give rise to the inference. *See Tellabs*, 551 U.S. at 325. Taken together, Plaintiff's allegations give rise to a strong inference of scienter.

### 4.       State Street's Scienter

State Street's scienter has likewise been adequately pleaded. State Street necessarily knew about its abdication of its own disclosed collateral-selection responsibilities, and State Street is merely rehashing arguments that have already been made in *Space Coast* and rejected by the Court. *See* Ex. D, at 34.

In any event, the Complaint's detailed allegations that State Street violated its disclosed CDO collateral-management practices and procedures demonstrate State Street's scienter.[14] Further evidence bolstering State Street's scienter is State Street's prior abdication of its purported independent collateral-manager role with respect to the Carina CDO in November 2006. Just as in Markov, State Street's disclosed collateral-manager role in Carina was false: State Street admitted in a February 2012 settlement with the Massachusetts Securities Division that it abdicated its independent collateral-manager role in Carina by secretly allowing Magnetar, which would profit if the collateral failed, to select the collateral. ¶¶92-94, 99.

The Engagement Letter dated December 8, 2006 between Barclays and State Street for Markov ECF No. 17-17 (DX Q) demonstrates that just as State Street abdicated its collateral-selection responsibilities in Carina to Magnetar, State Street abdicated its collateral-selection

---

[14] *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("[D]efendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness."); *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir. 2000) (same).

responsibilities in Markov to Barclays.[15] And this abdication in Markov occurred just two days after State Street received a December 6, 2006 email from Magnetar asking to discuss the contents of the Carina CDO that Magnetar wanted to short. ¶98. State Street officer Gianatasio replied to Magnetar that he "would be happy to discuss the CDO bucket with you." *Id.* Gianatasio was also a key State Street employee working on Markov. ¶95. Thus, during the same time period in both Markov and Carina, instead of independently selecting assets in the best interest of investors in the CDO notes as State Street represented it would do, State Street secretly and knowingly participated in the fraud by allowing a party with interests adverse to the notes investors to select the CDO assets. *See, e.g., Global Intellicom*, 1999 WL 544708, at *9.

Further evidence of State Street's scienter comes from a settlement between State Street and the SEC, in which State Street paid $250 million to settle allegations that it mismanaged a bond fund by secretly loading it with the same types of risky RMBS that were referenced by Markov. ¶103. And in an action by Prudential against State Street for mismanaging two other bond funds, an internal State Street presentation was disclosed that told employees to "take more active risk" and move away from State Street's reputation as a conservative risk manager, but not to disclose this directive to anyone outside State Street. ¶105. In the same action, State Street employee Flannery, who was also a key employee responsible for Markov, testified that "in the CDOs, . . .  the features or the types of assets and amounts of assets that would go into the CDO structure was [sic] really more directed by the investment bank . . . ." ¶108. Thus, State Street knew that it was taking more risk and allowing the investment bank that arranged a CDO to

---

[15] The undisclosed December 8, 2006 agreement provided that Barclays would "*advis[e]* [Markov] and [State Street] *on the selection and acquisition [of assets]*, with a veto right on acquisitions during the term of this Agreement" and would "*advis[e]* [Markov] and [State Street] *on the recommended scope of due diligence* for the Collateral" (ECF No. 17-17, DX Q, at 2), whereas the May 1, 2007 Offering Circular provided to BayernLB stated that *"[t]he Collateral Assets to be Acquired by [Markov] were selected by [State Street] subject to the consent of [Barclays]* . . . .". ECF No. 17-17, DX G, at 124.

choose the collateral, contrary to its representations to investors in Markov.

The Complaint also alleges evidence demonstrating that State Street knew about the undisclosed risks of the very types of securities referenced by Markov. Flannery testified that in February 2007 (the same time Markov was being set up), State Street concluded that the performance of BBB subprime securities (like those referenced by Markov) was being caused by hedge funds that were "bet[ting] against the lowest quality housing-related subprime securities" and "set[ting] up shorts." ¶110. Flannery sent an email to State Street Corp.'s CFO in April 2007 stating that "it is fairly likely that we, and the markets, will be wrestling with mortgage-related issues for some time and . . . we may take some bruises along the way." ¶112. Flannery clarified in his testimony that the "bruises" would be taken by investors in State Street's CDOs and other managed products, not by State Street itself. *Id.* State Street's CDO department (which worked on Markov) rejected 11 of the 20 RMBS constituting the BBB 2006-02 ABX Index for having excessive credit risk, but Markov included 15 RMBS issued by the same trusts constituting that index, and the Markov Chain CDOs referenced seven of the very same RMBS constituting that index. ¶113. An internal State Street presentation acknowledged that the higher-rated RMBS issued by the same trusts experienced market declines in March 2007 similar to those experienced by the lower-rated tranches in February. ¶114. Thus, State Street knew that Markov included high-risk securities, contrary to its representations to investors.

State Street also knew that its technology was inadequate to perform its responsibilities as Markov's collateral manager. The Markov Pitchbook represented that State Street used an "[i]nternally developed, proprietary web-based surveillance platform," "[m]ultiple levels of analysis at both deal and tranche level allow[ing] for early detection of negative collateral performance," and "[u]pdated stress testing based on current collateral characteristics for

underperforming deals." ¶116. Yet State Street's director, North American Fixed Income, wrote in a 2006 email to Flannery that his group had "inadequate portfolio analytics that are used to manage the mandates and strategies that we are involved in" and "severely flawed and inadequate infrastructure that the funds are built on . . . ." *Id.* Another 2006 internal State Street document stated that "growing our business on this type of foundation introduces a significant amount of risk. Quite frankly, managing our current business on this type of platform is extremely risky." ¶117. Thus, State Street knew that it could not perform its purported role as Markov's independent collateral manager and had actually abdicated that role to Barclays.

Cases cited by Defendants are inapposite. In *Epirus Capital Mgmt., LLC v. Citigroup Inc.*, 2010 WL 1779348, at *5 (S.D.N.Y. Apr. 29, 2010), plaintiffs did not plead "any facts to suggest that the performance or selection process for the allegedly worthless assets . . . was materially different from the performance or selection process for the other assets in [the] portfolio."[16] Plaintiff here, however, has pled with particularity that the collateral selection for Markov ran afoul of State Street's own guidelines for collateral selection (¶¶113, 160, 169, 208-10), evidencing that State Street did not control the selection of Markov's collateral.

### 5.    Plaintiff Is Not Required to Plead Violations of Mortgage Underwriting Standards with Respect to Specific Mortgages

BayernLB alleges that Defendants misrepresented State Street's role as an independent collateral manager for Markov so that Barclays could profit—allegations that are supported by contemporaneous internal emails, testimony, and other evidence involving the very individuals at Barclays and State Street responsible for Markov, as well as by Defendants' own Exhibit Q. This case is not about statements concerning the underwriting of loans backing RMBS, but about the

---

[16] Similarly, in *Footbridge*, 2010 WL 3790810, at *4, the court "note[d] at the outset that this [was] *not* a case where *risky*, subprime mortgage-backed securities *were inserted into a structured investment product without adequate disclosure.*'" That case has no application to the facts here.

roles Barclays and State Street represented they would play in the transaction and the nature of a

CDO, over 95% of whose collateral was not RMBS but rather other CDOs or synthetic RMBS

and CDOs. Thus, the cases Defendants claim "required a plaintiff asserting fraud allegations

related to RMBS to tie its allegations of fraud to the specific mortgages underlying the RMBS at

issue" are off point. Def. Mem. at 17.[17] Significantly, this Court in *Space Coast* did not require

the specific pleading requirements Defendants' say are needed here.

Here, Plaintiff supports its allegations that Barclays and State Street intentionally

misrepresented their roles in the Markov transaction, and that Barclays knew it was designed to

fail, by pointing to Barclays' intimate knowledge of the systematic problems in the housing

market that led to the subprime crisis, including deviations from mortgage underwriting

standards generally. ¶¶20-21, 65-83. These facts, in addition to the other collective evidence

concerning Barclays' and State Street's manipulation of Markov, are more than adequate to

plead scienter. *See, e.g., Dodona I, LLC v Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 643-44

(S.D.N.Y. 2012) (distinguishing *LBBW* and citing collective allegations, including defendant's

use of Clayton data, performance of due diligence and role as underwriter, in finding scienter);

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762,

773-74 (1st Cir. 2011) (allegations that securitization machine was broken support allegations of

underwriting violations). Defendants mischaracterize *Tsereteli v. Residential Asset Securitization*

*Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010), which actually held that plaintiffs need not

identify "the [specific] loans underlying the Certificates [that] were issued in deviation from

---

[17]The cases cited by Defendants turned on misrepresentations about the quality of the RMBS and the improper underwriting of the underlying mortgages. Plaintiff here does not allege that the Defendants misrepresented the underwriting process of the mortgages underlying the particular RMBS backing any of Markov's collateral, and the cases cited by Defendants do not involve the central misrepresentation at issue in this case: that Defendants misrepresented their roles in the Markov transaction.

IndyMac Bank's underwriting standards." *Id.* at 392.

Plaintiff's claim is not based on the allegation that Defendants misrepresent the quality of specific RMBS, or that underwriting processes of specific lenders whose loans backed Markov. For that reason, Defendants' cases, such as *New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.*, 2012 WL 1076143, at *13 (S.D.N.Y. Mar. 29, 2012), *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *13 (S.D.N.Y. Sept. 28, 2010), and the handful of other cases requiring that allegations concerning the abandonment of underwriting guidelines be linked to specific loans underlying the RMBS, are inapposite. Those cases do not involve the central misrepresentation at issue in this case: that Defendants misrepresented their roles in the Markov transaction. As noted above, Defendants have not challenged the sufficiency of any of the misrepresentations alleged by BayernLB. To the extent these cases touch upon *scienter*, they are aberrant and contrary to the weight of better-reasoned precedent, as numerous courts evaluating nearly identical allegations of widespread abandonment of underwriting guidelines have held that they are sufficient to state a claim.[18]

### C.    Plaintiff Has Adequately Pled Reliance

Lastly, Defendants argue that Plaintiff has not adequately pled reasonable reliance. Defs. Br. at 35-38. But this Court has already rejected Defendants' identical arguments in *Space Coast*:

> Defendants argue that because of the vast disclosures in Markov's offering documents, [Space Coast]'s predecessor, Eastern Financial, a sophisticated investor, could not have reasonably relied on any alleged misrepresentations. However, "Whether or not reliance on alleged misrepresentations is reasonable in

---

[18] *See, e.g., In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971 (N.D. Cal. 2010) (plaintiffs need not directly "tie[] any inconsistent underwriting conduct to the specific Certificates at issue in this case"); *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 509-10 (S.D.N.Y. 2010) (same); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010) (same); *N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC*, 720 F. Supp. 2d 254, 268-70 (S.D.N.Y. 2010) (same); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010) (same); *N.J. Carpenters Health Fund v. Residential Capital*, LLC, Nos. 08-CV-8781, 08-CV-5093 (HB), 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) (same).

> the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss." *Maloul v. Berkowitz*, No. 07 Civ. 8525 (LBS), 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008). Whether Eastern Financial's reliance was reasonable is not susceptible to decision as a matter of law, but left to further factual development.

2012 WL 946832, at *1. *See also Jaquith v. Newhard*, 1993 WL 127212, at *15 (S.D.N.Y. Apr. 20, 1993) ("[T]he reasonableness of the reliance cannot be resolved on a motion to dismiss."). Just as in *Space Coast*, the reasonableness of Plaintiff's reliance on Defendants' misrepresentations about Markov in this action should not be resolved without a full record.

Even as a pleading matter, Plaintiff adequately alleges its reliance on the Offering Materials and on oral misrepresentations made directly to Plaintiff by Barclays and State Street. ¶¶17, 27, 118, 153-56. Specifically, the Complaint alleges as follows:

> BayernLB reviewed the Offering Materials, including the Offering Circular and Pitchbook, the Indenture and other legal documents, ratings letters from Moody's and Standard & Poor's, and asset-level information about the Markov collateral portfolio provided by Barclays. Through that review, BaryernLB conducted an independent analysis that confirmed that the investment – as represented by Defendants – was appropriate. Critical to that determination were Barclays' and State Street's numerous representations concerning State Street's Collateral Manager role, which BayernLB understood greatly mitigated the risk of the investment. ¶155.

Defendants assert that because the Offering Materials contained boilerplate disclaimers, Plaintiff's reasonable reliance is negated. Defs. Br. at 35-38. But under Second Circuit law, such a defense requires that the particular facts alleged to have been misrepresented were actually disclosed, and Defendants do not assert that the truth about their misrepresentations was disclosed here. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) ("[E]ven assuming that [defendants'] disclosures were factually accurate, we cannot decide on the present record whether those disclosures were conveyed with sufficient 'intensity and credibility' as to

dispel the false impression created by [defendants'] alleged misrepresentations.").[19]

The boilerplate disclaimers upon which Defendants rely do not come close to revealing the substance of Defendants' misrepresentations and omissions. Defendants rely on disclaimers that investors should consider the likely level of defaults on the collateral; that Defendants were not acting as fiduciaries or financial advisers; that investors represented that they were sophisticated; and that investors had the opportunity to ask questions. Defs. Mem. at 37. None of these disclaimers says anything even remotely related to the concealed facts alleged by Plaintiff: that State Street abdicated its independent collateral manager role to Barclays, and that Barclays selected collateral that was intended to fail and was therefore adverse to the notes investors. As the Second Circuit held in *Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002), reliance is reasonable despite disclaimers that plaintiff would not rely on defendant's advice or recommendations, that plaintiff would make its own investment decisions, and that defendant was not a fiduciary or advisor. *See id.* at 330 ("A disclaimer is generally enforceable only if it tracks the substance of the alleged misrepresentation.").[20]

The Second Circuit's non-precedential affirmance in *LBBW*, even if it were binding,

---

[19] *See also M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, 881 N.Y.S.2d 364(Table), at *11 (Sup. Ct. 2009) ("In the absence of specific language . . . addressing the complaints by Plaintiff with respect to the quality of the collateral and the adequacy of [defendant's] underwriting, the disclaimers in the documents do not negate the reliance factor as a matter of law."); *In re MBIA Sec. Litig.*, 700 F. Supp. 2d at 581 (S.D.N.Y 2010) (rejecting defendants' "truth-on-the-market" argument that plaintiffs knew the truth about a CDO and holding that the defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint"); *In re Citigroup Bond Litig.*, 723 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (rejecting "truth on the market" defense where defendants "point to nothing that could allow the Court to find at this stage that sufficiently specific information about [defendants'] CDO holdings was already in the public domain as to defeat plaintiff's claim as a matter of law").

[20] *See also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 2002 WL 31426310, at *6 (S.D.N.Y. Oct. 29, 2002) (reliance reasonable despite disclaimers that neither party was relying on advice of other, plaintiff was evaluating transaction and making its own decision, and defendant was not acting as fiduciary or financial advisor); *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24, 27 (S.D.N.Y. 2002) (a disclaimer must provide a "clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim").

would not change the result dictated by the precedential decisions in *Ganino* and *Caiola*. While the disclaimers upon which the court relied in *LBBW* were similar to the ones cited by Defendants here, *LBBW* did not address misrepresentations regarding the roles of the collateral manager and investment bank in selecting collateral for the CDO at issue there. *See* 2012 WL 1352590, at *2. Thus, like the disclaimers relied on by Defendants here, the disclaimers relied on by the court in *LBBW* do not negate Plaintiff's reasonable reliance on Defendants' statements about a subject the disclaimers simply do not address.

The only other post-*Space Coast* case cited by Defendants, *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59 (N.Y. App. Div. 2012), is (like *LBBW*) both non-controlling and distinguishable on its facts. There, the plaintiff alleged that the defendants misrepresented a CDO's risk by selecting assets that satisfied the disclosed credit-rating criteria for the CDO but traded at wide spreads from their ratings. *See id.* at *64-65. There was no allegation that the defendants made any representations about the spreads at which the assets would trade relative to their ratings. *See id.* at *68 n.9 ("UBS never issued any warranty concerning any of the matters *HSH* claims were misrepresented"). Here, Defendants undeniably represented to Plaintiff that State Street would act independently in selecting assets for Markov.

Furthermore, the *HSH* court emphasized repeatedly that the plaintiff "agreed [in the transaction documents] that it was not relying on any advice from UBS . . . ." *Id.* at *61. Indeed, unlike this case, in *HSH* the plaintiff expressly disclaimed reliance on the offering documents and any other written representations by UBS.[21] Here, Plaintiff did not disclaim reliance on the

---

[21] *See id.* at *62 ("[The noteholder] acknowledges and agrees that . . . it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel, or ***representations*** (***whether written or oral***) of [UBS] or any of [its] affiliates . . . .") (alterations in original; emphasis added); *id.* at *67 ("it cannot be overemphasized that *HSH* agreed that it was purchasing the NS4 notes based on its own judgment . . . and not in reliance upon any views expressed by UBS"); *id.* at *69 ("*HSH* expressly disclaimed any reliance upon representations by UBS, ***whether written or oral***") (emphasis added).

Offering Materials prepared by Defendants, but was actually required to represent that it **did** rely on those materials.[22]

    *HSH* is also distinguishable because the court there held that "the true nature of the risk being assumed could have been ascertained from reviewing market data or other publicly available information" because the allegedly undisclosed information was precisely the market spreads of the CDO's assets. *Id.* at \*66; *see also id.* at \*70 ("the facts allegedly misrepresented were not peculiarly within UBS's knowledge"). By contrast here, Plaintiff could not have determined from any publicly available information that Barclays and State Street had secretly agreed to allow Barclays to control the selection of the assets for Markov. Thus, neither of the two post-*Space Coast* cases relied upon by Defendants supports their position that the Court should reach a different result here than it did in *Space Coast*.

    Furthermore, whether Plaintiff was a sophisticated investor (Defs. Mem. at 36) is of no consequence given the nature of the fraud alleged. *See Pinnacle*, 2011 WL 5170293, at \*14 ("[E]ven a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that Morgan Stanley would select inherently risky underlying assets and short them."). In any event, Plaintiff's "sophistication as [an] investor does not presumptively negate a finding of reliance." *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 599 (S.D.N.Y. 2008).

    Similarly, BayernLB's analysis of the Markov CDO at the time of entering into the transaction could not have uncovered Defendants' complex fraud. The facts that State Street had

---

[22] *See* Offering Circular, ECF No. 17-7 (DX G), at 207 ("the purchaser has carefully read the final Offering Circular . . . and has based its decision to purchase the Applicable Notes upon the information contained therein and is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuer, the Initial Purchasers, the Deposit Agreement Counterparty or the Collateral Manager, as to the Issuer, other than any in such Offering Circular") (emphasis added).

abdicated its collateral-manager responsibilities to Barclays and that Barclays was selecting high-risk collateral that it expected to fail were nowhere available in any document to which BayernLB had access. *See Nathel v. Siegal*, 592 F. Supp. 2d 452, 465-66 (S.D.N.Y. 2008) (investor justified in relying on a misrepresentation where documents not readily available). Defendants' cases are therefore irrelevant.[23]

Plaintiff relied on Defendants' misrepresentations that State Street would select collateral that was in Markov notes investors' best interest. Plaintiff did not and could not have known that in fact, collateral was selected by Barclays and was chosen to favor Barclays' short position. Thus, Plaintiff has demonstrated reasonable reliance.

### D.     The Alleged Misrepresentations Are Attributable to Defendants

Defendants' argument that the undisputedly false statements alleged by Plaintiff cannot be attributed to Defendants under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), is flatly refuted by their own Exhibit Q, the pre-closing agreement between State Street and Barclays. ECF No. 17-17.  At most, Defendants' argument raises a disputed question of fact that cannot be resolved on a motion to dismiss.

The December 8, 2006 agreement between Barclays and State Street with respect to Markov provides that "*[Barclays'] responsibilities hereunder shall include the following* . . .":

> (g) other than the Company Materials (as defined below), *preparing any preliminary offering circular (the "Preliminary Offering Circular") and final offering circular (the "Final Offering Circular"), or other offering document in respect of the Securities, including any amendments or supplements thereto (collectively, the "Offering Documents")* and other than the Company Materials, preparing supplemental marketing materials in respect of the Securities, including any confidential information memorandum, roadshow presentation, cash flow analyses and other summary information in connection with the Transaction or

---

[23] *See, e.g.*, *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F. 3d 189, 195 (2d Cir. 2003) (plaintiff *had* prior notice of the existence of material facts but did not insist that representation be included in the final written stock purchase agreement).

other written materials delivered to actual or prospective investors (the "Marketing Materials") . . . . (ECF No. 17-17, DX Q at 2-3.)

The "Company" is defined as State Street. *Id.* at 1. The "Company Materials," which under the clause quoted above are the only portions of the Offering Documents that were not "prepar[ed]" by Barclays, were prepared by State Street:

> [W]ith respect to any offering of Securities, . . . [State Street] will (i) provide any material and necessary information relating to [State Street] or any of its affiliates to be included in the Offering Documents (the "Company OM Materials"), (ii) to the extent reasonably requested, cooperate with [Barclays] and use its commercially reasonable efforts to provide such other material and necessary written information relating to [State Street] or any of its affiliates to be included in the Marketing Materials (together with the Company OM Materials, the "Company Materials") . . . .

ECF No. 17-17, DX Q at 4. Thus, Defendants' own exhibit demonstrates that *all* of the information in the Offering Documents was either ***"prepar[ed]" by Barclays* or *"provide[d]" by State Street***. These documents were prominently attributed to State Street and Barclays, whose names and corporate logos were featured in large type on the cover of the Offering Circular.

It is in no way surprising that State Street and Barclays prepared the Offering Documents and emblazoned their names on those documents, because Markov was a mere shell company set up as a special purpose vehicle for the transaction with no personnel of its own; thus, the Offering Documents were necessarily prepared entirely by State Street and Barclays. ¶¶35; 173.

Defendants attempt to come within the holding of *Janus* by citing disclaimers in the Offering Circular that the Defendants did not make "any representation or warranty, express or implied, to any person as to the accuracy or completeness of the information contained in this offering circular" except as to certain sections and that "nothing contained in this offering circular is, or shall be relied upon as a representation to any person by" Barclays or State Street, except as to those specified sections. Defs. Br. at 40. But Barclays and State Street themselves delivered the Offering Documents to Plaintiff and are therefore outside the scope of *Janus*, even

in light of the disclaimers on which they seek to rely. On similar facts in *In re National Century Financial Enterprises Inc.*, 846 F. Supp. 2d 828 (S.D. Ohio 2012), the court denied a motion for summary judgment by the underwriter defendant, Credit Suisse. *Id.* at 843. Like Defendants here, Credit Suisse argued that it could not be liable for statements in private placement memorandums ("PPMs") on *Janus* grounds because the PPMs belonged to the issuers. The court disagreed, even though the PPMs "expressly" represented that Credit Suisse owed *no* duty to noteholders to verify the completeness of the PPMs. *Id.* at 862. The court held that Credit Suisse's "focus on the PPMs 'belonging' to the issuers ignores the fact that it was CS who took these statements and put them into investors' hands. Even if Credit Suisse did not author every word in the PPMs, it did communicate them to investors." *Id.*

Finally, the indemnification provisions and limitations of liability in the Offering Circular further demonstrate that the disclaimers relied upon by Defendants do not negate State Street's 10(b) liability under *Janus*. The Offering Circular provides that State Street will not be liable for losses "incurred as a result of the actions or omissions of the Collateral Manager under the . . . Transaction Documents or with respect to the Preliminary Offering Circular or this final Offering Circular . . . ***except*** (i) ***by reason of the acts or the omissions of the Collateral Manager that constitute fraud, bad faith, willful misconduct, gross negligence or reckless disregard by it in the performance of its duties and obligations*** thereunder . . . ." Ex. A, at 178. Thus, the Offering Circular expressly preserved State Street's liability for fraud, bad faith, willful misconduct, or reckless disregard of its duties, such as its knowing or reckless abdication of its duties as the purportedly independent collateral manager for Markov as alleged by Plaintiff.

Under similar circumstances, Judge Koeltl held in *City of Roseville Employees' Retirement System v. Energy Solutions, Inc.*, 814 F. Supp. 2d 395 (S.D.N.Y. 2011), that language

in the allegedly false offering documents "indemnifying [a defendant] for material misstatements or omissions in the registration statement" meant that defendant could be liable for statements in the registration statement consistent with *Janus*, even though that document was attributed to another corporate entity. *Id.* at 418. The same result should apply here.

### E.     Plaintiff Has Sufficiently Pled Section 20(a) Claims

Plaintiff asserts control-person liability claims against Barclays Bank PLC ("BBPLC"), State Street Bank & Trust Company ("SSBTC"), and State Street Corp. ¶¶165-71. Allegations of control need not be "extremely detailed" to withstand a motion to dismiss. *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 627 (S.D.N.Y. 2005). The control-person inquiry is "fact-intensive . . . and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (citation omitted).

This Court has already sustained substantially identical control-person claims against BBPLC and SSBTC in *Space Coast*. *See* 2012 WL 946832, at *2. Defendants do not challenge Plaintiff's control-person claims against SSBTC, which should therefore be sustained. *See* Defs. Br. at 41-42. Defendants' only challenge to Plaintiff's control-person claims against BBPLC is their assertion that Plaintiff has not alleged an underlying violation of § 10(b). *Id.* at 41. For the reasons discussed above with respect to Plaintiff's 10(b) claim, Defendants argument fails.

Plaintiff respectfully submits that its allegations are also sufficient to state a § 20(a) claim against State Street Corp. Control-person liability requires (a) a primary violation of the securities laws and (b) control by the defendant over the primary violator, both of which have been adequately pleaded with respect to the underlying Defendant State Street. Plaintiff respectfully submits that the Court should reconsider its holding in *Space Coast* that "the controlling person's conscious misbehavior or recklessness" is required to be pleaded. 2012 WL 946832, at *2 (citation omitted). *See In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42

(S.D.N.Y. 2007); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 451 (S.D.N.Y. 2005); *In re WorldCom, Inc. Sec. Litig.,* 294 F. Supp. 2d 392, 415 (S.D.N.Y.2003).

Even if Plaintiff is required to plead State Street Corp.'s culpable participation in the fraud, the Complaint satisfies that test. Plaintiff alleges that State Street Corp.'s senior management and Board of Directors monitored and approved State Street's business strategy and that many of the executives of State Street were also executives of State Street Corp., including Flannery, who participated directly in the Markov fraud. ¶29. As discussed above, Flannery sent an email to State Street Corp.'s CFO in April 2007 discussing the elevated risk levels in the mortgage-related securities market and stating that there would be some "bruises along the way," which he later testified meant bruises for investors in State Street's managed products, not for State Street itself. ¶30. A July 2007 presentation to the State Street Corp. Board highlighted the increased fees State Street was able to generate through more active strategies such as CDOs like Markov, as opposed to its traditional passive index funds. *Id.* And State Street, particularly its CDO products, became ever more important parts of the overall business and profits of State Street Corp. during the relevant period. ¶¶31-33. Thus, the Complaint adequately alleges that State Street Corp. was a culpable participant in the fraud.

### F.     BayernLB Adequately Pleads a Negligent Misrepresentation Claim

Just as the Court sustained Space Coast's claim for negligent misrepresentation against State Street, BayernLB has adequately alleged that State Street, which had superior access to and knowledge concerning its true role in "selecting" Markov's collateral and the true credit risk of that collateral, owed a duty to BayernLB not to act negligently. ¶192; *Kimmell v. Schaefer*, 89 N.Y.2d 257, 262-63 (N.Y. 1996). Disregarding the Court's ruling in *Space Coast*, State Street invokes the Second Circuit's summary order in *LBBW* yet again to wrongly contend that certain limited disclaimers in the Offering Materials coupled with BayernLB's sophistication preclude a

"special relationship" that required State Street to provide correct information to BayernLB.

Again, the law has not changed and *LBBW* is not on point. BayernLB successfully asserts a negligent-misrepresentation claim because it adequately pleads facts supporting all three of the *Kimmel* factors that give rise to the "special relationship":

> (1) whether the person making the representation held or appeared to hold unique or special expertise; (2) whether a special relationship of trust or confidence existed between the parties; and (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001) (citing *Kimmell*, 89 N.Y.2d at 264).

Here, State Street held itself out as possessing specialized and unique expertise in evaluating and selecting Markov's collateral portfolio, including in the Markov Pitchbook and in direct communications and meetings with BayernLB representatives. ¶¶27, 116, 120, 192, 200. Indeed, Plaintiff relied on State Street's claimed expertise by repeatedly seeking information (such as documentation concerning Markov's collateral) from State Street that was unavailable to BayernLB. ¶152. Further, BayernLB depended entirely on State Street to properly evaluate, monitor, and select Markov's assets, and Plaintiff's numerous communications with State Street in reliance on that purported role formed a special relationship of trust and confidence such as that held sufficient under *Kimmell* and *Suez*. ¶¶200-01. Lastly, State Street was plainly aware, through the parties' direct communications and otherwise, that its representations concerning Markov would be used by BayernLB in making its investment decision. ¶¶17, 27, 200-01.

Such allegations more than suffice to meet BayernLB's burden at the pleading stage. *See Suez*, 250 F.3d at 103-04 (even where "special relationship of trust" was "sparsely pled," fiduciary duty was alleged where complaint "emphatically allege[d]" the other two *Kimmell* factors because defendants claimed to have "special knowledge" about venture and its founder

39

and knew that plaintiffs sought information about founder "to aid their investment decision").

Indeed, State Street has no answer to the Second Circuit's more recent, binding decision in *Aladdin*, where the court upheld Bayerische Landesbank's claim for gross negligence. *See* 2012 WL 3156441, at *15. The Second Circuit held that the kinds of facts establishing a duty of disclosure to support a negligent-misrepresentation claim were the same as those that supported Bayerische Landesbank's gross negligence claim. The facts the Second Circuit found to be sufficient in *Aladdin* perfectly describe BayernLB's relationship with State Street here:

> (1) Aladdin was aware that the [transaction documents] had the particular purpose of installing Aladdin as the Portfolio Manager to manage the Reference Portfolio on behalf of the Noteholders; (2) Bayerische was known to Aladdin and relied on Aladdin to perform its obligations pursuant to the [transaction documents]; and (3) Aladdin's conduct in soliciting Bayerische's investment and its representation that it would manage the CDO in Bayerische's favor evinced an understanding by Aladdin that Bayerische would rely on its performance.

*Aladdin*, 2012 WL 3156441, at *17.

Moreover, unlike in *LBBW*, neither the Offering Documents' purported disclaimers nor Plaintiff's alleged sophistication defeats reliance because the claims here arise from State Street's **knowing** abdication of its role as independent collateral manager, a fact "peculiarly within [State Street's] knowledge." *LBBW*, 2012 WL 1352590, at *3 . Indeed, State Street's promise that it would act "***solely***" on behalf of Markov's investors and BayernLB's numerous direct communications with State Street that appeared to confirm this fact (¶¶23, 27, 200) flatly distinguish the relationship here from the typical "buyer and seller in a standard arm's length transaction" held insufficient in *LBBW*. 2012 WL 1352590, at *3.

### G.    The Standards Governing BayernLB's Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, and Breach of Contract Claims

Plaintiff's fiduciary-duty and contract claims are governed by the notice pleading standard of Fed. R. Civ. P. 8(a), which requires only a "short and plain statement of the claim

showing that the pleader is entitled to relief." *In re NovaGold Res., Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 276 (S.D.N.Y. 2009). As the Supreme Court recently reaffirmed, "the pleading standard Rule 8 announces does not require 'detailed factual allegations.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted) ("The plausibility standard is ***not*** akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). A complaint need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### H.   BayernLB Adequately Pleads Breach of Fiduciary Duty Against State Street and Aiding and Abetting Breach of Fiduciary Duty Against Barclays

BayernLB adequately pleads that State Street breached its fiduciary duty. State Street erroneously argues that BayernLB has failed to plead this claim under Rule 8, but ignores the allegations in BayernLB's Complaint, citing instead a single allegation in the *Space Coast* complaint. BayernLB's allegations go beyond those in *Space Coast* and establish that State Street owed BayernLB fiduciary duties and breached those duties. The Offering Documents' purported disclaimers cited by State Street cannot immunize it from liability for that breach.

"A fiduciary relationship exists between two persons when one of them is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation," which is "necessarily [a] fact-specific" inquiry. *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (N.Y. 2005). It is fundamental that fiduciary "liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." *Id.* at 20. Indeed, the question of "[w]hether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss." *Id.* at 19.

Here, BayernLB alleges that it reposed trust and confidence in State Street based on State Street's "fiduciary heritage," expertise, and knowledge in evaluating, monitoring, and modeling

the performance of Markov's assets (as State Street had represented in the detailed description of its expertise in 35 of 68 pages of the Markov Pitchbook) and on BayernLB's communications with State Street before and after BayernLB purchased the Markov notes, which provided assurance to BayernLB that State Street was acting in BayernLB's best interests. ¶¶17, 27, 200-01. For example, in October 2007, representatives of State Street—including Gianatasio—held a conference call with BayernLB to discuss Markov's performance and recent market developments. During the call, BayernLB representatives, relying on State Street's superior expertise, discussed Markov's performance with State Street and asked for and received information about Markov's assets that was otherwise unobtainable by BayernLB. ¶200.

Indeed, BayernLB sent and received multiple emails requesting and, in some cases, receiving information and documentation concerning Markov's collateral that was available to BayernLB only from State Street, demonstrating that State Street was in the "best position to disclose" the true facts about Markov. *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848-49 (N.Y. 2011) (fiduciary relationship was alleged by purportedly "sophisticated" investors where defendants, who had "'particular experience and expertise' in the New York real estate market," "organized the . . . companies, solicited [plaintiffs'] involvement and exercised control over the invested funds" because they were "in the best position to disclose material facts to investors").

The individuals at State Street with responsibility for Markov purportedly performed a functionally identical role in "selecting" assets for Markov as they did in managing State Street's bond funds for its ERISA fiduciary clients. ¶¶114, 201. These facts adequately plead a fiduciary relationship. *See EBC I*, 5 N.Y.3d at 20 (fiduciary relationship alleged where plaintiff was "induced to and did repose confidence in Goldman Sachs' knowledge and expertise to advise it as to a fair IPO price and engage in honest dealings with [plaintiff's] best interest in mind").

42

*Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584 (N.Y. 2012), is not to the contrary. In *Oddo*, the court held that an investor in notes issued by two structured investment vehicles ("SIVs") failed to allege that the SIVs' collateral managers owed investors a fiduciary duty. *Id.* at 593. Significantly, the plaintiffs in *Oddo* had "***no direct dealings with***" the collateral managers, and the complaint "***never alleged any direct communications*** between plaintiff and the collateral managers, and consequently, there is insufficient factual basis to establish a relationship of higher trust between Oddo and [the collateral managers]." *Id.* at 593-94. Here, by contrast, BayernLB's complaint alleges numerous direct dealings with State Street. *See also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 561 (N.Y. 2009) (declining to find fiduciary relationship where "plaintiffs do not allege that ***they had direct contact or any relationship—contractual or otherwise***—with S & K").

Nor do the Offering Circular's purported disclaimers preclude a fiduciary relationship. These provisions, appearing under the heading "***Investment Decision***," only purport to disclaim a fiduciary relationship between State Street and investors "***in connection with their purchase***" of the Markov notes. Ex. A, at 206-07. That State Street was not in a position to advise investors, as a fiduciary, as to whether Markov was a suitable or wise investment in no way precludes a finding that State Street was acting in a fiduciary capacity in selecting and monitoring Markov's assets on behalf of BayernLB and in advising BayernLB concerning Markov's assets—a role defined not by BayernLB's status as a ***potential investor***, but as a Markov ***noteholder***. Indeed, BayernLB was entirely dependent on State Street's good-faith performance of its duties as collateral manager. Under *Aladdin*, any ambiguity concerning the extent and scope of this purported disclaimer ***must*** be construed against Barclays. *See Aladdin*, 2012 WL 3156441, at *9.

BayernLB has also pleaded that Barclays aided and abetted State Street's breach of

fiduciary duty. A claim for aiding and abetting a breach of fiduciary duty requires: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847-48 (2d Cir. 1987). Here, BayernLB has pleaded not only a breach of duty by State Street, but also that Barclays was the primary architect of that breach by inducing State Street to permit it to select the assets Barclays wanted to bet against.

## I.      BayernLB Adequately Pleads Breach of Contract Harming a Third Party

The motion to dismiss BayernLB's breach of contract claim fails for the same reason the motion to dismiss Space Coast's contract clam failed. BayernLB's Complaint "identifies a contract (the collateral management agreement between SSGA and Markov), and alleges that it was intended for the benefit of Markov's investors, and that SSGA breached that contract by allowing BarCap to select the collateral for Markov's portfolio." *Space Coast*, 2012 WL 946832, at *8; *see also* ¶¶209-10. State Street does not and cannot contest that BayernLB is an intended third-party beneficiary of the CMA. *See Aladdin*, 2012 WL 3156441, at *13 (finding third-party beneficiary contract claim adequately pleaded in action arising out of CDO losses).

Instead, State Street inexplicably argues that BayernLB has failed to allege a "basis for liability under the agreement" (Defs. Br. at 45), despite the Court's *Space Coast* decision and Plaintiff's numerous allegations detailing how State Street harmed Plaintiff by allowing Barclays to "select the collateral for Markov's portfolio" in contravention of the CMA. *Space Coast*, 2012 WL 946832, at *8; *see also* ¶¶1-2 (State Street ceded collateral-management role); ¶113 (State Street rejected its own analysts' findings); ¶¶123-25 (State Street did not "determin[e] the specific Collateral Assets . . . taking into consideration . . . the payment obligations of the Issuer"; "act[] on behalf of the Issuer" with respect to the synthetic assets; supervise and direct investment and reinvestment of CDO collateral "solely with the objective of maximizing the

44

Issuer's return"; ensure that "a Collateral Asset [was not acquired] in the expectation that it or any obligation or security to which it refers will default"; or "monitor[] the Collateral Assets…on an ongoing basis"); ¶¶208-10 (State Street did not "select" assets in manner required by CMA); *see also* CMA ECF NO. 17-13 (DX M) at 1-3 & Annex B. As this Court held in *Space Coast*, this conduct is a clear breach of the CMA's terms.[24]

State Street then argues that none of its numerous breaches are actionable, citing an exculpatory provision in the CMA that State Street never raised with the Court in *Space Coast*. State Street now, for the first time, contends that this provision means it is only contractually liable in two situations: (i) where there is "***any*** untrue statement of material fact or [omission of] a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading" in certain sections of the Offering Materials; and (ii) where State Street's conduct "constitutes fraud, bad faith, willful misconduct, gross negligence or reckless disregard" in the performance of or in respect of its duties as collateral manager. CMA ECF No. 17-13 (DX M), at 21. State Street contends that these provisions defeat BayernLB's contract claim because the "Complaint does not sufficiently allege fraud because it fails to allege scienter or reliance." But even assuming the exculpatory clauses are enforceable and apply to BayernLB, State Street's argument ignores the allegations in the Complaint.

First, BayernLB has alleged several misstatements in the specified sections of the Offering Materials that fall within the exculpatory clause's first exemption. *See, e.g.*, ¶121 (statements that State Street's fixed income process was "***designed to produce consistent returns***" by "pursu[ing] an asset management style that is ***disciplined and seeks to control risk,***"

---

[24] *See also* CMA ECF No. 17-13 (DX M) at 1-2 ("Collateral Manager ***shall***…determin[e] the specific Collateral Assets . . . taking into consideration, among other factors, the payment obligations of the Issuer . . . acting on behalf of the Issuer with respect to the Issuer's rights and obligations of the Issuer under any Synthetic Asset Agreement); *id.* at 3 (requiring "good faith" in performance of obligations).

and "was designed to ensure that appropriate due diligence is conducted prior to any security purchase, and appropriate monitoring of security performance is conducted on a regular basis for as long as the security remains in the portfolio" are false, and omitted that State Street had ceded control over asset selection and management). Indeed, the liability-limitation provision states that State Street is **strictly liable** for these misstatements, *i.e.*, there is no requirement that they be made with any culpable state of mind. These breaches are more than adequately pleaded and clearly fall outside the liability limitation.

Second, BayernLB has pleaded a fraud—and this Court has already sustained this very claim—in connection with State Street's performance of its duties under the CMA. *See Space Coast*, 2012 WL 946832, at *8. But even if Plaintiff had not pleaded a fraud, as it has, the liability limitation does not cover conduct constituting "bad faith," "willful misconduct," "gross negligence," or "reckless disregard," which are subject to Rule 8 and do not require a showing of reliance or scienter as do claims for fraud.

Indeed, the facts alleged here—that State Street ceded its role in performing its "sole" duty to select and manage a $2 billion portfolio so that Barclays could profit—evince conduct that smacks of intentional wrongdoing, extreme carelessness, and reckless indifference to investors' interests as required to show "bad faith," "willful misconduct," "gross negligence," or "reckless disregard," and any argument to the contrary presents an issue of fact that should be left for trial.[25] State Street did not simply fail in a good-faith effort to manage Markov's

---

[25] *See, e.g., Camofi Master LDC v. College P'ship, Inc.,* 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006) (Chin, J.) (determinations of "bad faith, willful misconduct or gross negligence" "generally present factual questions inappropriate for resolution on a motion to dismiss") (citing *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 400 (2d Cir. 2000); *Quickie, LLC. v. Medtronic, Inc.,* 2004 WL 74309, at *2 (S.D.N.Y. Jan.15, 2004) (Lynch, J.) (willful infringement is an "issue[] of fact for trial"); *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.,* 136 F. Supp. 2d 253, 256 (S.D.N.Y. 2001) (gross negligence is "a question of fact for a jury"); *Anwar v. Fairfield Greenwich, Ltd.,* 728 F. Supp. 2d 372, 419 n.15 (S.D.N.Y. 2010) (argument that

collateral; the Engagement Letter submitted by Defendants establishes that State Street secretly agreed with Barclays to surrender State Street's role as independent collateral manager, the very role it contracted to perform for Plaintiff's benefit.

State Street relies on that very document, which establishes its bad faith, to argue that the Engagement Letter precludes third-party beneficiary claims arising from the CMA. Specifically, State Street argues that because the Engagement Letter was in effect before Markov's closing, and because 92.2% of Markov's assets were purportedly selected by that time, BayernLB cannot make out a breach of contract claim. Defs. Br. at 44. Not so.

This Court has already rejected State Street's argument that a contract claim is unavailable because the CDO's assets were purportedly selected before the date of the CMA. *See* Defs.' *Space Coast* Joint Reply Memorandum of Law In Further Support of Defendants' Motion to Dismiss Plaintiff's Complaint, Ex. C, at 20 (arguing that 92.2% of assets were selected before closing). And even State Street acknowledges that at least 8% of the assets selected for Markov were selected after closing. Moreover, BayernLB alleges numerous facts concerning State Street's breaches ***following*** the transaction's closing—including that State Street abdicated its role in challenging Barclays' swap valuations (which could only have occurred post-closing) (¶¶19, 51); failed to appropriately monitor the performance of the collateral because it lacked the capacity to do so (¶¶131-32); and permitted Barclays to influence the asset-selection process throughout Markov's six-month lifespan (*passim*).

In any event, State Street's wrongful conduct before the closing of Markov does not absolve it of its breach. Indeed, the fact that Barclays had improperly influenced the collateral selection process throughout the ramp-up period meant that, on day one, State Street was in

---

provision barring liability except for "willful misconduct" or "reckless disregard" precluded a third-party beneficiary contract claim "***at the pleading stage…carries no water***").

breach of the CMA. *See, e.g., Fleisher v. Phoenix Life Ins. Co.*, --F. Supp. 2d.--2012 WL 1538357, at *7 (S.D.N.Y. May 3, 2012) ("The labeling and marketing Plaintiffs allege . . . must by its nature have occurred 'before the contract [was] entered into,' . . . [but] to the extent that any such representations were later memorialized in the Policies, any breach of those representations would inevitably constitute a breach of the express provisions of the Policies.").

### J.   Plaintiff Has Standing to Maintain This Action

It is well-settled that the domestic branch of a foreign bank, like Plaintiff New York Branch, is simply the U.S. branch of the same legal entity as the foreign bank and has standing to sue and be sued in U.S. courts. For example, Judge Duffy held in *Caisse Nationale de Credit Agricole-CNCA, New York Branch v. Valcorp., Inc.*, No. 92 Civ. 1689 (KTD), 1992 WL 245500 (S.D.N.Y. Sept. 17, 1992), that "[a]s the United States' branch of the [foreign] Bank, Credit Agricole, New York has standing to bring suit to collect the debt owed by [the defendant] to [a foreign] branch of the Bank." *Id.* at *3.[26]

The Second Circuit's recent decision in *Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC*, -- F.3d --, 2012 WL 3156441 (2d Cir. Aug. 6, 2012), confirms this longstanding principle. In that case, both the New York Branch and Bayerische Landesbank were named as plaintiffs. The court held that naming both as parties was redundant because they are the same legal entity: "Bayerische's New York branch . . . is not separately incorporated, has no legal identity separate from Bayerische Landesbank, and therefore has no standing to assert a claim against Aladdin ***independent** of Bayerische's claim*." *Id.* at *7

---

[26] Defendants' assertion that Plaintiff lacks standing because the Markov notes were purchased not by the New York Branch but by the London branch of Bayerische Landesbank (Defs. Br. at 11 n.7) is factually incorrect, as demonstrated in Plaintiff's accompanying Memorandum of Law Concerning the Application of Morrison Australia National Bank Ltd., 130 S. Ct. 2869 (2010). The evidence submitted by Plaintiff with that brief demonstrates that the Complaint's allegation that the New York Branch purchased the Markov notes (*see, e.g.*, ¶16) is correct.

(emphasis added). The court did not hold that the New York Branch, suing alone, would lack standing and did not dismiss the New York Branch's claims, but rather held that "***we will treat the claims of Bayerische Landesbank, New York Branch and Bayerische Landesbank as one and the same***." *Id.* Thus, *Aladdin* actually supports the New York Branch's standing to sue in its own name without redundantly adding Bayerische Landesbank, which is simply the same legal entity as the New York Branch and has identical claims.

Defendants' reliance on *Greenbaum v. Svenska Handelsbanken, NY*, 26 F. Supp. 2d 649 (S.D.N.Y. 1998), is misplaced. There, no question was presented concerning the standing to sue of a U.S. branch of a foreign bank. Rather, the only question presented and decided was whether employment-discrimination damages, for which the defendant's employee headcount was a factor, should be calculated based on headcount of the U.S. branch or the entire foreign bank. *See id.* at 650, 655. In deciding that question, the court correctly noted that "the domestic branch of a foreign bank is not a separate legal entity under either New York or federal law." *Id.* at 652. This is entirely consistent with *Aladdin*'s holding that the New York Branch's claims are identical to Bayerische Landesbank's claims because the New York Branch and Bayerische Landesbank are the same legal entity. The passing references in *Greenbaum* to a branch's ability to sue are dicta and are contrary to *Aladdin* and *Caisse Nationale de Credit Agricole-CNCA, New York Branch*.

If the Court determines that this action should be brought in the name of Bayerische Landesbank, Plaintiff respectfully requests leave to amend under Fed. R. Civ. P. 17(a)(3).

## IV.   CONCLUSION

For the reasons above, Defendants' motion should be denied in its entirety.

Dated: August 28, 2012                          Respectfully submitted,

                                                **BERNSTEIN LITOWITZ BERGER &
                                                GROSSMANN LLP**

/s/ Avi Josefson
_____
Gerald H. Silk
Avi Josefson
Jai Chandrasekhar
Michael D. Blatchley
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
jai@blbglaw.com
michaelb@blbglaw.com
*Counsel for Plaintiff Bayerische*
*Landesbank, New York Branch*